UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────

VINCENT S. LONG,

                                   Plaintiff,

                                                        9:17-cv-0916

v.
                                                        (GLS/TWD)

ANTHONY J. ANNUCCI; N. DOLDO; M.
MONTROY; L. MOORE; M. NITSHKE;
TAYLOR; L. SCHABER; and D. DINELLO,

                                   Defendants.

───────────────────────────────────────

APPEARANCES:                              OF COUNSEL:

VINCENT S. LONG
Plaintiff, *pro se*
9 Howell Street
Bath, New York 14810

BARBARA D. UNDERWOOD                      MATTHEW P. REED, ESQ.
Attorney General of the State of New York     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

This prisoner civil rights action commenced pursuant to 42 U.S.C. § 1983 has been

referred to the Court for Report and Recommendation by the Hon. Gary L. Sharpe, Senior United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff, formerly an inmate in custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), alleges violations of his rights under the

Eighth and Fourteenth Amendments, the American with Disabilities Act of 1990, 42 U.S.C. §§

12132-12134 ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation

Act") during his confinement at Cape Vincent Correctional Facility ("Cape Vincent").  (Dkt. No.

1.)  Defendants remaining following initial review are DOCCS Commissioner Anthony J.

Annucci ("Annucci"), Cape Vincent Superintendent N. Doldo ("Doldo"), Cape Vincent Deputy

Superintendent of Programs M. Montroy ("Montroy"), Cape Vincent Counselor L. Moore

("Moore"), Cape Vincent Counselor M. Nitschke ("Nitschke"), Cape Vincent Counselor Taylor

("Taylor"), Cape Vincent Nurse Administrator L. Schaber ("N.A. Schaber"), and DOCCS

Regional Medical Director for Cape Doctor Vincent D. Dinello ("Dr. Dinello").  (Dkt. No. 4.)

Claims surviving initial review are: (1) ADA and Rehabilitation Act claims against

Annucci, (2) Eighth Amendment conditions of confinement claims against Doldo, Montroy,

Moore, Nitschke, Taylor, and N.A. Schaber; (3) Eighth Amendment medical indifference claims

against Dr. Dinello and N.A. Schaber; and (4) Fourteenth Amendment due process claims

against Doldo, Montroy, Moore, and Schaber.  *Id.* at 22.

Presently before the Court is Defendants' motion for partial dismissal of Plaintiff's

complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), filed

on behalf of Defendants Doldo, Montroy, Moore, N.A. Schaber, and Dr. Dinello.  (Dkt. No. 16.)

Defendants move to dismiss the following claims: (1) Eighth Amendment conditions of

confinement claim related to Plaintiff's conditions in the Alcohol and Substance Abuse

Treatment program dorm ("ASAT dorm") against Doldo and Montroy for lack of personal

involvement; (2) Eighth Amendment conditions of confinement claim related to Plaintiff's

conditions in the infirmary against Doldo, Moore, and N.A. Schaber for lack of personal

involvement and against Montroy for failure to state a claim; (3) Fourteenth Amendment due

2

process claim related to Plaintiff's confinement in the infirmary against Doldo, Montroy, Moore, and N.A. Schaber for lack of personal involvement; and (4) Eighth Amendment medical indifference claim against Dr. Dinello and N.A. Schaber for failure to state a claim.  *Id.* at 22.[1] Plaintiff has not opposed the motion.[2]  For the reasons that follow, the Court recommends Defendants' motion be granted in part and denied in part.

## I.    BACKGROUND

The following relevant facts are derived from the face of Plaintiff's complaint and are accepted as true for the purposes of deciding this motion.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).[3]

Plaintiff arrived at Cape Vincent in March 2014.  (Dkt. No. 1 at 7.)  Medical records show he had pinched nerves in his back and hip and a foot condition at the time of his arrival.  (Dkt. No. 1-1 at 1-8.)  On May 7, 2014, Plaintiff requested he be allowed to order his own orthotics for his plantar fasciitis condition.  (Dkt. No. 1 at 8.)  N.A. Schaber denied his request and told Plaintiff he had to get them from the facility.  *Id.*  Plaintiff then requested orthotics from the facility.  *Id.*  On July 3, 2014, Plaintiff received a pair of medical boots, which he alleges were not made for a plantar fasciitis condition.  (Dkt. No.1 at 8; Dkt. No. 1-1 at 22.)

---

[1]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2]    "In deciding an unopposed motion to dismiss under Rule 12(b)(6), a court is to assume the truth of a pleading's factual allegations and test only its legal sufficiency."  *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000).  "If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal."  *Id*. at 323.

[3]    Plaintiff submitted 133 pages of exhibits to his complaint consisting primarily of medical and grievance records.  (Dkt. Nos. 1-1, 1-2.)  To the extent the exhibits are relevant to Plaintiff's complaint, they have been considered by the Court.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference.").

On July 25, 2014, a podiatrist recommended "semi-custom orthotics" for Plaintiff.  (Dkt. No. 1-1 at 15.)  Despite this recommendation, Dr. Dinello denied Plaintiff's requests for orthotics on September 29, 2014, and again on October 22, 2014.  (Dkt. No. 1 at 9.)  In November 2014, a physical therapist at the Watertown Correctional Facility also recommended orthotics for Plaintiff and noted that his foot condition was making his hip pain worse.  (Dkt. No. 1-1 at 31.)  Dr. Dinello denied the third request for orthotics on March 18, 2015.[4]  (Dkt. No. 1 at 10.)

Plaintiff alleges Dr. Dinello and N.A. Schaber acted with deliberate indifference to his serious medical needs by denying his numerous requests for orthotics.  (Dkt. No. 1 at 6.)  Plaintiff claims the lack of orthotics caused him pain and deteriorated his related hip conditions.  *Id.*

In June 2015, Plaintiff was transferred to the Alcohol and Substance Abuse Treatment Program ("ASAT") dorm even though non-party Dr. Palao had issued Plaintiff a medical permit removing him from all programs on March 24, 2015, which would not expire until September 24, 2015.  (Dkt. No. 1 at 11; Dkt. No. 1-1 at 41.)  On July 5, 2015, Plaintiff filed Grievance CV-10226-15 about his confinement in the ASAT dorm.  (Dkt. No. 1 at 12.)  Plaintiff claims he was moved to the program dorm and assigned work against his doctor's order, had to walk longer distances to the commissary, library, etc., and could not stretch as instructed by his doctor.  (Dkt. No. 1-2 at 30-31.)  According to Plaintiff, these conditions were making his medical problems worse.  *Id.*  The grievance was denied, and Plaintiff appealed to Superintendent Doldo.  *Id.* at 36.

On July 29, 2015, Doldo responded that Plaintiff was excused from all programs until August 16, 2015.  *Id.* at 37.  Plaintiff started medical idle status on August 3, 2015, but he

---

[4]    Plaintiff alleges Dr. Dinello also denied his request for the reissuance of his worn-out medical boots on April 10, 2015, but Defendants note in their motion that this denial was made by an individual with the initial "SCM."  (Dkt. Nos. 1-1 at 43; 16-1 at 24 n.8.)

remained in the ASAT dorm until August 10, 2015.  (Dkt. No. 1 at 12.)  Plaintiff claims his

conditions of confinement in the ASAT dorm violated his Eighth Amendment right to be free

from cruel and unusual punishment and contends that Doldo and Montroy have supervisory

liability because they learned of the conditions through the grievance procedure.  *Id.* at 5-6.

On September 15, 2015, Dr. Palao diagnosed Plaintiff with bone spurs near his heel as a

result of untreated plantar fasciitis.  *Id.* at 13.  Dr. Palao gave Plaintiff arch support for his boots,

but Plaintiff claims it exasperated the bone spurs.  *Id.*  Plaintiff was assigned to be a dorm porter

on September 26, 2015, despite his various medical conditions.  *Id.*

On September 29, 2015, Plaintiff underwent hip replacement surgery and received a lift

inside his boots to correct the leg length discrepancy that resulted from the surgery.  *Id.* at 13-14.

However, on December 2, 2015, N.A. Schaber took away Plaintiff's medical boots because Dr.

Perrier told her to do so.  *Id.* at 14.  Plaintiff claims Dr. Perrier never gave this instruction and the

regular boots worsened his plantar fasciitis condition.  *Id.*

After the hip replacement surgery, Plaintiff complained about hip pain, foot pain, bone

spurs, and knee pain.  *Id.* at 15.  On February 1, 2016, Plaintiff filed a request for reasonable

accommodations, asking for "shorter walking distance, higher toilets, grab bars for shower, etc."

(Dkt. No. 1-2 at 41-43.)  In response, Plaintiff was admitted to the infirmary on February 3,

2016, the only area at Cape Vincent with grab bars, while he awaited transfer to a medical

facility.  (Dkt. No. 1 at 16.)  Plaintiff signed the Reasonable Accommodation Form Modification

("RAFM") for housing in the infirmary on February 11, 2016, at Montroy's direction.  *Id.*

While housed in the infirmary, Plaintiff alleges he (1) could not attend programs or

access the law library; (2) ate leftover food and received no alternative food tray; (3) was denied

packages; and (4) had no opportunity for outside recreation.  *Id.* at 17-20.  On March 11, 2016,

Plaintiff's transfer request to another facility was denied by the Office of Classification and Movement because his present placement was "appropriate." (Dkt. No. 1-2 at 50.) Plaintiff remained in the infirmary.

On August 1, 2016, Plaintiff filed Grievance CV-10613-16 regarding the infirmary condition and demanded transfer to another facility that could accommodate his medical needs. (Dkt. No. 1-2 at 56-58.) On August 9, 2016, the Inmate Grievance Resolution Committee ("IGRC") responded that Plaintiff should file an updated RAFM to expedite his program transfer. *Id.* at 59. Plaintiff was offered a one-hour recreation period the same time as dinner and claims he was required to choose between having dinner when it was delivered or having outside recreation. (Dkt. No. 1 at 21.) Plaintiff appealed to Superintendent Doldo. (Dkt. No. 1-2 at 59.) Doldo responded on September 9, 2016, noting Plaintiff had been transferred to Wyoming Correctional Facility ("Wyoming") on August 11, 2016. (Dkt. No. 1-2 at 61.) Plaintiff claims, based on the foregoing, Doldo, Montroy, Moore, and N.A. Schaber are liable for the conditions of his confinement in the infirmary and for confining him to the infirmary without due process. (Dkt. No. 1 at 5-6.)

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Rule 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

6

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed, pursuant to Rule 12(b)(6), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*. 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P,* 949 F.2d 42, 47 (2d Cir. 1991).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's]

supporting papers liberally, and . . . interpret them to raise the strongest arguments that they

suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also*

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se*

complaints liberally even after *Twombly*).

## III.    DISCUSSION

### A.    Necessity of Personal Involvement for Supervisory Liability

Doldo and Montroy seek dismissal of Plaintiff's Eighth Amendment conditions of

confinement claims with regard to his time in the ASAT dorm based on lack of personal

involvement. (Dkt. No. 16-1 at 10-11.) Doldo, Moore, and N.A. Schaber seek dismissal of

Plaintiff's conditions of confinement with regard to his time in the infirmary on the same

grounds. *Id*. at 11-14. Doldo, Montroy, Moore, and N.A. Schaber all seek dismissal of

Plaintiff's Fourteenth Amendment due process claims against them also on the same grounds.

*Id*. at 14-17.

The law is clear that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each government-official defendant, through the official's own

individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 ("Government officials

may not be held liable for the unconstitutional conduct of their subordinates under a theory of

*respondeat superior*.").

The Second Circuit has held that a supervisory defendant may be personally involved in a

§ 1983 claim when: "(1) the defendant participated directly in the alleged constitutional

violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).[5]

Personal involvement will be found if the supervisory official "receives and acts on a prisoner's grievance or otherwise reviews ***and*** responds to a prisoner's complaint. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (emphasis added). Personal involvement will also be established if the supervisory official actually reviews a grievance that is "ongoing" such that the official could remedy the wrong. *Sanchez v. Graham*, No. 9:12-CV-1646 (NAM/DJS), 2016 WL 5854551, at *7 (N.D.N.Y. Sept. 12, 2016)[6]; *see also Hyatt v. Rock*, No. 9:15-CV-89 (DNH/DJS), 2018 WL 1470619, at *4 (N.D.N.Y. Feb. 16, 2018) (supervisor's denial of a grievance will establish personal involvement only if there is an ongoing situation which he can remedy).

---

[5]    The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

[6]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**B.      Personal Involvement as to Conditions of Confinement Claim Regarding the ASAT Dorm**

Plaintiff alleges Doldo and Montroy "were all part of forcing Plaintiff's move to ASAT program dorm" and "with the grievance procedures, all of these staff was [sic] informed of the issue."  (Dkt. No. 1 at 5.)

The Court finds Plaintiff has not plausibly alleged Montroy was personally involved in Plaintiff's conditions of confinement claim.  Plaintiff claims Montroy only learned about the conditions in ASAT in February 2016, six months after Plaintiff was moved out of the ASAT dorm.  (Dkt. No. 1 at 2.)  A supervisor's denial of a grievance will only establish personal involvement where there is an ongoing constitutional violation.  *Hyatt*, 2018 WL 1470619, at *4. A supervisory official who reviews the grievance is "personally involved" in an ongoing constitutional violation if he is confronted with a situation that he can remedy directly.  *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008).  If the official is confronted with a violation that has already occurred and is not ongoing, the official will not be found personally responsible for failing to "remedy" a violation.  *Id.*

Here, Plaintiff has not alleged Montroy knew of the alleged violation while it was ongoing and might have been able to act on it.  Therefore, the Court recommends dismissal of Plaintiff's Eighth Amendment conditions of confinement claim regarding the ASAT dorm against Montroy for lack of personal involvement.

In contrast, Plaintiff claims Doldo responded to two of his grievances regarding the conditions in the ASAT dorm while the confinement was ongoing.  (Dkt. No. 1-1 at 49; Dkt. No. 1-2 at 37.)  In Grievances CV-10226-15 and CV-10232-15, Plaintiff claims he was moved to an ASAT dorm on June 21, 2015, even though Dr. Palao had removed him from all programs until

September 24, 2015.  (Dkt. No. 1-1 at 45; Dkt. No. 1-2 at 31.)  Doldo contends he was not

personally involved because he delegated the matter to the nurse administrator, did not take

action to investigate this matter, and merely affirmed a previous denial.  (Dkt. No. 16 at 8-9.)  It

is true that the mere receipt of a complaint or the delegation to a subordinate to respond to the

complaint is not sufficient to establish personal involvement.  *See Walker v. Fischer*, No. 9:08-

CV-1078 (TJM/ATB), 2011 WL 4369116, at *7 (N.D.N.Y. July 25, 2011), *report and

recommendation adopted*, 2011 WL 4369096 (N.D.N.Y. Sept. 19, 2011), *aff'd*, 523 F. App'x 43

(2d Cir. 2013).

However, when a superintendent provides a detailed and specific response to the

grievance rather than a pro forma denial, the response may be enough to establish the

superintendent's personal involvement.  *See, e.g.*, *Walker*, 2011 WL 4369116 at *7 (denying

summary judgment on the issue of personal involvement when the defendant superintendent's

responses explained and defended the alleged constitutional deprivations).  Here, Doldo

responded to the grievance on July 29, 2015, and acknowledged Plaintiff was medically excused

from all programs at the time, and yet Plaintiff remained in the ASAT dorm until August 10,

2015.  (Dkt. No. 1-1 at 49; Dkt. No. 1-2 at 37; Dkt. No. 1 at 12.)  The Court finds Plaintiff has

plausibly alleged Doldo's personal involvement in the conditions of confinement claim related to

the ASAT dorm.  *See McKenna v. Wright*, No. 01 CIV. 6571 (HB), 2004 WL 102752, at *6

(S.D.N.Y. Jan. 21, 2004) (denying the defendant deputy superintendent's motion to dismiss

because he affirmed the denial of a grievance with a comment that evidenced familiarity with the

plaintiff inmate's situation).  Therefore, the Court recommends Doldo's motion to dismiss

Plaintiff's conditions of confinement claim while in the ASAT dorm for lack of personal

involvement be denied.

**C.    Personal Involvement Regarding Plaintiff's Infirmary Due Process Claim**

On February 3, 2016, Plaintiff was moved into the infirmary after he requested reasonable accommodations for his disabilities. (Dkt. No. 1-2 at 41-43.) Plaintiff remained in the infirmary until his transfer to Wyoming on August 11, 2016. (Dkt. No. 1 at 21.) Plaintiff alleges he was confined in the infirmary without a hearing in violation of his due process right under the Fourteenth Amendment. *Id.* at 5. Doldo, Montroy, Moore, and N.A. Schaber move to dismiss this claim for lack of personal involvement. (Dkt. No. 16 at 12-15.)

The Court finds Plaintiff has failed to plausibly allege these Defendants' personal involvement in his due process claim. The complaint and attached exhibits demonstrate Plaintiff was housed in the infirmary as a result of his request for reasonable accommodations. (Dkt. No. 1-2 at 41-43.) It appears the infirmary was the only place at Cape Vincent where his disabilities could be accommodated. (Dkt. No. 1 at 16.) Plaintiff remained in the infirmary for six months because the Office of Classification and Movement cancelled his transfer to another handicap accessible facility. (Dkt. No. 1-2 at 50.) Plaintiff has not alleged any of these Defendants made the decision to keep Plaintiff in the infirmary for punitive reasons. Further, as Defendants have pointed out, Plaintiff has failed to allege they had the power to transfer Plaintiff to another facility.[7] *See, e.g.*, *Goros v. Pearlman*, No. 9:03-CV-1303, 2007 WL 1423718, at *3 (N.D.N.Y. May 10, 2007) (dismissing due process claim against the defendant doctor for lack of personal involvement because the plaintiff was housed in the infirmary due to his need for the oxygen concentrator there, and no evidence can show the defendant doctor had power to authorize the use of oxygen concentrator in general population).

---

[7]    Plaintiff was transferred to Wyoming on August 11, 2016, and the complaint does not allege any of the Defendants made the decision to transfer Plaintiff. (Dkt. No. 1 at 21.)

Although Plaintiff filed a grievance about his due process claim on July 19, 2016, he does not allege and the attached exhibits do not demonstrate any of these Defendants received or responded to this grievance.  (Dkt. No. 1 at 20.)  Therefore, the Court recommends dismissing Plaintiff's Fourteenth Amendment due process claim against Doldo, Montroy, Moore, and Schaber for lack of personal involvement.

### D.    Conditions of Confinement Claim as to the Infirmary

#### 1.    Lack of Personal Involvement by Doldo, Moore, and N.S. Schaber

Plaintiff claims, *inter alia*, he was denied adequate food and outside recreation while confined in the infirmary in violation of the Eighth Amendment.  (Dkt. No. 1 at 5.)  Even liberally construed, Plaintiff has failed to allege Defendants Doldo, Moore, and N.A. Schaber's personal involvement in his conditions of confinement claim related to the infirmary.

Plaintiff has attached a grievance filed on August 1, 2016, detailing the alleged conditions in the infirmary.  (Dkt. No. 1-2 at 56-57.)  However, Doldo responded to this grievance on September 9, 2016, and Plaintiff was transferred to another facility on August 11, 2016.  (Dkt. No. 1-2 at 61.)  Because Doldo responded to this grievance after Plaintiff had been transferred, the Court finds Plaintiff has failed to allege Doldo's personal involvement.  *See Harnett*, 538 F. Supp. 2d at 524.

Plaintiff contends Moore was the "head counselor" at Cape Vincent and, therefore, Moore was personally involved in Plaintiff's conditions in the infirmary as a supervisory official.  (Dkt. No. 1 at 6.)  However, while Plaintiff was in the infirmary, his counselor was Nitschke, not Moore.  *Id.* at 11.  Plaintiff does not allege any specific acts by Moore with respect to the conditions in the infirmary, nor does Plaintiff claim Moore knew of those conditions.  As discussed above, the doctrine of *respondeat superior* does not apply to §1983 claims, and claims

for monetary damages under §1983 require a showing of more than the linkage in the prison

chain of command. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). The Court cannot find

Moore was personally involved in Plaintiff's conditions of confinement claim without a more

specific showing of Moore's acts or at least knowledge.

 Plaintiff has also failed to allege N.A. Schaber's specific acts relating to Plaintiff's

conditions in the infirmary. N.A. Schaber is only mentioned regarding Plaintiff's confinement in

the infirmary in connection with her asking Plaintiff if he needed a toilet seat fit.[8] (Dkt. No.1 at

16.) Therefore, the Court cannot find N.A. Schaber was personally involved in this claim.

 Based on the foregoing, the Court recommends Plaintiff's conditions of confinement

claim related to the conditions in the infirmary be dismissed against Defendants Doldo, Moore,

and N.A. Schaber.

### 2. Failure to State a Claim Against Montroy

 The Court has found that Plaintiff has failed to make a plausible showing of personal

involvement by Doldo, Moore, and N.A. Schaber as to Plaintiff's infirmary conditions of

confinement claim and recommended dismissal of the claim as against those Defendants on that

ground. Defendant Montroy, however, does not appear to have moved for dismissal of Plaintiff

Eighth Amendment conditions of confinement claim specifically on that ground, but rather more

generally for failure to state a claim. (See Dkt. No. 16-1 at 11-14.)

 The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the

form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The constitutional

---

[8] Plaintiff alleges in the complaint: "Nurse Administrator asked if I needed a toilet seat
lift." (Dkt. No. 1 at 16.) The Court assumes "Nurse Administrator" refers to Nurse
Administrator Schaber.

prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

Regarding the conditions of confinement, the Supreme Court has stated, "while the Constitution 'does not mandate comfortable prisons, prisoners may not be denied the minimal civilized measure of life's necessities.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Specifically, the Eighth Amendment requires that inmates not be deprived of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal citation and quotation omitted). However, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

The required culpable state of mind of the prison official is one of deliberate indifference. *Farmer*, 511 U.S. at 834; *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The prison official must know that the inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take

reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847).

In this case, Plaintiff claims, *inter alia*, he was denied adequate food and outside recreation in the infirmary.  Specifically, Plaintiff claims he was initially not able to get an alternative food tray, had to eat fish that made inmates sick, was given outdated milk, was given leftover food not on the menu, and that the cold and hot food trays were mixed.  (Dkt. No. 1 at 17, 20.)  The Eighth Amendment requires prisoners be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1987) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)).  However, limited denial of food does not rise to the level of cruel and inhuman punishment.  *Barclay v. New York*, 477 F. Supp. 2d 546, 554-55 (N.D.N.Y. 2007).

Plaintiff does not allege facts showing that he was provided an inadequate amount of food, that the food was nutritionally inadequate, or that it posed any danger to him other than the conclusory statement that he had to eat fish "even though it made inmate [sic] sick," or go hungry. *Id.* at 17.  Therefore, the Court finds Plaintiff has failed to allege facts plausibly showing the kind of extreme deprivations sufficient to sustain a conditions of confinement claim. *Blyden,* F.3d at 263.  *See Smith v. Burge*, No. 9:03-CV-955 (LEK/GHL), 2006 WL 2805242, at *1, 11 & n.78 (N.D.N.Y. Sept. 28, 2006) (dismissing food-related conditions of confinement claim because the plaintiff did not allege nutritional inadequacy or physical harm).

Plaintiff further claims he was denied outside recreation during his six-month confinement in the infirmary.  (Dkt. No. 1 at 21.)  According to Plaintiff, he had to take pills for

acid reflux due to his lack of exercise, and he went outside on June 4, 2016, for the first time since he was transferred to the infirmary on February 3, 2016.  (Dkt. No.1 at 18-19.)

The Second Circuit has held that an inmate has a right to some opportunity to exercise, subject to a safety exception.  *See, e.g.*, *Dumpson v. McGinnis*, 348 F. App'x 658, 659 (2d Cir. 2009); *see also Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (finding constitutional violation when inmate was allowed out of medical keeplock only ten minutes per week for over three and a half years); *Williams v. Goord*, 142 F. Supp. 2d 416, 429 (S.D.N.Y. 2001) ("A denial of all meaningful out-of-cell exercise for a significant period of time without adequate justification constituted an Eighth Amendment violation.").

Here, Plaintiff alleges he was allowed only minutes of fresh air during his six-month confinement in the infirmary.  In response, Defendants contend the staff at Cape Vincent had a legitimate penological interest in the safety and security of Plaintiff.  (Dkt. No.16 at 17.) However, the Second Circuit has recognized that deprivations of exercise for safety reasons "must be limited to unusual circumstances or circumstances in which exercise is impossible because of disciplinary needs."  *Williams*, 142 F. Supp. 2d at 429 (S.D.N.Y. 2001) (*quoting Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996)).

In this case, Defendants argue Plaintiff was kept in the infirmary because of his "extensively documented medical ailments."  (Dkt. No. 16 at 17.)  At this juncture, the Court finds nothing in Plaintiff's complaint or exhibits that supports a finding that his ailments rose to the level of unusual circumstances dictating a complete denial of Plaintiff's opportunity to exercise and experience fresh air.  However, the Court also finds nothing in the complaint or exhibits that plausibly shows Montroy's personal involvement in the failure to provide Plaintiff with adequate opportunity to exercise and experience fresh air.  The only clear personal

17

involvement of Montroy alleged with regard to Plaintiff's placement in the infirmary or his treatment while there involves giving Plaintiff the RAFM to sign for housing in the infirmary on February 11, 2016. (Dkt. No. 1 at 16.) There are no facts showing that Montroy made, or was involved in, the decision to place Plaintiff in the infirmary. Inasmuch as there are no facts plausibly showing Montroy's personal involvement in the sole claim that arguably constitutes a conditions of confinement violation, Plaintiff cannot be found to have stated an Eighth Amendment conditions of confinement claim for damages against Montroy. *See McKinnon*, 568 F.2d at 934) (personal involvement required to state a claim for damages under § 1983). Therefore, the Court recommends dismissal of Plaintiff's Eighth Amendment conditions of confinement claim related to the infirmary against Defendant Montroy for failure to state a claim.

### E.    Deliberate Indifference to Serious Medical Needs

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is

sufficiently serious.'" *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837.

For the purpose of this motion, Defendants assume Plaintiff has adequately plead a sufficiently serious medical need. (Dkt. No. 16 at 18.) Dr. Dinello and N.A. Schaber contend, however, Plaintiff cannot meet the second prong of the deliberate indifference test.

The subjective prong of the deliberate indifference test requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Harrison v. Barkley*, 219 F .3d 132, 137 (2d Cir. 2000) (citations omitted). A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

Defendants argue Plaintiff was provided a significant amount of medical care with respect to his medical conditions: Plaintiff was seen by doctors, a podiatrist, and a physical

therapist, and Plaintiff received medical boots, a cane, and medications for his conditions.  (Dkt. No. 16 at 19.)  Further, Dr. Dinello argues he denied Plaintiff's requests for orthotics because he considered other courses of treatment to be more appropriate.  *Id.* at 21.  As such, Dr. Dinello contends Plaintiff merely disagreed about the preferred type of treatment, which does not establish subjective indifference.  *Id.* at 21-22.

The Court disagrees.  Here, Plaintiff has not alleged medical indifference based solely on his opinion or preference of treatment.  Instead, Plaintiff has plausibly alleged at least one podiatrist and one physical therapist recommended the requested orthotics despite the fact that Plaintiff was already on medication and had medical boots.  (Dkt. No. 1-1 at 15, 31.)  Attached exhibits indicate Dr. Dinello received these recommendations.  (Dkt. No. 1-1 at 29-33.)

Yet, Dr. Dinello still denied Plaintiff's request for the recommended orthotics on three occasions.  (Dkt. No. 1 at 9-10.)  At this juncture, the Court finds Plaintiff has plausibly alleged Dr. Dinello was deliberately indifferent to Plaintiff's medical needs by denying his requests for orthotics.  *See, e.g.*, *Giambalvo v. Sommer*, No. 10 CIV. 6774 (JPO), 2012 WL 4471532, at *4-6 (S.D.N.Y. Sept. 19, 2012) (finding deliberate indifference at the motion to dismiss stage when the defendant doctor denied requests for medical shoes after being informed of the plaintiff inmate's foot condition and a specialist in podiatry recommended the medical shoes).  Therefore, the Court recommends Dr. Dinello's motion to dismiss Plaintiff's medical indifference claim be denied.

Regarding N.A. Schaber, Plaintiff alleges she (1) denied his request to order his own orthotics on May 28, 2014; (2) kept him from seeing a doctor for 30 days while he was in the ASAT dorm; and (3) took away his medically prescribed boots vindictively on December 2,

2015. (Dkt. No. 1 at 8, 12, 14.) The Court finds Plaintiff has failed to plausibly allege N.A. Schaber was deliberately indifferent.

First, it appears N.A. Schaber denied Plaintiff's request for his own orthotics based on the legitimate policy of the prison. (Dkt. No. 1-1 at 26.) Indeed, at the time of the denial, Plaintiff had yet to obtain any recommendation for the requested orthotics from a podiatrist or a doctor.

Second, while Plaintiff was confined in the ASAT dorm, exhibits show Plaintiff did visit sick call. (Dkt. No. 1 at 11-12.) The nurse at sick call gave Plaintiff pain medication and scheduled him to see a doctor on July 17, 2015. (Dkt. 1-2 at 27.) Therefore, Plaintiff's own exhibits defeat his claim that N.A. Schaber kept him from seeking medical treatment during his confinement at the ASAT dorm.

Finally, Plaintiff has failed to show N.A. Schaber took away his medical boots vindictively. In response to Plaintiff's Grievance CV-10358-15, Doldo elaborated that Dr. Palao consulted with Dr. Perrier, who performed Plaintiff's hip surgery, and recommended Plaintiff's boots be replaced with regular boots. (Dkt. No. 1-2 at 9.) Plaintiff's conclusory allegation that Dr. Perrier did not order Schaber to take away the boots must fail without further factual support. (Dkt. No.1 at 14.) Therefore, the Court finds Plaintiff failed to allege N.A. Schaber was deliberately indifferent to his serious medical needs and recommends dismissal of his Eighth Amendment medical indifference claim against her.

### F.    Leave to amend

When a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000). Therefore, in deference to Plaintiff's *pro se* status, the Court recommends

Plaintiff be permitted an opportunity to replead consistent with the above recommendations.

**IV.    CONCLUSION**

If this Report and Recommendation is accepted by the District Court, the claims

remaining in this action will Plaintiff's: (1) ADA and Rehabilitation Act claims against

Defendant Annucci, who has not moved to dismiss, in his official capacity; (2) Eighth

Amendment conditions of confinement claim related to the ASAT dorm against Defendant

Doldo and against Nitschke, and Taylor, who have not moved to dismiss; and (3) Eighth

Amendment medical indifference claim against Defendant Dinello.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss be **GRANTED IN PART** and

**DENIED IN PART**; and it is further

**RECOMMENDED** that the following claims be **DISMISSED WITHOUT**

**PREJUDICE**: (1) Plaintiff's Eighth Amendment conditions of confinement claim related to the

ASAT dorm against Defendant Montroy; (2) Plaintiff's Eighth Amendment conditions of

confinement claim related to the infirmary against Defendants Doldo, Montroy, Moore, and

Schaber; (3) Plaintiff's Fourteenth Amendment due process claim relating to his placement in the

infirmary against Defendants Doldo, Montroy, Moore, and Schaber; and (4) Plaintiff's Eighth

Amendment medical indifference claim against Defendant Schaber; and it is further

**RECOMMENDED** that Defendants' motion be **DENIED** as to: (1) Plaintiff's Eighth

Amendment conditions of confinement claim related to the ASAT dorm against Defendant

Doldo; and (2) Plaintiff's Eighth Amendment medical indifference claim against Defendant

Dinello; and it is further

22

RECOMMENDED that if the District Court accepts this Court's Report-Recommendation that Plaintiff be given thirty (30) days from the filing of the District Court's Order to submit an amended complaint for initial review by this Court; and it is further

RECOMMENDED that Plaintiff be directed to include all of his claims in a single amended pleading which shall supersede and replace his original complaint in its entirety; and it is hereby

ORDERED that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 20 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (*citing Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  July 26, 2018
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2007 WL 1423718
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dimitrios GOROS, Plaintiff,

v.

Kenneth S. PEARLMAN, Superintendent; James
A. Mance, Deputy Superintendent; D. Kelefant,
IGP Supervisor; Riddick, Senior Correction
Counselor; Sgt. Allen; Sgt. C. Kante; C.O. Durante;
C.O. Meacham; Henrich, Inmate Grievance
Resolution Clerk, Five Points Correctional
Facility; Brown, Inmate Grievance Program
Supervisor, Five Points Correctional Facility;
and Gregoire J. Peter, M.D., Medical Director,
Five Points Correctional Facility, Defendant.

No. 9:03-cv-1303.
|
May 10, 2007.

**Attorneys and Law Firms**

Dimitrios Goros, Rome, NY, pro se.

Senta B. Siuda, Office of Attorney General, Syracuse, NY,
for Defendant.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff, an inmate at Five Points Correctional
Facility, commenced the instant pursuant to 42
U.S.C. § 1983 claiming that Defendants violated
his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Defendants previously
moved for Judgment on the Pleadings. A Report-
Recommendation recommended denying the motion as
to the Eighth Amendment claim against Defendant
Peter, but granting the motion as to all other claims
and defendants. The Court adopted the Report-
Recommendation and also allowed Plaintiff's retaliation
claim to remain. Plaintiff was ordered to file a Second
Amended Complaint. The Second Amended Complaint
named only Dr. Gregoire as a Defendant, claiming that

he acted with deliberate indifference to Plaintiff's serious
medical needs, he retaliated against him for engaging
in protected activity, and placed Plaintiff in keeplock in
violation of his due process rights. Defendant moves for
summary judgment pursuant to Fed.R.Civ.P. 56. Despite
being warned of the potential consequences of failing to
respond to a summary judgment motion, Plaintiff has
failed to file any opposition papers with regard to this
motion.

### I. FACTS [1]

Plaintiff arrived at Five Points Correctional Facility on
September 10, 2003. At that time, Plaintiff had a variety
of medical conditions, including Chronic Obstructive
Pulmonary Disease, coronary artery disease, chronic
gastritis/eso p hag itis, and low back pain. Plaintiff was
first examined by Dr. Gregoire on September 19, 2003.
After several subsequent examinations by Dr. Gregoire,
on November 7, 2003, Plaintiff refused to be examined by
Dr. Gregoire and physically pushed him away. Plaintiff
again refused examination by Dr. Gregoire on December
2, 2003. On December 16, 2003, Dr. Gregoire examined
Plaintiff. At that time, Plaintiff requested a seat for
the shower. Dr Gregoire approved the request. During
the examination, Plaintiff refused to attempt to stand
and requested both a shower seat and a bed table for
his cell. On December 31, 2003, Plaintiff rejected the
shower bench that he previously requested and had been
approved by Dr. Gregoire. On that same day, Plaintiff
requested a wheelchair to use in the shower, a bed table,
and a water pitcher. Those requests were denied by
Dr. Gregoire because he believed those items were not
medically necessary and would be available to Plaintiff in
the handicapped housing for the general population.

On January 13, 2004, Plaintiff refused routine blood work.
On March 11, 2004, Dr. Gregoire wrote a memorandum
to Plaintiff regarding his Prevacid prescription. Plaintiff
was prescribed a 15 mg dose. Plaintiff insisted that the
medication was available in a 10 mg dose. Dr. Gregoire
attempted to explain that a 10 mg dose was not available.
Plaintiff refused the 15 mg dose of Prevacid and refused
alternative medications.

On June 28, 2004, Dr. Gregoire gave Plaintiff instructions
on the use of his albuterol inhaler and advised that it could
continue to be used while Plaintiff was waiting to receive
a new inhaler. Plaintiff refused to be examined. On that

same date, Dr. Gregoire wrote a memorandum to Plaintiff explaining that his use of an oxygen concentrator machine necessitated that he be housed in the infirmary rather than the general population. [2] On June 29, 2004, Dr. Gregoire wrote another memorandum to Plaintiff explaining the albuterol inhaler instructions.

## II. STANDARD OF REVIEW

**\*2** Summary judgment will be granted when there is no genuine material issue of fact and the moving party is entitled to judgment as a mater of law. Fed .R. Civ.P. 56(c). The court must consider the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999). A fact is considered material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The court cannot grant summary judgment if "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party ." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000). There must be evidence provided by the non-moving party to support its claims. The burden of demonstrating there is no genuine issue of material fact is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party meets its burden, the burden then shifts to the non-moving party, who must show that there is a genuine issue of material fact requiring a trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-586 (1986).

## III. DISCUSSION

Plaintiff claims that his Eighth Amendment rights were violated because Dr. Gregoire showed a deliberate indifference to his serious medical needs. Plaintiff contends that Dr. Gregoire was indifferent to his need to use a wheel chair for use in the shower, as well as his need for a bed table, a water pitcher, and certain medications.

To succeed on an Eighth Amendment claim, Plaintiff must proffer evidence from which a fair-minded trier of fact reasonably could conclude that Defendants acted with deliberate indifference towards his serious medical needs. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). This test encompasses an objective and subjective element. Whether a medical condition is sufficiently serious is an objective test. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). Whether defendants acted with deliberate indifference to such a need is governed by a subjective test. *Id.*

Determining whether a deprivation is sufficiently serious requires inquiry into whether the prisoner was deprived of medical care and whether "the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2006). To be sufficiently serious, the condition must present a substantial risk of harm. It must be a condition of urgency which, if not adequately treated, would produce death, degeneration or extreme pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The Court must consider the risk of harm from such deprivation rather than simply the severity of the preexisting medical condition.

For the purposes of the instant motion only, Defendant focuses only on the subjective test of whether Defendant acted with deliberate indifference. A showing of medical malpractice or negligence is insufficient to support a claim of deliberate indifference. Deliberate indifference generally describes a mental state more blameworthy than negligence. *See Chance v. Armstrong,* 143 F.3d 698 (2d Cir.1998). There must be evidence that Defendants "actually wished [Plaintiff] harm, or at least, [were] totally unconcerned with [his] welfare." *Hathaway,* 37 F .3d at 69. There must be evidence of a "complete denial of or intentional effort to delay access to medical care, or a reckless and callous indifference to the safety of prisoners." *Hogan v. Russ,* 890 F.Supp. 146, 149 (N.D.N.Y.1995). The subjective standard for a claim of deliberate indifference to a serious medical need requires a high level of culpability. This mental state in similar to that of recklessness in criminal law. The actor must be "aware of a substantial risk of harm." *Salahuddin,* 467 F.3d at 280. The belief that a certain course of conduct poses no substantial risk of harm "need not be sound so long as it is sincere." *Id.* at 281.

**\*3** In support of his motion for summary judgment, Defendant submitted proof demonstrating that he responded to Plaintiff's requests, provided the proper medication for his condition, approved his request for a shower seat, and that Plaintiff had access to a wheel chair. Defendant also submits evidence that Plaintiff frequently refused treatments and refused to be examined. In response, Plaintiff fails to point to sufficient evidence

upon which a fair-minded trier of fact could reasonably conclude that Dr. Gregoire was deliberately indifferent to a serious medical need. Plaintiffs disagreements over the proper dosage of Prevacid or how long a canister of albuterol lasts does not evidence deliberate disregard. Plaintiff's complaints regarding the functioning of his faucet in his cell, the need for a water pitcher, and his other complaints do not implicate any serious medical needs and do not involve Dr. Gregoire. Accordingly, the Eighth Amendment claims are DISMISSED.

Plaintiff also contends that Defendant refused Plaintiff treatment in retaliation for engaging in protected speech. For the reasons discussed, there is insufficient evidence that Plaintiff was denied medical treatment. Accordingly, the First Amendment claim must fail.

Next, Plaintiff alleges that he was placed in keeplock in violation of his due process rights. The undisputed evidence before the Court is that Plaintiff was not placed in keeplock, but was placed in the infirmary because his health necessitated the use of an oxygen concentrator. This machine was deemed a security risk to be allowed into the general population. Plaintiff does not claim that he did not require the use of the oxygen concentrator.

There is no evidence that Plaintiff was placed in the infirmary for punitive reasons. There similarly is no evidence that it was Dr. Gregoire's decision whether to allow Plaintiff into the general population with the oxygen concentrator. Plaintiff, therefore, fails to demonstrate that Dr. Gregoire was personally involved in any alleged due process violations, that there were not legitimate reasons for placing him in the infirmary, or that he was otherwise exposed to atypical prison conditions without adequate due process of law. Accordingly, this claim is DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1423718

Footnotes

1    Because Plaintiff has failed to file a Statement of Material Facts as required by Local Rule 7.1(a)(3) or otherwise respond to the motion for summary judgment, the following facts are taken from Defendant's properly supported Statement of Material Facts and deemed to be true.

2    The oxygen concentrator machine is viewed as a security risk in the general population.

2018 WL 1470619
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shane HYATT, Plaintiff,
v.
David A. ROCK, et al., Defendants.

Civ. No. 9:15-CV-89 (DNH/DJS)
|
Signed 02/16/2018

**Attorneys and Law Firms**

SHANE HYATT, 05-A-4430, Five Points Correctional
Facility, Caller Box 119, Romulus, NY 14541, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., The Capitol,
Albany, New York 12224, Attorney for Defendants.

## REPORT-RECOMMENDATION and ORDER

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** *Pro se* Plaintiff Shane Hyatt brought a civil rights
Complaint, pursuant to 42 U.S.C. § 1983, alleging that
Defendants violated his constitutional rights while he
was in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS")
and housed in Upstate Correctional Facility ("Upstate")
and Clinton Correctional Facility. Defendants move
for summary judgment as to Plaintiff's claims against
Defendant Rock. Dkt. No. 76. For the reasons that
follow, the Court recommends that Defendants' Motion
for Partial Summary Judgment be **granted**.

## I. BACKGROUND

Plaintiff alleges that excessive force was used against
him during a February 3, 2012 use of force incident
and a May 12, 2012 use of force incident, and alleges
that he was denied adequate medical treatment following
the incidents. *See* Dkt. No. 24, Am. Compl., *generally*.
Following the District Court's initial review of Plaintiff's
Amended Complaint, the following claims remain: Eighth

Amendment excessive force claims arising from the
February and May, 2012 incidents against a number of
Upstate staff; Eighth Amendment failure to intervene/
protect claims arising from the February and May,
2012 incidents against a number of Upstate staff; and
supervisory liability claims against Defendant Rock
related to Plaintiff's excessive force claims. *See* Dkt. No.
37.

Defendant Rock is the former Superintendent of Upstate
Correctional Facility. Dkt. No. 76-1, Rock Aff., ¶ 2.
Plaintiff filed a number of grievances, which were reviewed
under an expedited procedure for grievances alleging
harassment by DOCCS employees. *Id.* at ¶ 9. Defendant
Rock delegated the investigation of grievances to the
"grievance Lieutenant" or another designated supervisor,
and a senior supervisor would prepare a summary of the
findings and conclusions for Defendant Rock's review. *Id.*
at ¶ 11. Defendant Rock did not personally investigate
the allegations contained in Plaintiff's grievances or draft
the decisions in response to grievances. *Id.* at ¶ 12. In the
event that Defendant Rock felt, upon reviewing a senior
supervisor's draft decision, that further investigation
was needed, Defendant Rock would order additional
investigation or forward the matter to the Office of
the Inspector General. *Id.* at ¶ 14. Regarding Plaintiff's
five grievances, each grievance was investigated by an
investigating supervisor, who found that Plaintiff's claims
had no merit; Defendant Rock or Acting Superintendent
Uhler then reviewed and signed off on the senior
supervisor's draft decision. *Id.* at ¶ 20.

**\*2** Plaintiff alleges that Defendant Rock failed to
properly investigate and respond to his grievances,
and was thereby deliberately indifferent to Plaintiff's
safety. *See* Am. Compl. Specifically, Plaintiff alleges
that "Defendant Rock's failure to act on the numerous
letters, Complaints, lawsuits, and grievances filed with
and against his offices [sic.] by the Plaintiff as well as
other Prisoners ... constituted deliberate indifference to
the Plaintiff's as well as other Prisoners' health and safety,
and his failure to act contributed to and proximately
caused the used [sic.] of excessive force and the Plaintiff's
injuries...." Am. Compl. at p. 78. Plaintiff contends that
Defendant Rock violated his constitutional rights "by
failing to take disciplinary action ... to curb the pattern
and history of excessive force." *Id.* at pp. 77-78.

2018 WL 1470619

Presently pending before the Court is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Rock on the basis that (1) Plaintiff cannot establish his personal involvement; (2) Plaintiff cannot establish that Defendant Rock violated Plaintiff's Eighth Amendment rights; and (3) Defendant Rock is entitled to qualified immunity. Dkt. No. 76-3, Defs.' Mem. of Law. A response in opposition to that Motion was received on December 11, 2017. Dkt. No. 94. The Court finds that Defendants have established that there is no genuine dispute as to any material fact regarding Defendant Rock's alleged involvement in the events underlying the Amended Complaint. As such, the Court recommends that Defendant Rock's Motion be **granted**.

## II. LEGAL STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

**\*3** As discussed below, the Court finds that Plaintiff has failed to establish the personal involvement of Defendant Rock in the alleged constitutional violations or that Defendant Rock was deliberately indifferent to Plaintiff's safety and recommends that this action be **dismissed** as against Defendant Rock on that basis. The Court therefore does not reach Defendants' contentions that Defendant Rock is entitled to qualified immunity.

### A. Personal Involvement

#### 1. Supervisory Liability, Generally

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A supervisory official "may not be held liable for damages merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "the doctrine of *respondeat*

*superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

The Second Circuit has held that the personal involvement of a supervisory official may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted). [1]

**\*4** The only categories under which Defendant Rock's involvement could fall are those in which a supervisor is informed of a violation and fails to remedy the wrong, or where a supervisor creates or allows to occur a policy or custom under which unconstitutional practices occur. *See* Am. Compl.

### 2. Receipt of Grievances

It is settled that the mere receipt of, without personally investigating, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d 195, 199 (N.D.N.Y. 2009). Moreover, as a general principle, "[m]erely denying a prisoner's grievance is insufficient to establish personal involvement." *Hatzfield v. Eagen*, 2010 WL 5579883, *5 (N.D.N.Y. Dec. 10, 2010) (citation omitted); *see Brooks v. Chappius*, 450 F. Supp.2d 220, 226 (W.D.N.Y. 2006) (dismissing claims against a supervisory official whose sole alleged involvement was reviewing the results of investigations and denying the plaintiff's grievances based on the determinations of other staff members); *see also Flores v. Tryon*, 2017 WL 3705124 (W.D.N.Y. Aug. 28, 2017) (collecting cases); *Ramrattan v. Fischer*, 2015 WL 3604242, at *11 (S.D.N.Y. June 9, 2015).

Some courts in this Circuit have held that a supervisor's review and denial of a grievance, in certain circumstances, is sufficient to establish personal involvement. *See Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (collecting cases). However, certain of those courts, including this Court, have held that a supervisor's denial of a grievance will only establish personal involvement where there is an ongoing constitutional violation. *See id.* ("[M]any courts in this Circuit [ ] have held that an alleged constitutional violation complained of in a grievance must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.' ") (quoting *Vega v. Artus*, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009)); *Sanchez v. Graham*, 2016 WL 5854551, at *7 (N.D.N.Y. Sept. 12, 2016). As such, "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *Ford v. Martuscello*, 2017 WL 4181385, at *8 (N.D.N.Y. July 20, 2017), *report and recommendation adopted*, 2017 WL 4155358 (N.D.N.Y. Sept. 18, 2017); *Thompson v. New York*, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001).

Here, Defendant Rock did not personally investigate the allegations contained in the grievances or draft the decisions in response to grievances. Rock Aff., at ¶ 12. Each of the five grievances that Defendants recount was investigated by an investigating supervisor, who found that each grievance had no merit. [2] *Id.* at ¶ 20. Defendant Rock reviewed the summaries of findings, prepared by a senior supervisor, and signed off on the final decisions. *Id.*

**\*5** Under these standards, Plaintiff fails to establish Defendant Rock's personal involvement. Plaintiff's grievances do not allege continuing violations; rather, they allege discrete incidents of assault. *See, e.g., Johnson v. Fischer*, 2012 WL 5866130, \*4 (N.D.N.Y. Oct. 17, 2012), *report and recommendation adopted*, 2012 WL 5866524 (N.D.N.Y. Nov. 19, 2012) (finding allegations of ongoing exposure to contaminants to be continuing in nature); *Baez v. Harris*, 2007 WL 446015 (N.D.N.Y. Feb. 7, 2007) (finding allegations that supervisor's denial of appeal resulted in him being detained in solitary housing to be continuing in nature). Plaintiff's only allegations that could reasonably be read as ongoing are those regarding Upstate's staff's failure to treat his medical needs and his accompanying grievances regarding the same. *See* Am. Compl. Plaintiff's Eighth Amendment deliberate indifference to medical needs claims have already been dismissed on the merits, however. Dkt. No. 37 at pp. 8-10. Because the alleged violations were not ongoing, Plaintiff's allegations against Defendant Rock cannot establish personal involvement.

### 3. Policy or Custom

Finally, Plaintiff has produced no evidence that would support a contention that Defendant Rock created, or allowed to continue, a policy or custom that fostered the violation of constitutional rights. *See James v. Goord*, 2001 WL 34552046, at \*2 (W.D.N.Y. Feb. 10, 2001). Plaintiff conclusorily alleges that the investigations of his grievances were insufficient and flawed. Dkt. No. 94, Pl.'s Decl., ¶¶ 12, 17, 21, 23, 27, & 28. Such speculation is insufficient to defeat the Motion. *See Hyman v. Cty. of Albany*, 2016 WL 2865711, at \*15 (N.D.N.Y. Mar. 31, 2016) ("Accepting plaintiff's version of the facts, it nevertheless cannot be said that the investigation is so deficient that [the Superintendent's] acceptance of it supports an inference that he created or continued an unconstitutional policy.... any such inference would

be based on pure speculation."). As such, the Court finds that Plaintiff cannot establish Defendant Rock's personal involvement in the facts alleged in the Amended Complaint.

### B. Deliberate Indifference to Plaintiff's Safety

The Court recommends that Plaintiff's claim against Defendant Rock be dismissed because Defendant Rock was not sufficiently personally involved in any of the alleged constitutional violations in order to be held liable for those actions. If the Court were to find, however, that Defendant Rock's denial of Plaintiff's grievances makes him personally involved in the violations, the Court would still find that his denial of the grievances does not constitute deliberate indifference.

A deliberate indifference claim can only succeed if the plaintiff can demonstrate that "the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see Thompson v. New York*, 2001 WL 636432, at \*7-8 (finding no deliberate indifference by the superintendent where "[a]s plaintiff himself allege[d], the Superintendent authorized an investigation based on plaintiff's filed grievance, and the investigating official concluded, based on documentation before him, that the corrections officers were not guilty of misconduct" and "[p]laintiff allege[d] no basis for inferring that the Superintendent was obliged to reject this conclusion or be deemed to have shown deliberate indifference to known misconduct by the prison staff.").

Here, Plaintiff only submits conclusory allegations that Defendant Rock was aware of excessive force and failed to act on that knowledge. Such conclusory allegations cannot defeat a motion for summary judgment. *See Scott v. Coughlin*, 344 F.3d at 287. Specifically, Plaintiff alleges that Defendant Rock

> **\*6** fail [sic.] to take disciplinary action or corrective action with respect to allegations of excessive force, or otherwise fail [sic.] to protect the safety of the inmates in

his custody from excessive force by staff, that allegations of excessive force by inmate [sic.] were not properly and fully investigated by his staff and reviewed by him or the Acting Superintendent, and that he had actual knowledge about the used [sic.] of excessive force against prisoners at Upstate C.F. by security staff since October 1, 2009, through October 2013, through grievances, lawsuits, complaints, memorandums [sic.] and other documents.

Pl.'s Decl. at ¶ 28.

No evidence has been submitted that would demonstrate that Defendant Rock had the requisite state of mind. Plaintiff's allegations that the investigations were insufficient does not establish that Defendant Rock knew of and disregarded an excessive risk to Plaintiff's safety. *See Farmer v. Brennan*, 511 U.S. at 837. Even if the investigations were flawed as Plaintiff asserts, he provides no evidence that Defendant Rock's acceptance of them demonstrates that he knew of and disregarded an excessive risk to Plaintiff's safety. *See Thompson v. New York*, 2001 WL 636432, at *7-8. "[M]ere negligence will not suffice." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Moreover, the evidence suggests that the documents provided to Defendant Rock indicated that the supervising investigator did conduct thorough investigations, and as such, any contention that Defendant Rock knew of and disregarded an excessive risk to Plaintiff's safety are unsupported. *See, e.g.*, Pl.'s Decl. at ¶ 25 (memorandum from investigating Lieutenant recounts that Plaintiff and seven inmate witnesses were interviewed, and documentation submitted by all staff members mentioned in the complaint was reviewed during investigation).

As such, even if the Court were to find that Defendant Rock had sufficient personal involvement to potentially be held liable for any constitutional deprivation, the Court would recommend granting summary judgment as to Defendant Rock on the basis that there is no genuine issue of material fact as to Defendant Rock's deliberate indifference to Plaintiff's rights.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Partial Summary Judgment (Dkt. No. 76) be **GRANTED** and that Defendant Rock be **DISMISSED** as a Defendant in this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [3] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Slip Copy, 2018 WL 1470619

---

Footnotes

1    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of NewHaven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g.*, *Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g.*, *Bellamy v. Mount Vernon Hosp.*, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed.Appx. 55 (2d Cir. 2010), others disagree

2018 WL 1470619

and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role. *See, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

2   The Court notes Plaintiff's contention that Defendants do not address each of the relevant grievances. Dkt. No. 94-2, Pl.'s SMF, ¶ 10. Plaintiff does not provide a description of the grievances not addressed by Defendants, or any evidence that these grievances, UST-41594-10, filed in February of 2010, or UST-45725-11, filed in April of 2011, would alter the Court's analysis. Rather, these appear to allege isolated incidents of assault, from one and two years prior to the incidents at issue in this case. Dkt. No. 76-2, Hale Aff., Ex. A, pp. 2-3.

3   If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 102752
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward MCKENNA Plaintiff

v.

Lester N. WRIGHT, et al. Defendants.

No. 01 Civ. 6571(HB).
|
Jan. 21, 2004.

**Synopsis**
**Background:** State prisoner brought § 1983 action against prison officials, seeking order requiring officials to provide prisoner with medical treatment for his hepatitis C virus and cirrhosis, declaring that officials violated Eighth Amendment and Fourteenth Amendment rights, enjoining defendants from conditioning medical care on non-medical criteria, requiring defendant to pay damages, attorney fees and costs. Officials moved for summary judgment, on grounds of qualified immunity.

**Holdings:** The District Court, Baer, J., held that:

[1] prisoner exhausted his administrative remedies prior to filing his § 1983 action;

[2] receipt by non-medical supervisory official of letters requesting follow up medical care was insufficient to impute personal involvement to official;

[3] allegation was sufficient to establish deputy superintendent's personal involvement;

[4] allegation was sufficient to establish superintendent's personal involvement; and

[5] officials were not entitled to qualified immunity.

Motion granted in part, and denied in part.

West Headnotes (6)

**[1]    Civil Rights**
   ⚖ Criminal law enforcement;prisons

State prisoner exhausted his administrative remedies prior to filing his § 1983 action against prison officials, in connection with officials' alleged failure to provide prisoner with appropriate medical treatment for hepatitis C; prisoner filed complaint with state Commission of Corrections Medical Review Board, filed a grievance complaint with the prison administrators, and appealed the denial of his grievance. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[2]    Civil Rights**
   ⚖ Criminal law enforcement;prisons

Receipt by non-medical supervisory prison official of letters written by state prisoner with hepatitis C requesting follow up medical care was insufficient to impute personal involvement to official, for purpose of prisoner's § 1983 action for failure to provide adequate medical treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[3]    Civil Rights**
   ⚖ Criminal law enforcement;prisons

State prisoner's allegation against deputy superintendent of prison, that he personally denied prisoner's requests for medical treatment related to his hepatitis C virus through the denial of grievance for lack of medical care, was sufficient to establish deputy superintendent's personal involvement in the alleged failure to provide prisoner with adequate medical treatment for his hepatitis C, as required for § 1983 claim against deputy superintendent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[4]    Civil Rights**

⚷  Criminal law enforcement;prisons

State prisoner's allegation against prison superintendent, that superintendent failed to address or rectify the denial of prisoner's medical treatment for hepatitis C when he denied prisoner's appeal of the denial of his grievance related to inadequate medical treatment, was sufficient to establish superintendent's personal involvement, for purpose of prisoner's § 1983 claim related to failure to provide medical treatment for prisoner's hepatitis C virus. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[5]    Civil Rights**

⚷  Prisons, jails, and their officers;parole and probation officers

Prison officials were not entitled to qualified immunity from liability in state prisoner's § 1983 action for deliberate indifference to his serious medical needs, in connection with prisoner's alleged failure to receive medical treatment for his hepatitis C, where prisoner's allegations as pled demonstrated that prisoner's knew or reasonably should have known that they were violating plaintiff's clearly established Eighth Amendment rights. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[6]    Constitutional Law**

⚷  Constitutional Rights in General

**Constitutional Law**

⚷  Relationship to Other Constitutional Provisions;Incorporation

Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior that Amendment, not the more generalized notion of substantive

due process, must be the guide for analyzing these claims. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

*OPINION & ORDER*

BAER, J.

**\*1** Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") to dismiss plaintiff Edward McKenna's ("plaintiff" or "McKenna") § 1983 claims for violations of the Eight and Fourteenth Amendments, on the basis that some defendants lack the requisite personal involvement and all are protected by qualified immunity. For the foregoing reasons, defendants' motion is granted-in-part and denied-in-part.

I. BACKGROUND

A. Factual Background

1. *McKenna's Medical History*

McKenna, now fifty-seven, began serving his current sentence at the New York Department of Correctional Services' ("DOCS") Green Haven Correctional Facility ("Green Haven") on February 27, 1990. Amended Complaint ("Am.Compl.") ¶ 52. When McKenna entered Green Haven, he informed the relevant DOCS personnel that he "had a history of intravenous drug use, had been diagnosed with a sexually transmitted disease ("STD"), had served in the Vietnam War and had spent prior time in prison. Such information was also recorded in McKenna's medical records." Id ¶¶ 53–54. The DOCS Hepatitis C Primary Case Practice Guidelines ("DOCS Guidelines") states that such factors place inmates at a heightened risk for the Hepatitis C Virus ("HCV"). [1] Id. ¶ 53. However, McKenna was not tested for HCV when he entered Green Haven. Id. ¶ 55. In 1994, some four years later, even after McKenna's routine blood test results "reflected known and medically accepted indicia of HCV—his blood platelets were low and his liver enzymes were high," DOCS personnel failed to test McKenna for HCV. Id. ¶¶ 56. Three years later, in 1997, when blood

tests revealed that his platelets were even lower and his liver enzymes were even more elevated, McKenna still was not tested for HCV. Id. ¶ 57. In June 1998, McKenna was transferred to a different DOCS facility, Woodbourne Correctional Facility ("WFC"). Despite the fact that it was DOCS' policy to test all patients for HCV when they entered a new facilities, McKenna was not tested. Id. ¶ 60.

Finally, the plaintiff was finally tested for HCV on or around June 6, 1999. Id. ¶ 61. Following that exam, on or about July 19, 1999, Dr. Mervat Makram, a physician at the Health Care Unit at WCF, informed McKenna that he had HCV. Id. ¶ 62. Before embarking on a treatment regimen, the plaintiff told Dr. Makram that he wished to study its side effects. Dr. Makram did not mention the benefits of early treatment or refer McKenna to a specialist. Id. ¶¶ 62–64. Dr. Makram never followed-up to find out McKenna's decision. Id. ¶ 62. On or about September 16, 1999, after suffering from abdominal pain since 1996, McKenna was finally seen by Dr. Frank Lancellotti, at the Health Care Unit at WCF. Id. ¶ 65. During this visit, McKenna informed Dr. Lancellotti that he wanted treatment for his HCV. Id ¶ 70. Dr. Lancellotti denied McKenna the treatment because pursuant to a DOCS policy, "inmates are ineligible for HCV treatment if they are not necessarily going to be incarcerated for at least twelve (12) months from the day treatment begins." Id. ¶ 71. However, DOCS Guideline also state that "[i]nmates who will not predictably complete a course of treatment should receive a baseline evaluation and be referred to medical follow-up and treatment upon release." Id. While McKenna was not scheduled for release for another four years, he was due before the parole board in just under one year. Id. ¶ 74–75. McKenna was denied parole on or about August 29, 2000. Id. ¶ 80.

 **\*2** Instead of investigating whether McKenna's pain was due to his HCV, Dr. Lancellotti treated McKenna with Ranitidine, an ulcer medication. [2] Id. ¶ 66. As prescribed, McKenna continued to take Ranitidine for two years and six months, during which time his pain did not diminish. Id. ¶ 68. On or about April 23, 2001, when he was finally tested for ulcers, it turned out he did not have any. Id. ¶ 69. On or about December 11, 2000, McKenna again met with Dr. Lancellotti, requested HCV treatment, and was denied—this time based on a DOCS policy which required that HCV treatment recipients first complete an Alcohol and Substance Abuse Treatment Program ("ASAT"). However, DOCS had earlier deemed McKenna ineligible

for participation in an ASAT due to his medical condition. Id. ¶¶ 81–82. Dr. Lancellotti referred McKenna to the Albany Medical Center ("AMC"). Id. ¶ 83. On or about January 10, 2001, after McKenna received a CAT Scan at AMC, he was diagnosed as having a condition "compatible with cirrhosis." [3] Id. ¶ 84. McKenna learned of this diagnosis on or about February 2, 2001 from Dr. Lancellotti, who informed McKenna that he had likely suffered from cirrhosis since June 1999, and told him that he would refer him to a liver specialist at AMC. Id. ¶ 85.

On or about March 19, 2001, McKenna was seen by Dr. Benedict, a gastroenterologist at Coxsackie Regional Medical Unit ("CRMU"), who told McKenna to return for a follow-up visit in three to four weeks so that he could evaluate McKenna's esophageal varices, a complication of cirrhosis. Id. ¶¶ 86–87. McKenna saw Dr. Maliakkal at AMC on or about April 23, 2001, when he received an Endoscopy procedure for the varices, and was told to return in four to six weeks to discuss drug treatment for his HCV. Id. ¶ 88. Seven weeks later, after not receiving this follow-up visit, McKenna wrote to Dr. Wright, the Associate Commissioner and Chief Medical Officer at DOCS, and on or about July 5, 2001, forwarded a copy of this letter to DOCS Commissioners Glenn S. Goord and Anthony Annucci. Id. ¶ 90. McKenna did not receive a response until August 3, 2001, when Dr. Wright wrote to explain the failure to follow Dr. Maliakkal's orders, and stated that "it is unlikely that you will be a candidate for Hepatitis C treatment because of special treatment concerns related to your cirrhosis." Id. ¶ 99. In the interim period, during which McKenna had not received a response, on or about July 25, 2001, John Beck and Madeline deLone, attorneys from the Legal Aid Society Prisoners' Rights Project ("LASPRP") sent a letter to Dr. Makram, requesting that McKenna receive his prescribed follow-up visit. On this same day, Dr. Makram met with McKenna and informed him that "his cirrhosis of the liver was decompensated [4] and that his earlier request for treatment was denied on June 1, 2001 based on the status of his liver" despite the fact that no liver biopsy had been performed. Dr. Makram explained that because Dr. Wright had denied McKenna treatment for HCV, there was no need for him to return to AMC. When McKenna expressed concern that he could experience internal bleeding, Dr. Makram explained that "if he hemorrhaged, he would be taken to the emergency room." Id. ¶ 92. On or about August 7, 2001, McKenna wrote to Goord to reiterate his need for a follow-up visit

with Dr. Maliakkal because of his risk of hemorrhaging. Dr. Wright responded on or about October 5, 2001, and explained that because McKenna's HCV was at an advanced stage, he was not a candidate for HCV drug treatment. Id. ¶¶ 100–101. On or about June 19, 2002, Beck wrote to Wright, urging him to reconsider the decision to deny McKenna drug treatment, and requested that McKenna see a gastroenterologist and that Beck receive copies of McKenna's medical documentation. Id. ¶ 102. On or about October 1, 2002, Beck wrote to Dr. Wright and Dr. Makram, reiterating these requests. Id. ¶ 103.

**\*3** Armed with the knowledge that his condition was decompensated, on or about December 17, 2001, McKenna wrote to Dr. Wright to request that he be seen by a liver specialist to determine whether a liver transplant would be possible. Id. ¶ 94. When McKenna received no response, Beck wrote to Dr. Wright, reiterating McKenna's request, and on April 26, 2002, Dr. Wright responded, stating that McKenna's cirrhosis was actually compensated. "He also wrote that McKenna was both too sick to be treated for HCV and too well to be considered for a liver transplant." Id. ¶¶ 95–96. In October 2002, Dr. John E. Cunningham, the Acting Regional Director at DOCS, denied HCV treatment to McKenna because he was not enrolled in an ASAT. Id. ¶ 104. McKenna explained to Dr. Cunningham that he had been drug-free for thirty-six years and alcohol-free from twenty-four years, and had already completed programs similar to the ASAT affiliated with the facility. Id. ¶¶ 105–106. Despite the fact that McKenna had already been diagnosed as "medically unassignable", meaning that he was too ill to participate, he began the ASAT program on or about December 16, 2002, solely to become eligible for HCV treatment. Id. ¶ 107. During this time, McKenna suffered from "chronic fatigue, weakness, extreme breathing difficulty, dizziness, blurred vision, disorientation, and abdominal pain that was aggravated by prolonged sitting." Id. ¶ 108. On or about January 7, 2003, Beck wrote to Dr. Makram, requesting that McKenna receive HCV treatment since he was now enrolled in an ASAT. Id. ¶ 110. McKenna was approved for HCV drug therapy on or about January 17, 2003. Id. ¶ 111. McKenna wrote to Dr. Cunningham on or about January 29, 2003, because he still had not begun treatment. McKenna had a video conference through Telemeet with Dr. Rodgers of AMC on or about February 3, 2003, during which Dr. Rodgers recommended that

McKenna begin a forty-eight week course of Peg–Interferon plus Ribavirin. Id. ¶ 113. McKenna received his first round of treatment on or about February 7, 2003, but his treatment was discontinued soon thereafter because he experienced side-effects. Id. ¶ 114. McKenna has not received an in-person evaluation by a specialist since April 2001. Id. ¶ 115.

### 2. *Administrative Remedies*

**[1]** McKenna has exhausted the administrative remedies available to him. On or about February 12, 2001, he filed a complaint with the New York State Commission of Corrections Medical Review Board ("CMRB"), alleging that the DOCS' Guidelines provisions requiring that inmates complete an ASAT program and be in such a position that they will definitely remain incarcerated for at least twelve months in order to be eligible for HCV treatment, were unconstitutional. Id. ¶ 118. McKenna filed a grievance complaint, WB–11519–01, on or about February 14, 2001, with regard to the delay and denial of his HCV treatment. Id. ¶ 119. Deputy Superintendent for Administration at WCF, T.J. Miller, denied McKenna's grievance on or about February 16, 2001 because "the delays McKenna experienced in receiving medical treatment were not critical in the view of the medical community." Id. ¶ 120. The Inmate Grievance Resolution Committee ("IGRC") issued a response to McKenna's grievance, after a hearing, suggesting that "the HCV policy should be looked into and possibly revised so that patients diagnosed with HCV could receive immediate treatment." Id. ¶ 121. McKenna appealed this determination to John P. Keane, the Superintendent of WCF, and specifically addressed the failure by the IGRC to address his personal denial and delay of treatment. Id. ¶ 122. Keane responded on or about March 7, 2001, stating that "the punitive and compensatory damages that McKenna had requested in his appeal were beyond the scope of the grievance program. Id. ¶ 123. McKenna appealed Keane's decision to the Central Office Review Committee ("CORC") on or about March 8, 2001. McKenna sought review of the denial and delay of his treatment and of the DOCS' Guidelines. The CORC denied his appeal on or about April 11, 2001. Id. ¶ 124.

### B. Procedural History

**\*4** McKenna filed his complaint *pro se* on July 19, 2001. On November 16, 2001, he moved pursuant to Fed.R.Civ.P. 65 for a permanent injunction, enjoining his

delay of medical treatment by a specialist. On March 5, 2002, Judge Knapp denied plaintiff's motion. On July 29, 2003, the matter was reassigned to this Court. Plaintiff filed an amended complaint, with the assistance of *pro bono* counsel, on August 21, 2003, seeking an Order (a) requiring defendants to provide McKenna with medical treatment for his HCV, including treatment by a specialist in HCV and cirrhosis, (b) declaring that defendants violated his Eight Amendment rights, (c) declaring that defendants violated his Fourteenth Amendment right to substantive due process, (d) enjoining defendants from conditioning medical care on non-medical criteria, (e) requiring defendants to pay compensatory damages of no less than $3,000,000, (f) requiring defendants to pay punitive damages of no less than $3,000,000, (g) requiring defendants to pay plaintiff's attorneys' fees and costs; and (h) providing any further relief that this Court deems fair and equitable. Defendants filed the instant motion to dismiss on October 3, 2003, and submitted the motion fully-briefed on November 3, 2003.

## II. DISCUSSION

### A. Standard of Review

In adjudicating a 12(b) motion to dismiss, all well-pled factual allegations are taken as true, and all reasonable inferences are construed in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 52 (2d Cir.1996). Dismissal of the complaint is appropriate only when it appears that the plaintiff cannot prove a set of facts "in support of his claim which would entitle him to relief." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). The Court's role is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000), quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984). However, "complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights 'instead of a litany of general conclusions that shock but have no meaning.' " *Morales v. Santor,* 94 Civ. 217, 1995 U.S. Dist. LEXIS 19021, at *4 (N.D.N.Y. Dec. 4, 1995), quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

### B. Personal Involvement

"An individual defendant is not liable under § 1983 absent personal involvement." *Rivera v. Goord,* 253 F.Supp.2d 735, 747 (S.D.N.Y.2003), citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). And, personal liability may not be imposed on a state official pursuant to a theory of respondeat superior. *See Black v. Coughlin II,* 76 F.3d 72, 74 (2d Cir.1996). Therefore, the plaintiff must assert that "the defendant had some direct [or personal] involvement in or responsibility for the misconduct." *Woods v. Goord, et al.,* 01 Civ. 3255, 2002 U.S. Dist. LEXIS 7157, at *22 (S.D.N.Y. April 23, 2002), quoting *Thompson v. New York,* 99 Civ. 9875, 2001 WL 936432, at *6 (S.D.N.Y. Mar. 15, 2001). In this Circuit, for purposes of asserting a § 1983 violation, the personal involvement of a supervisory official may be established when:

> **\*5** (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

*Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001), citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### 1. *Non–Medical Supervisory Defendants*

The amended complaint asserts claims against four non-medical supervisory defendants, Goord, Keane, Raymond Cunningham, and Miller.

### a. Goord

[2] Plaintiff has failed to assert sufficient facts to establish the personal involvement of defendant Goord. The only

direct claims asserted against Goord are that (1) on or about July 5, 2001, McKenna sent him a copy of a letter that he had previously sent to Dr. Wright, which stated his desire to be seen again by Dr. Maliakkal (Am.Compl.¶ 90), that (2) McKenna wrote a letter directly to Goord on August 7, 2001, reiterating this request (id.¶ 100), and finally that (3) on or about October 5, 2001, Dr. Wright (not Goord) responded to McKenna's August 7 letter (id.¶ 101). This involvement is clearly inadequate as the mere "[r]eceipt of letters or grievances [ ] is insufficient to impute personal involvement." *Woods v. Goord, et al.,* 2002 U.S. Dist. LEXIS 7157, at *24 (citations omitted); *Atkins et al. v. County of Orange, et al.,* 251 F.Supp.2d 1225, 1234 (S.D.N.Y.2003)* ("if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that *§ 1983* does not impose respondeat superior liability."), citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002).* Further, "referring medical complaint letters to lower-ranked prison supervisors [ ] [also] does not constitute personal involvement." *Woods,* 2002 U.S. Dist. LEXIS 7157, at *25. Therefore, plaintiff's position that Goord is personally liable for "his failure to ensure" that Dr. Wright properly resolved McKenna's grievance (Am.Compl.¶ 126), is merely an end-run around the legal standard and fails to establish Goord's personal involvement. Because plaintiff makes no further allegations as to Goord's involvement, plaintiff's claims against Goord are dismissed.

### b. Miller

**[3]**  Plaintiff has sufficiently established the requisite personal involvement of defendant Miller. Plaintiff asserts that Miller "personal[ly] deni[ed][ ] McKenna's HCV treatment" (Am.Compl.¶ 129), through his denial of plaintiff's February 14, 2001 grievance, in which he stated that "the delays McKenna experienced in receiving medical treatment were not critical in the view of the medical community." Id. ¶¶ 119–120. While some Courts in this district have recently held that "where a supervisory official receives and acts on a prisoner's grievance ... personal involvement will be found under the second *Colon* prong" (*Williams v. Fisher, et al.,* 02 Civ. 4558, 2003 U.S. Dist. LEXIS 16442, at *31 (S.D.N.Y. Sept. 17, 2003); *see also Atkins,* 251 F.Supp.2d at 1234)), others have found personal involvement in such circumstances only when the supervisor's response is detailed and specific (s *ee Woods,* 2002 U.S. Dist. LEXIS 7157, at *3031

(no personal involvement is established when defendant merely responded to plaintiff's letter but personal involvement attaches when defendant "responded in such a way as to suggest notice of the 'duration and extent of plaintiff's condition.' "), citing *Rashid v. Hussain,* 95 Civ. 676, 1997 WL 642549, at *3 (N.D.N.Y. Oct.15, 1997)).

***6**  Even under the more restrictive interpretation of *Colon,* Miller's personal involvement is apparent. While Miller's actual *response* [5] does not exude familiarity with the details of McKenna's situation, [6] since plaintiff's grievance, from which Miller based his determination, provides the full contextual background of McKenna's medical travails, the fact that Miller chose not to discuss the facts of McKenna's history in his response is irrelevant. Further, the seriousness of McKenna's illness, the grave consequences associated with delay of treatment, and the tortuous path that McKenna has traversed in his attempt to secure treatment—all of which were before Miller in McKenna's grievance—suffice to establish Miller's personal involvement through his denial of McKenna's grievance.

### c. Keane

**[4]**  Plaintiff has asserted sufficient claims against Keane to establish, at least at this stage, Keane's personal involvement in the alleged constitutional violations suffered by McKenna. Plaintiff asserts that Keane failed "to address or rectify the denial of McKenna's HCV treatment" (Am.Compl.¶ 127) when he handled plaintiff's appeal from the IGRC's February 22, 2001 decision on his grievance. Notably, although too late to assist McKenna, the IGRC credited McKenna's assertions by "suggest[ing] that the HCV policy should be looked into and possibly revised so that patients diagnosed with HCV could receive immediate treatment." Id. ¶ 121. McKenna appealed the IGRC's failure specifically to address "the denial and delay of medical treatment that McKenna had experienced" (id.¶ 122) and indeed was continuing to experience. After his review of the IGRC's decision, Keane affirmed and noted to McKenna that "the punitive and compensatory damages that [he] had requested in his appeal were beyond the scope of the grievance program." Id. ¶ 123. The fact that Keane viewed his role as limited to that of determining whether McKenna could be recompensed monetarily for his allegedly unconstitutional treatment through the grievance mechanism does not

serve to make him unfamiliar with McKenna's underlying contentions, about which he had or should have read.

While some Courts in this district have interpreted the second *Colon* factor ("the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong") to require more than the mere affirmance of a grievance denial (*see Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance–which is all that is alleged against him–is insufficient to establish personal involvement ..."), citing *Scott v. Scully,* 93 Civ. 8777, 1997 U.S. Dist. LEXIS 12966, at *11 (S.D.N.Y.1997); *Villante v. N.Y. State Dep't of Corr. Servs., et al.,* 96 Civ. 1484, 2001 U.S. Dist. LEXIS 25208, at *17 (N.D.N.Y. Oct. 25, 2001), Report and Recommendation adopted at 2002 U.S. Dist. LEXIS 26279 (N.D.N.Y. Mar. 28, 2002)),[7] the Second Circuit and other courts in this district have found sufficient personal involvement in such situations (*see Williams v. Smith, et al.,* 781 F.2d 319, 324 (2d Cir.1986); *Wright v. Smith, et al.,* 21 F.3d 496, 502 (S.D.N.Y.1994). Further, Keane did not merely affirm, but rather affirmed with a comment that evidenced a familiarity with McKenna's situation. Therefore, as the amended complaint pleads that Keane was "informed of the wrong" through McKenna's appeal and "failed to remedy the wrong", it is sufficient as to Keane's involvement at least for now.

d. Raymond Cunningham

**\*7** Plaintiff's assertions against defendant Raymond J. Cunningham, the Superintendent of WCF, while not at this early stage replete with factual support, provide the potential to establish Raymond Cunningham's personal involvement. Plaintiff asserts that Raymond Cunningham "knew of and disregarded McKenna's serious medical needs, evincing deliberate indifference to those needs" by "upholding the denial of McKenna's HCV treatment." Am. Compl. ¶ 128. While not exactly a model of clarity, this language could be interpreted as sufficient to establish Raymond Cunningham's personal involvement in McKenna's case, as required for § 1983 liability.[8] If after discovery, defendant continues to believe that Raymond Cunningham was not sufficiently involved, he has ample opportunity to demonstrate and support that belief in a dispositive motion.

C. Qualified Immunity

"The doctrine of qualified immunity protects state actors sued in their individual capacity from suits for monetary damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Baskerville v. Blot,* 224 F.Supp.2d 723, 737 (S.D.N.Y.2002), quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Even where [ ] a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Woods,* 2002 U.S. Dist. LEXIS 7157, at *35, quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d. Cir.1991). Therefore, state officials are shielded by qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001), quoting *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996). While "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law" (*Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992)), the determination "usually depends on the facts of the case ... making dismissal at the pleading stage inappropriate" (*Woods,* 2002 U.S. Dist. LEXIS 7157, at *35) (citations omitted)).

It has already been determined that plaintiff's claims against supervisory defendant Goord must be dismissed for failure to assert his personal involvement in the alleged constitutional violations. As to the remaining seven defendants, supervisory officials Miller, Raymond Cunningham, and Keane, and doctors Wright, Lancellotti, Makram, and John Cunninghman, defendants argue that all are protected by qualified immunity. While defendants do not contest that it is clearly established that inadequate medical care may comprise an Eighth Amendment violation when prison officials are deliberately indifferent to an inmate's serious medical needs, nor could they (*see Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977)), they assert that defendants acted in an objectively reasonable manner in either directly or indirectly denying medical treatment to the plaintiff. While defendants may be correct, at this stage, the Court need only determine whether the allegations in the amended complaint, read

in the light most favorable to plaintiff, demonstrate as a matter of law that defendants acted in an objectively reasonable manner in denying treatment to plaintiff. Defendants have failed to make this showing.

**\*8  [5]**  Defendants base their claim that it was objectively reasonable for these defendants to deny treatment on the fact that the denial was consonant with the HCV Guidelines (Def. Mem. at 16–18) and that non-medical officials may refrain from interfering with the medical treatment of inmates (Reply at 8). However, because plaintiff has asserted that the HCV Guidelines themselves are facially unconstitutional (Am.Compl.¶ 48), and that defendants' applied certain provisions of the HCV Guidelines in a purposeful effort to deny McKenna treatment "based on a series of ever-changing pretextual reasons" (id.¶ ¶ 5, 79, 81, 98), including but not limited to "pecuniary" motivations (id.¶ 8), defendants' argument misses the mark. Rather than demonstrate that the amended complaint is insufficient, defendants argue the ultimate determination to be made in this case. It is clear both from the lack of protestations to the contrary by defendants and this Court's independent review of the amended complaint that the allegations against these defendants, as pled, leave open the potential that they knew or reasonably should have known that they were violating plaintiff's clearly established Eighth Amendment rights. [9] As per the record currently before the Court, defendants have not established qualified immunity as a matter of law.

D. Fourteenth Amendment Claim

 **[6]**   As no one contests that McKenna's constitutional claim is covered by the Eighth Amendment, the substantive due process claim under the Fourteenth Amendment, based upon the same set of facts, should be dismissed. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Velez v. Levy,* 274 F.Supp.2d 444, 454 (S.D.N.Y.2003), quoting *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). "If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *U.S. v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). [10] Therefore, plaintiff's Fourteenth Amendment substantive due process claim is dismissed as against all defendants. [11]

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted-in-part and denied-in-part. All of plaintiffs' claims against defendant Goord as well as plaintiff's substantive due process claim under the Fourteenth Amendment against all defendants are dismissed. The clerk of the Court is requested to close this motion and any outstanding motions.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 102752

Footnotes

1    HCV "is the most common chronic blood-borne virus in the United States. Am. Compl. ¶ 28.

2    "According to the Physicians Desk Reference, Zantac [the non-generic form of Ranitidine] is metabolized in the liver; accordingly, physicians should use caution before recommending it to patients with hepatic dysfunction—i.e., liver ailments such as HCV ." Am. Compl. ¶ 67.

3    "Cirrhosis is a condition in which scar tissue in the liver replaces the healthy tissue, blocking blood flow and preventing normal liver function." Am. Compl. ¶ 38.

4    "Compensated cirrhosis is characterized as not being accompanied by jaundice, ascites (an abnormal accumulation of fluid in the abdomen), vericeal bleeding and hemorrhaging (the result of increased blood pressure in the portal vein caused by liver disease, which dilates veins in the walls of the esophagus and sometimes the stomach), or hepatic encephalopathy (personality changes, intellectual impairment, and a depressed level of consciousness that results from

McKenna v. Wright, Not Reported in F.Supp.2d (2004)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 41 of 90
2004 WL 102752

liver failure). Decompensated cirrhosis, on the other hand, is characterized as being accompanied by one or more of these complications." Am. Compl. ¶ 38.

5    As plaintiff pled as to Miller's response, and therefore referenced his response in the amended complaint, it is appropriate to consider the response, which is attached to defendants' moving papers. *See Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d. Cir.1991).*

6    Miller's response reiterated the stated medical rationale for the challenged provisions of the Protocol ("Protection of society from mutation of virus due to incomplete treatment" and "Limited efficacy of the treatment if the delays are not [incomprehensible]") and expressly relied on "the view of the medical community." (Knudsen Decl. Exh. C, at 10). However, it would provide too easy a loophole if the law prohibited liability so long as supervisors reiterated the stated medical rationale, no matter how blatantly abhorrent the rationale happened to be.

7    Although *Burgess* appears at first blush to present contra authority, the plaintiff in Burgess pled more than the mere affirmance of a grievance. *See Burgess v. Goord, et al.,* 98 Civ.2077, 1999 U.S. Dist. LEXIS 611, at 13–14 (S.D.N.Y. Jan. 26, 1999) (holding that Superintendent Keane's knowledge may be imputed both from plaintiff's appeal of his grievance to Keane and Keane's earlier statement regarding plaintiff's ability to take the stairs, "evinc[ing] his awareness of the situation."). Further, Judge Scheindlin criticized her *Burgess* holding in *Woods v. Goord,* when she noted, with regard to *Burgess,* that the "statement of law" that "courts have found personal involvement of a supervisory official where a plaintiff has sent letters or orally informed the official of an ongoing constitutional violation" is "now against the weight of authority." *Woods,* 2002 U.S. Dist. LEXIS 7157, at *26 n. 14.

8    For example, Raymond Cunningham may have been partially responsible for drafting the targeted provisions of the HCV Guidelines. While plaintiff asserts in his opposition papers that all of "the Supervisory Defendants *likely* played a part in creating and enforcing the Guidelines to prevent Mr. McKenna from receiving treatment" and that "evidence obtained through discovery will *likely* demonstrate that one or more of these three Defendants [Keane, Miller, or Raymond Cunningham] were responsible for permitting the continuance of the policies and practices that are alleged to have violated the Constitution" (Pl. Opp. at 11) (emphasis added), this specific claim is not pled in the amended complaint and therefore is not among the claims analyzed to determine if plaintiff's pleading is sufficient. *See Bolt Elec. v. City of New York,* 53 F.3d 465, 471–72 (2d Cir.1995). In any event, because this assertion is both indirect and hypothetical, plaintiff is encouraged to seek discovery on this issue.

9    Even at the summary judgment stage, dismissal of claims against a defendant on grounds of qualified immunity is appropriate only if "... the evidence is such that, even when it is viewed in the light most favorable to the plaintiff [ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *Ford v. McGinnis, et al.,* No. 02–0205, 2003 U.S.App. LEXIS 25224, at *42 (2d Cir. Dec. 15, 2003) (quotations omitted).

10    The case introduced by plaintiff for the first time at oral argument, *Langley v. Coughlin, et al.,* 715 F.Supp. 522, 538 (S.D.N.Y.1989), does not overturn this well-established rule. Rather, *Langley* discusses the relative standards of inadequate medical treatment under the Eighth and Fourteenth Amendments, finds that the "due process standard appears to be identical to the Eighth Amendment test for denial of medical care", and cites one scenario (habilitative training to people involuntarily confined) where due process provides a standard "to be applied when the individual is not claiming denial of all access to such services, but rather contends that the care provided was glaringly inadequate." *Id.* As that is not the posture of this case, and neither plaintiff nor defendant argued that McKenna's claims fall outside the confines of the Eighth Amendment, *Langley* provides no reason to depart from the tradition of dismissing a substantive due process claim that is more aptly pled under a specific Amendment.

11    It should be noted that since personal involvement is a prerequisite to liability under Section 1983, under which both plaintiff's Eighth and Fourteenth Amendment claims lie, plaintiffs would fare no better under a Fourteenth Amendment analysis with regard to Goord.

---

**End of Document**                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5854551
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward Sanchez, Plaintiff,

v.

Harold Graham, et al., Defendants.

Civ. No. 9:12-CV-1646 (NAM/DJS)
|
Signed 09/12/2016

**Attorneys and Law Firms**

EDWARD SANCHEZ, 326-49th Street, No. 2, Brooklyn, New York 11220, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, The Capitol, OF COUNSEL: ADRIENNE J. KERWIN, ESQ., Assistant Attorney General, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

On November 5, 2012, *pro se* Plaintiff Edward Sanchez commenced this action, pursuant to 42 U.S.C. § 1983, asserting claims under the Eighth Amendment arising from his conditions of confinement at Auburn Correctional Facility and the medical care he received at Clinton Correctional Facility. Dkt. No. 1, Compl. Presently before the Court is Defendants' Motion for Summary Judgment pursuant to FED. R. CIV. P. 56. Dkt. No. 40, Defs.' Mot. Summ. J. Plaintiff opposed the Motion and Defendants filed a Reply. Dkt. Nos. 56, Pl.'s Resp.; 58, Defs.' Reply. For the reasons that follow, the Court recommends that Defendants' Motion be **granted in part and denied in part**.

**I. BACKGROUND**

Plaintiff's Complaint asserts claims arising from his incarceration, while in the custody of the New York Department of Corrections and Community Supervision

("DOCCS"), at Auburn Correctional Facility ("Auburn") and Clinton Correctional Facility ("Clinton") from November 12, 2010 to September 2012. Compl. at ¶¶ 28-82. The Court herein summarizes the undisputed material facts.

**A. Plaintiff's Failure to File a Rule 7.1(a)(3) Statement of Material Facts**

Under Local Rule 7.1(a)(3), on a motion for summary judgment a non-movant must respond to the movant's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and "set forth a specific citation to the record where the factual issue arises." N.D.N.Y.L.R. 7.1(a)(3). "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.* Defendants request that the Court deem their Rule 7.1(a)(3) Statement of Material Facts admitted due to Plaintiff's failure to file an opposing statement of material facts. Defs.' Reply at pp. 3-4. However, the Second Circuit, acknowledging the court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that the court may in its discretion opt to conduct a review of the entire record even where one of the parties has failed to file a 7.1 statement. *Holtz v. Rockefeller & Co., Inc.*, 258 F. 3d 62, 73 (2d Cir. 2001). Therefore, in deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

**B. Plaintiff's Medical History**

On January 21, 2004, when Plaintiff was incarcerated at Southport Correctional Facility, he was sent for a CT scan of his lumbar spine, due to persistent low back pain radiating down both legs, which was subsequent to a fall down a flight of stairs said to have occurred in 2001. Compl. at ¶¶ 14-15; Dkt. No 1-1, Pl.'s Exs. at pp. 2 & 5.[1] The CT scan revealed suspicion of a herniated disc at L5-S1. Pl.'s Exs. at p. 2. Plaintiff was then transferred to Auburn, and his incoming health screening, conducted on February 3, 2004, indicated that he had "low back pain possible herniated disc" and further indicated that he was to be assigned to a bottom bunk. *Id.* at p. 3. Plaintiff was also provided other accommodations for his back pain at Auburn, including an extra mattress

and a back brace. *Id.* at p. 4 & 6. An MRI was conducted on December 9, 2004, which indicated grade one spondylolisthesis and left posterior disc protrusion at L5-S1. *Id.* at p. 10. Plaintiff was then released from DOCCS custody, but was incarcerated again in late 2009. *See* Compl. at ¶ 28. On January 15, 2010, a "problem list" listing Plaintiff's medical complaints while in DOCCS custody was generated, which listed chronic lower back pain as late as December 18, 2009. *Id.* at ¶ 29; Pl.'s Exs. at pp. 18-19. An x-ray report prepared on February 12, 2010 indicated, *inter alia*, that Plaintiff had grade one anterolisthesis at L5-S1. Pl.'s Exs. at p. 20. An orthopedic consult was recommended, and while Plaintiff agreed to it, the consult form is notated at the top "Albany denied." *Id.* at pp. 21-22.

### C. Auburn Correctional Facility

**\*2** According to the Plaintiff, he was transferred to Auburn on November 12, 2010. Compl. at ¶ 33. Plaintiff was initially assigned to a single cell. Dkt. No. 40-5, Harold Graham Decl., dated Sept. 4, 2014, at ¶ 6. That same day, a "Screening and Physical Assessment for Placement in a Double Cell" form was filled out and signed by Defendant Nurse Cornall. Dkt. No. 40-13, Joshua Farrell Decl., Ex. 1.[2] The Form contained two sections: (1) a medical record screening review and (2) a physical assessment.[3] *Id.* In connection with the review of an inmate's medical records, the Form specifically asked:

> Are there any known medical indications requiring him to be placed in the bottom bunk bed?(E. G. Medically documented – back problems (through radiological or physician review)...). *Id.*

The Form is marked "no." *Id.* The second section of the Form deals with a physical assessment of the inmate and inquires whether such examination disclosed medical indications requiring the inmate to be placed in the bottom bunk. *Id.* The Form was again marked "no." *Id.* Plaintiff asserts in the Complaint that Defendant Cornall never conducted a physical assessment of him. Compl. at ¶ 35. In addition to the Screening and Physical Assessment Form, Defendant Cornall also completed a "Health Screening for Intrasystem Transfer" form on November 12, 2010. Dkt. No. 40-9, Noreen Cornall Decl., dated Sept. 26, 2014,

at ¶ 6; Farrell Decl., Ex. 8. Defendant Cornall is unable to recall examining Plaintiff, but believes that he did not mention any back problems at the screening because it was her practice to record all of an inmate's health complaints on the Health Screening form. Cornall Decl. at ¶ 6. She further notes that on the Health Screening form Plaintiff was noted to "ambulate without assistance." *Id.*; Farrell Decl., Ex. 8.

On this same date, a counselor in Auburn's Guidance Unit began to complete a form[4] (the "Double Cell Information Sheet") to review Plaintiff's status for double celling; at that time, all Auburn inmates were reviewed for double celling. Graham Decl. at ¶ 9; Farrell Decl., Ex. 2. The counselor completed the "Suitability" and "Compatibility" sections of the Information Sheet, and then forwarded the Information Sheet to Health Services for completion of the "Health Services Review Results." Graham Decl. at ¶ 9. In completing the "Health Services Review Results," a nurse would review the inmate's Medical Problem List and determine whether the inmate was suitable for double bunking consistent with DOCCS Policy No. 1.49.[5] Dkt. No. 40-8, Mary Coryer Decl., dated Sept. 8, 2014, at ¶ 11. The nurse who completed Plaintiff's "Health Services Review Results" approved Plaintiff for double celling and indicated that he did not need a bottom bunk. Farrell Decl., Ex. 2. Defendant Nurse Cornall denies that she was the nurse who completed the "Health Services Review Results." Cornall Decl. at ¶¶ 8-9. As explained by Defendant Nurse Coryer, although Plaintiff's Medical Problem List indicated "Back Pain with Radiating Symptoms," the associated code did not require bottom bunk placement under Policy No. 1.49; bottom bunk placement was only required if the code was "SRID." Coryer Decl. at ¶ 11; Farrell Decl., Ex. 6. On November 19, 2010, a captain at Auburn, who is not a defendant to this action, approved Plaintiff for double celling. Graham Decl. at ¶ 7; Farrell Decl., Ex. 2.

**\*3** Plaintiff was not assigned to a double cell until March 2, 2011. Graham Decl. at ¶ 11. The decision to assign Plaintiff to a specific double cell was made by the Movement Control Officer who was on duty that date. *Id.* The Movement Control Officer is supervised by the Lieutenant Watch Commander. *Id.* at ¶ 16. Defendant Graham, the Superintendent of Auburn, explains that the decision to assign an inmate to a specific double cell is made chronologically; that is, inmates who have been housed at Auburn longer are assigned to a double cell

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

before inmates who have arrived more recently. *Id.* at ¶ 12. Plaintiff was assigned to a top bunk. Compl. at ¶ 41. Plaintiff claims that placement in the top bunk caused him "extreme back pains" because there was no ladder and he had to climb and jump in order to reach his bed. *Id.* at ¶ 43.

Plaintiff sent letters requesting to be removed from the top bunk and his double cell assignment to Defendants Coryer and Graham on March 7, 16, and 24, 2011. *Id.* at ¶¶ 43-45; Farrell Decl., Exs. 3 & 7. On April 5, 2011, Plaintiff filed a grievance, assigned No. AUB-58370-11, which complained that he had been assigned to a top bunk without consideration of his chronic lower back pain. Farrell Decl., Ex. 4. On April 7, 2011, Plaintiff alleges that he fell while trying to reach the top bunk, aggravating his back injury. *See* Compl. at ¶¶ 48-49. Plaintiff was taken to sick call, where he was given Motrin and ordered to have one day of bed rest. Pl.'s Exs. at pp. 42-43. Plaintiff returned to sick call on April 8, 2011, and was excused from programs and work for three more days. *Id.* at pp. 44-45.

On April 12, 2011, Defendant Coryer responded to Plaintiff's complaint letters. Coryer Decl. at ¶ 18. Reviewing Plaintiff's Medical Problem List and current medical chart, Defendant Coryer determined that Plaintiff did not meet the criteria for bottom bunk placement under DOCCS Policy No. 1.49 and advised Plaintiff as such. *Id.* Defendant Coryer directed Plaintiff to "go to sick call to address concerns." Farrel Decl., Ex. 7. She explains that she intended Plaintiff to attend sick call to have a physical examination to determine if his back problems qualified him for a bottom bunk. Coryer Decl. at ¶ 18. However, on April 16, 2011, Plaintiff was removed from his double cell assignment. Graham Decl. at ¶ 24. On April 22, 2011, Defendant Coryer sent another a response to Plaintiff that informed him that he did "not meet the criteria for a bottom bunk" and referred him to her earlier letter. Farrell Decl., Ex. 7.

### D. Clinton Correctional Facility

On February 10, 2012, Plaintiff was transferred to Clinton. Compl. at ¶ 70. At Clinton, Plaintiff received medical care from Defendant Dr. Kang Lee. At his first examination of Plaintiff, on February 29, 2012, Defendant Dr. Lee noted Plaintiff's high blood pressure, left shoulder injury, and degenerative back condition, and also marked

that Plaintiff was fully ambulatory. Dkt. No. 40-10, Kang Lee Decl., dated Sept. 11, 2014, at ¶ 6; Farrell Decl., Ex. 9 ("Pl.'s AHR") at p. 34. [6] Plaintiff had a prescription for Neurontin at that time. Lee Decl. at ¶ 6. Reviewing Plaintiff's medical chart, and due to Plaintiff's history of heroin abuse, Dr. Lee determined that it was appropriate to treat Plaintiff with non-steroidal anti-inflammatory drugs on an as-needed basis. *Id.*

After the February 29 examination, Defendant Dr. Lee ordered an x-ray of Plaintiff's right knee and that Plaintiff be provided with a refill of his Neurontin prescription and a knee brace. *Id.* at ¶ 7. On March 22, 2012, Dr. Lee saw Plaintiff for pain in his right knee and left shoulder. *Id.*; Pl.'s AHR at p. 38. Dr. Lee prescribed Plaintiff Naprosyn for his pain symptoms and ordered a physical therapy consultation. Lee Decl. at ¶ 7. He also reviewed Plaintiff's right knee x-ray report, which indicated "partial ossification of the proximal patellar tendon near its patellar attachment site." *Id.* He determined that no action was required with respect to that finding. *Id.*

**\*4** On April 4, 2012, Plaintiff was approved for physical therapy for his left shoulder, and Plaintiff started his physical therapy the next day. *Id.* at ¶¶ 8-9. After sessions on April 26 and April 27, Plaintiff was noted to tolerate the physical therapy well. Farrell Decl., Ex. 11. When Plaintiff saw Dr. Lee again on April 28, 2012, he was noted to be fully ambulatory. Lee Decl. at ¶ 10; Pl.'s AHR at p. 40. Plaintiff claimed that the Naprosyn was ineffective at treating his pain. Lee Decl. at ¶ 10. On May 3, 2012, Plaintiff refused further physical therapy. *Id.* at ¶ 11. On May 18, 2012, Plaintiff refused to be examined by Dr. Lee. *Id.* at ¶ 12.

When Plaintiff next saw Defendant Dr. Lee on June 28, 2012, he continued to complain of shoulder, knee, and back pain. *Id.* at ¶ 13; Pl.'s AHR at p. 45. Dr. Lee noted that Plaintiff was fully ambulatory and not limping. Pl.'s AHR at p. 45. Dr. Lee again saw Plaintiff on August 2, 2012, for the same complaints. *Id.* at p. 47. Dr. Lee determined that it was appropriate to continue treating Plaintiff with Neurontin and Naprosyn. Lee Decl. at ¶ 14; Pl.'s AHR at p. 47. On August 28, 2012, at sick call, Plaintiff requested a referral to a pain specialist and stated that he was unable to take Naprosyn because it upset his stomach. Pl.'s AHR at p. 48. On October 11, 2012, Dr. Lee saw Plaintiff for the same complaints and requested that

Sanchez v. Graham, Not Reported in F.Supp.3d (2016)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 45 of 90
2016 WL 5854551

Plaintiff not be assigned to jobs requiring heavy lifting. Lee Decl. at ¶ 15.

### E. Plaintiff's Claims

Plaintiff's Complaint asserts Eighth Amendment medical indifference claims based on his assignment to a top bunk without regard to his back injury at Auburn against Defendants Cornall, Coryer, Graham, Dr. Kooi, and Robinson. Plaintiff also asserts an Eighth Amendment medical indifference claim against Defendant Dr. Lee based on the medical treatment he received at Clinton. Plaintiff names Dr. Carl Koenigsmann, Deputy Commissioner and Chief Medical Officer, as a Defendant to these claims. In addition to his constitutional claims, Plaintiff asserts negligence and medical malpractice claims. Plaintiff requests monetary damages and declaratory and injunctive relief.

### F. Defendants' Motion

Defendants moved for summary judgment on October 1, 2014. Defs.' Mot. for Summ. J. Defendants seek summary judgment on the following grounds: (1) Defendants Graham, Robinson, Dr. Kooi, Coryer, and Cornall were not personally involved in the decision to assign Plaintiff to a top bunk; (2) Defendants are entitled to judgment as a matter of law on Plaintiff's deliberate medical indifference claims; (3) Defendants are entitled to qualified immunity on Plaintiff's deliberate medical indifference claims; (4) Dr. Koenigsmann was not personally involved in any of the alleged constitutional violations and Plaintiff failed to exhaust his administrative remedies on any claims against Dr. Koenigsmann; and (5) Plaintiff's declaratory and injunctive relief claims are moot, his official capacity claims are barred by the Eleventh Amendment, and his state law claims are barred by N.Y. Correction Law § 24. Dkt. No. 40-1, Defs.' Mem. of Law.

## II. DISCUSSION

### A. Summary Judgment Standard

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Plaintiff's Claims Against the Auburn Defendants

The basis of Plaintiff's Eighth Amendment claim arising from the events that occurred at Auburn is that Defendants' assignment of Plaintiff to a top bunk,

in spite of his established medical condition, and in alleged contravention of the applicable DOCCS protocol, amounts to deliberate indifference to his serious medical needs and therefore violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

### 1. Personal Involvement

It is undisputed that the final decision to assign Plaintiff to a double cell was made by a non-defendant officer, and the final decision to approve Plaintiff for placement in a double cell was made by a non-defendant captain. Graham Decl. at ¶¶ 9 & 11. Accordingly, Defendants argue that Plaintiff cannot establish the personal involvement of any of the named Defendants in the decision to assign Plaintiff to a double cell. Defs.' Mem. of Law at pp. 5-9. Plaintiff alleges the liability of (1) Defendants Graham, Robinson, and Dr. Kooi for implementing a policy at Auburn of double bunking inmates without regard to medical need, failing to investigate Plaintiff's complaints, and failing adequately supervise their subordinates; (2) Defendant Coryer for failing to properly investigate and respond to his complaints; and (3) Defendant Cornall for failing to properly conduct a medical assessment of Plaintiff. *See* Compl. at ¶¶ 83-128 & 136-45.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A supervisory official may not be held liable merely because he held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be

held liable simply because he holds a high position of authority).

**\*6** The Second Circuit has held that the personal involvement of a supervisory official may be established if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted). [7]

#### a. Supervisory Claims

Plaintiff's allegations with respect to Defendants Graham, Robinson, and Dr. Kooi are unsupported by the record and insufficient to establish the personal involvement of these Defendants. Defendant Graham is the Superintendent of Auburn; Defendant Robinson was the Deputy Superintendent of Security at Auburn during the relevant events of this action; and Defendant Dr. Kooi is the Facility Health Services Director at Auburn. Graham Decl. at ¶ 1; Dkt. Nos. 40-6, Grafton Robinson Decl., dated Sept. 4, 2014, at ¶ 1; 40-7, Pang Kooi Decl. at ¶ 1.

First, it is undisputed that none of these Defendants directly participated in the decision to assign Plaintiff to a double cell. Graham Decl. at ¶ 14; Robinson Decl. at ¶ 14; Kooi Decl. at ¶ 14. Second, while Plaintiff alleges that he sent letters complaining of his double

bunking to Defendants Graham and Robinson, Compl. at ¶¶ 44 & 50, it is undisputed that neither of these Defendants personally investigated those letters, but instead referred them to subordinates. The mere receipt of, without personally investigating, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d 195, 199 (N.D.N.Y. 2009). Defendant Graham received letters from Plaintiff dated March 16, 2011 and April 11, 2011, which he read, but then forwarded to Defendant Coryer to investigate and answer. Graham Decl. at ¶ 22; Farrell Decl., Ex. 3. Defendant Robinson does not recall receiving the April 11, 2011 letter that Plaintiff allegedly sent to him, but states that he did not personally investigate any inmate letter complaints and would forward them to an appropriate department. Robinson Decl. at ¶ 22. Accordingly, Plaintiff's letters to Defendants Graham and Robinson are insufficient to establish those Defendants' personal involvement.

**\*7** Plaintiff also alleges the personal involvement of Defendant Graham based on the appeal of his grievance to the Superintendent's office. Compl. at ¶ 86. Some courts in this Circuit have held that a supervisor's review and denial of a grievance is sufficient to establish personal involvement. *See, e.g.*, *Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009). However, certain of those courts have held that a supervisor's denial of a grievance will only establish personal involvement where there is an ongoing constitutional violation, a position that the Court adopts here. *See id.* ("[M]any courts in this Circuit ... have held that an alleged constitutional violation complained of in a grievance must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.' " (quoting *Vega v. Artus*, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009))); *Harnett v. Barr*, 583 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). In this case, Plaintiff was removed from his double cell assignment on April 16, 2011, eleven days after Plaintiff

filed a grievance relative to his cell assignment. Graham Decl. at ¶ 24. Plaintiff did not appeal his grievance to the Superintendent's office until June 2, 2011, Farrell Decl., Ex. 15 at p. 154;[8] therefore, the alleged violation was not ongoing by the time Defendant Graham's office considered Plaintiff's grievance. Accordingly, this basis for Defendant Graham's personal involvement is also insufficient.

Plaintiff's remaining allegations against Defendants Graham, Robinson, and Dr. Kooi recite the *Colon* categories in conclusory terms and are insufficient to create personal involvement. Specifically, Plaintiff alleges that these Defendants allowed a policy in which unconstitutional practices occurred and were grossly negligent in supervising their subordinates. Compl. at ¶¶ 85, 90, 94, 97, 103, & 105. Both of these allegations are entirely unsupported. There is no evidence of a policy or custom of assigning inmates to double bunking without completing a medical assessment. Nor is there any evidence that these Defendants' supervision of their subordinates was grossly negligent, such as if they had personal knowledge of misconduct by their subordinates, either in this or other similar cases. *See Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 62 (N.D.N.Y. 2009). Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** as to Defendants Graham, Robinson, and Dr. Kooi and that these Defendants be **DISMISSED** from this action.

### b. Defendant Nurse Coryer

Defendant Nurse Coryer is the Nurse Administrator at Auburn. Coryer Decl. at ¶ 1. Like Defendants Graham, Robinson, and Kooi, it is undisputed that Nurse Coryer did not directly participate in the decision to assign Plaintiff to a double cell. *Id.* at ¶ 14. However, unlike those Defendants, Nurse Coryer personally investigated and responded to Plaintiff's letters complaining of his double bunking. *Id.* at ¶ 18. As stated by Defendant Graham, Nurse Coryer "was the supervisor who could investigate and respond to Plaintiff's concerns." Graham Decl. at ¶ 22. Nurse Coryer received letters from Plaintiff dated March 7, March 24, and April 11, 2011. Coryer Decl. at ¶ 18. She both forwarded those letters to the nurse assigned to Plaintiff's cell block and responded directly. *Id.* On April 12, 2011, she completed a sick call response, in which she reviewed Plaintiff's medical problem list and current

medical chart, from which she determined that Plaintiff did not meet the criteria for bottom bunk placement under DOCCS Policy No. 1.49. *Id.*; Farrell Decl., Ex. 7. She advised Plaintiff to attend sick call in order to obtain a physical examination to determine whether bottom bunk placement was appropriate. Coryer Decl. at ¶ 18. Nurse Coryer referred Plaintiff to this April 12 response in a letter dated April 22, 2011. Farrell Decl., Ex. 7.

Defendants argue that Plaintiff's letters to Nurse Coryer are insufficient to establish her personal involvement. Defs.' Mem. of Law at p. 8. However, while it is well-established that the mere receipt of a letter from an inmate is insufficient to establish personal involvement, "[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson v. Wright*, 234 F. Supp. 2d at 363-64; *see also Colon v. Coughlin*, (stating that a supervisory defendant may be personally involved where there is evidence that "the defendant, after being informed the violation through a report or appeal, failed to remedy the wrong"); *Pugh v. Goord*, 571 F. Supp. 2d 477, 515-16 (finding personal involvement of defendants who investigated and responded to the plaintiff's grievances and complaints); *Ramos v. Artuz*, 2001 WL 840131, at *8-10 (S.D.N.Y. July 25, 2001) (finding personal involvement of defendant who "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff in his letters"). Thus, based on Defendant Coryer's investigation of and response to Plaintiff's letters, the Court finds that there is sufficient evidence to find that she was personally involved in the alleged constitutional deprivations.

### c. Defendant Nurse Cornall

**\*8** Defendant Nurse Cornall is a nurse at Auburn. Cornall Decl. at ¶ 1. The basis of Plaintiff's claim against Defendant Cornall is that he completed Plaintiff's Screening and Physical Assessment Form, which, he claims, resulted in his assignment to a top bunk. Compl. at ¶¶ 125-27. In her screening and assessment, Defendant Cornall indicated that Plaintiff did not have any medical problems, including back problems, that would require him to be placed in a bottom bunk. Cornall Decl. at ¶ 6. Plaintiff claims that Defendant Cornall never conducted a physical assessment of him. Compl. at ¶ 35.

Notwithstanding her completion of the Screening and Physical Assessment Form, Defendant Cornall claims that she was not involved in the completion of the Double Cell Information Sheet that approved Plaintiff's placement in a double cell; she claims that a different nurse reviewed Plaintiff's medical records and signed the Double Cell Information Sheet. Cornall Decl. at ¶¶ 8-9.

Based on the current record, the review process for the placement of an inmate into double cell housing at Auburn is not entirely clear. In completing the Screening and Physical Assessment Form, Defendant Cornall was required to review Plaintiff's medical records and conduct a physical examination of Plaintiff; however, it appears that a different nurse also reviewed Plaintiff's medical records in connection with the Double Cell Information Sheet and indicated that Plaintiff did not require placement in a bottom bunk. In discussing the review of an inmate for double cell housing, Defendants suggest that the only required form is the Double Cell Information Sheet. *See* Graham Decl. at ¶ 9. Indeed, Defendants refer to the Double Cell Information Sheet as the "Approval" form. *Id.* Defendants therefore imply that the Screening and Physical Assessment completed by Defendant Cornall was not part of the review that approved Plaintiff for placement into double cell housing. *See* Defs.' Mem. of Law at pp. 10-11 (arguing that "Plaintiff's double celling was approved by an unidentified Captain upon the input of both an unknown counselor in Auburn's Guidance Unit and an unnamed nurse in Auburn's Health Screening Unit"). However, under DOCCS regulations, the Screening and Physical Assessment Form completed by Defendant Cornall was a condition precedent to Plaintiff's assignment to double cell housing. N.Y. COMP. CODES R. & REGS. tit. 7, § 1701.9. Furthermore, on a motion for summary judgment, the record must be construed in the light most favorable to Plaintiff, as the non-moving party. Thus, the Court finds Defendant Cornall's completion of the Screening and Physical Assessment Form is sufficient to establish her personal involvement in the alleged constitutional violations.

### 2. Eighth Amendment Deliberate Medical Indifference

Having recommended dismissal of Defendants Graham, Robinson, and Dr. Kooi for a lack of personal involvement, the only remaining Defendants to this claim

are as Defendant Nurse Cornall for her alleged failure to properly complete the Screening and Physical Assessment Form, and Defendant Nurse Coryer for her alleged failure to reasonably investigate and respond to Plaintiff's placement in a top bunk.

### a. Legal Standard

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment applies to the provision of medical care and inmate safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *see also Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997)("[P]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."). To establish an Eighth Amendment deliberate medical indifference claim, an inmate must establish (1) a deprivation that is, in objective terms, "sufficiently serious," and (2) that prison officials acted with deliberate indifference to his health or safety. *See Farmer v. Brennan*, 511 U.S. at 834.

**\*9** Under the objective standard, the Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer v. Brennan*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know

of and disregard an excessive risk to an inmate's health or safety. *Hathaway v. Coughlin*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

### b. Analysis

In this case, Plaintiff suffered chronic lower back pain; his medical records show that he has spondylolisthesis and posterolateral disc protrusion at L5-S1. *See* Pl.'s Exs. at p. 10. On account of his lower back pain, Plaintiff had received a bottom bunk order at other correctional facilities prior to being housed at Auburn. *See id.* at pp. 3 & 11. Furthermore, Plaintiff was removed from his top bunk at Auburn, eleven days after he filed a grievance complaining of his assignment, Compl. at ¶ 53; the current record does not reveal the reason why Plaintiff was removed from his top bunk assignment and whether it was due to a determination that Plaintiff medically required a bottom bunk assignment. Courts generally agree that chronic back injuries are "sufficiently serious" to satisfy the objective prong of the Eighth Amendment test. *See, e.g.*, *Jones v. Smith*, 2015 WL 5750136, at \*12 (N.D.N.Y. Sept. 30, 2015); *Briel v. Fields*, 2013 WL 1833248, at \*3 (E.D.N.Y. May 1, 2013). Although the record demonstrates that Plaintiff's back injury had warranted a bottom bunk assignment prior to his transfer to Auburn, and Plaintiff was promptly removed from a top bunk assignment at Auburn after he filed a grievance, the Court finds that there are questions of fact as to whether Plaintiff's chronic back injury was "sufficiently serious" to satisfy the objective prong.

Next, the Court addresses whether Defendants Nurse Cornall and Nurse Coryer's alleged actions evidence deliberate indifference to Plaintiff's serious medical needs. An inmate may state an Eighth Amendment claim against correctional officials for improper placement in a top bunk, assuming that the proper subjective standard is met. *See, e.g.*, *Briel v. Fields*, 2013 WL 1833248, at \*3 (finding that the plaintiff's allegations that the defendants were aware of his back condition and recommendation that he be placed in a bottom bunk, but purposely assigned him to a top bunk, stated claim under subjective prong, and collecting cases); *Perdue v. Dreyer*, 2008 WL 4826260, at \*5-6 (W.D.N.Y. Nov. 5, 2008)(finding questions of fact at subjective prong where plaintiff advised defendants

of his medical history of seizures and showed them a previously issued medical permit for a lower bunk, but was nevertheless placed on the top bunk,); *but see Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 49-50 & 53 (N.D.N.Y. 2009)(finding no evidence that the defendant nurse was aware of the plaintiff's seizure condition and thus no question of fact as to whether the defendant acted with deliberate indifference in failing to issue the plaintiff a bottom bunk order); *Jones v. Smith*, 2015 WL 5750136, at *12 (finding no evidence that the defendants' failure to assign the plaintiff to a bottom bunk was anything more than negligence).

**\*10** In the present case, viewing the evidence as it must in a summary judgment context in the light most favorable to Plaintiff as the non-moving party, the Court finds that there are questions of fact regarding whether Defendant Nurse Cornall acted with deliberate indifference to Plaintiff's serious medical needs. First, according to Plaintiff, his back condition was well-documented in his medical chart, including the prior issuance of a bottom bunk order, and yet, upon her review of Plaintiff's medical records, Nurse Cornall indicated that he had no such condition. Farrell Decl., Ex. 1. The Court notes that it is unclear what medical records Nurse Cornall reviewed. *See* Cornall Decl. at ¶ 6. In addition, Defendant Nurse Coryer claims that the code associated with Plaintiff's back condition did not require bottom bunk placement under DOCCS Policy No. 1.49.[9] Nonetheless, Plaintiff had previously been issued a bottom bunk order and was promptly removed from the top bunk on this occasion.

Were the matter simply limited to Nurse Cornall's review of medical records, the recommendation of this Court would most likely be different because any such error in the review may constitute, at worst, mere negligence. More important for purposes of the deliberate indifference inquiry is Plaintiff's claim that Nurse Cornall never performed the required physical assessment. Compl. at ¶ 35. Nurse Cornall disputes Plaintiff's claims, although she candidly admits that she does not recall examining Plaintiff. Cornall Decl. at ¶ 5. Whether this physical assessment for suitability in a top bunk was in fact performed, and if so, in what manner, is a significant question of fact that must be left for the jury to determine. If Plaintiff is able to establish at trial that Nurse Cornall was aware of his documented medical history of chronic back conditions, and possibly his prior receipt of a bottom

bunk pass, and despite this knowledge refused or failed to perform the physical assessment required to determine if there are "medical indications requiring him to be placed in a bottom bunk bed," and then indicated that there were no medical conditions requiring Plaintiff to be placed in a bottom bunk, a reasonable jury could conclude that the deliberate indifference test has been met. Therefore, questions of fact remain.

With regard to Defendant Nurse Coryer, any claim of supervisory liability would be based upon the second *Colon* category; her alleged failure to reasonably investigate an ongoing constitutional violation and remedy the wrong. Once again viewing the evidence in the most favorable light to Plaintiff, the Court finds questions of fact to be resolved. Nurse Coryer claims that she performed a medical record review; however, there is no indication in the record that she visited Plaintiff or performed any physical assessment, nor does she say that she did. *See* Coryer Decl. Instead, she maintains that she directed Plaintiff, by her March 12 letter, to attend sick call in order to be physically examined to determine whether his back problems required a bottom bunk assignment. Coryer Decl. at ¶ 18. She states that "[i]f the resulting physical exam resulted in a finding that Plaintiff's climbing ability was significantly limited, his top bunk placement could then be revoked." *Id.* However, the March 12 letter does not, in so many words, advise Plaintiff of the possibility of receiving a physical assessment at sick call in order to be reevaluated for a bottom bunk assignment; rather, it summarily directed Plaintiff to "go to sick call to address concerns." Farrell Decl., Ex. 7. Similarly, Nurse Coryer's April 22 letter to Plaintiff definitively states that he did "not meet the criteria for a bottom bunk." *Id.* Viewing this evidence in the light most favorable to Plaintiff, a reasonable fact finder could find that Nurse Coryer, like Defendant Nurse Cornall, determined, without any physical assessment being done, that Plaintiff was not eligible for bottom bunk placement. Therefore, factual questions exist as to whether Defendant Coryer acted with deliberate indifference in failing to reasonably investigate and respond to Plaintiff's placement in a top bunk.

**\*11** Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on the merits be **DENIED** as to Defendants Nurse Cornall and Nurse Coryer.

### 3. Qualified Immunity

The Court next considers whether Defendants Nurse Cornall and Nurse Coryer are entitled to qualified immunity. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999). It was clearly established by 2011, the date of the events alleged in the Complaint, that prison officials may not be deliberately indifferent to an inmate's serious medical needs. *See Rahman v. Schriro*, 22 F. Supp. 3d 305, 316 (S.D.N.Y. 2014) (stating that the " 'right to be from deliberate indifference to serious medical needs'... was clearly established 'as far back as 1976 by *Estelle v. Gamble*, 429 U.S. 97 (1976)' "). For the same reasons as detailed above, there are significant questions of fact that prevent the Court from determining as a matter of law that it would have been objectively reasonable for Defendants Nurse Cornall and Nurse Coryer to believe that they were not violating Plaintiff's rights. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on the grounds of qualified immunity as to Defendants Nurse Cornall and Nurse Coryer be **DENIED**.

### C. Plaintiff's Claims Against Defendant Dr. Lee

The basis of Plaintiff's Eighth Amendment deliberate medical indifference claim against Defendant Dr. Lee is that Dr. Lee "failed to provide any kind of treatment" to Plaintiff for his complaints of left shoulder pain, lower back pain, and a swollen knee. Compl. at ¶ 71. More specifically, Plaintiff states that Dr. Lee did not provide him with adequate pain medication or refer him to a pain specialist. Farrell Decl., Ex. 12, Dep. of Edward Sanchez, dated July 24, 2014 ("Pl's Dep.") at pp. 34-35.

### 1. Legal Standard

As stated above, in order to state an Eighth Amendment claim for denial of medical care, a prisoner must demonstrate (1) a "sufficiently serious" medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

**\*12** The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir.

1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### 2. Analysis

Plaintiff was treated by Defendant Dr. Lee for chronic pain in his left shoulder and lower back and swelling in his right knee. Contrary to Plaintiff's claim that Dr. Lee "failed to provide any kind of treatment," Dr. Lee both evaluated and provided treatment for Plaintiff's conditions. At the objective prong, Plaintiff has not shown that the treatment provided was inadequate or that any inadequacy was "sufficiently serious." At his first examination, on February 29, 2012, Dr. Lee reviewed x-rays of Plaintiff's lower back and examined Plaintiff's left shoulder. Lee Decl. at ¶ 6; Pl.'s AHR at p. 34. Based on his examination, Dr. Lee determined that it was appropriate to treat Plaintiff's pain symptoms with Neurontin and Naprosyn, which Plaintiff was provided with throughout the relevant period. *See, e.g.*, Pl.'s AHR at pp. 34, 37-39, 41, 47, & 50. Dr. Lee also referred Plaintiff to physical therapy to treat his left shoulder. Lee Decl. at ¶ 9. Plaintiff was noted to tolerate the physical therapy well, but he elected to discontinue it in early May 2012. Lee Decl. at ¶ 11; Farrell Decl., Ex. 11. Based on Plaintiff's complaints of right knee swelling and pain, Dr. Lee ordered x-rays, which did not reveal any acute condition. Lee Decl. at ¶ 7; Farrell Decl., Ex. 10. Plaintiff was provided with a knee brace. Lee Decl. at ¶ 7. Plaintiff was also noted to be "fully ambulatory" at each appointment with Dr. Lee. Pl.'s AHR at pp. 34, 39, 40, 45, & 47. Thus, the record before the Court demonstrates that Dr. Lee reasonably responded to each of Plaintiff's complaints. Nor is there anything that indicates to the Court that the care Plaintiff claims he was deprived of—stronger pain medication and referral to a pain specialist—was "sufficiently serious."

Moreover, at the subjective prong, it is well-established that "mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d at 703. Plaintiff's claims are no more than disagreements with Dr. Lee's medical judgments. First, with respect to Plaintiff's claim that Dr. Lee prescribed ineffective pain medication, "disagreements over medications ... implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F. Supp. 2d at 155 (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y.

2001)). The decision not to prescribe stronger pain medication does not evidence deliberate indifference. *Vail v. Lashway*, 2014 WL 4626490, at *14 (N.D.N.Y. Sept. 15, 2014) ("[T]he decision to choose one form of pain medication over another ... is not indicative of deliberate indifference."). Additionally, "concern about prescribing narcotic pain medication, on which inmates ... could become dependent, may inform a medical judgment about what drugs to prescribe." *Wright v. Genovese*, 694 F. Supp. 2d at 160. In this case, Dr. Lee's decision to treat Plaintiff's pain symptoms with non-steroidal anti-inflammatory drugs rather than narotics was informed by Plaintiff's history of heroin abuse. Lee Decl. at ¶ 17. Second, as to Plaintiff's claim that Dr. Lee should have referred him to a pain specialist, "disagreements over ... the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Baranabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d at 312. Here, Dr. Lee determined that referral to a pain specialist was not indicated due to his review of Plaintiff's x-rays, Plaintiff's refusal to attend physical therapy despite positive results, and that Plaintiff was observed to ambulate without difficulty. Lee Decl. at ¶ 18.

**\*13** Finally, the Court can summarily deal with the Plaintiff's allegation that Dr. Lee was "dismissive and rude." Compl. at ¶ 71. Such allegations regarding the bedside manor of medical staff do not amount to a constitutional violation. *See Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) ("Insulting or disrespectful comments directed at an inmate generally do not rise to th[e] level" of a constitutional violation.); *Arce v. Banks*, 913 F. Supp. 307, 309 (S.D.N.Y. 1996) (finding that the plaintiff's allegation that nurse "yelled" at him did not state a claim as "yelling, cursing, or even race-baiting does not violate any constitutionally protected rights").

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's deliberate medical indifference claims against Defendant Dr. Lee.

### D. Plaintiff's Claims Against Defendant Dr. Koenigsmann

Defendant Dr. Koenigsmann is the Deputy Commissioner and Chief Medical Officer of DOCCS. Dkt. No. 40-11, Carl Koenigsmann Decl., dated Sept. 15, 2014, at ¶ 2. With respect to Defendant Dr. Koenigsmann, Plaintiff's

sole non-conclusory allegation is that Dr. Koenigsmann failed to implement quality improvement programs that would correct deficiencies in the training and review of DOCCS medical staff performance. *See* Compl. at ¶¶ 141 & 144. However, there is no evidence that Plaintiff's specific claims are among the issues that DOCCS' quality improvement programs address. Koenigsmann Decl. at ¶¶ 14-16. Furthermore, Plaintiff has not offered any evidence to conclude that Dr. Koenigsmann was aware of the alleged constitutional deprivations. Plaintiff's other conclusory allegations against Dr. Koenigsmann—that he allowed unconstitutional policies and customs, failed to adequately supervise subordinates, and was grossly negligent—are insufficient to establish his personal involvement. *See* Compl. at ¶¶ 138-39, 143, & 145. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** as to Defendant Dr. Koenigsmann and that this Defendant be **DISMISSED** from this action. [10]

### E. Plaintiff's Claims for Declaratory and Injunctive Relief

In addition to his request for damages, Plaintiff also seeks declaratory and injunctive relief. *See* Compl. However, since the commencement of this action, Plaintiff has been released from DOCCS custody and now resides in Brooklyn, N.Y. Dkt. No. 51. "In order for a federal court to retain jurisdiction over a case, an actual controversy must 'exist at all stages of review, not merely at the time the complaint is filed.' " *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir. 1996) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975)). "A case is moot when 'it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " *Davis v. New York,* 316 F.3d 93, 99 (2d Cir. 2002) (citation omitted). "Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot." *Pugh v. Goord,* 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008). Plaintiff's claims for declaratory and injunctive relief are therefore moot. Plaintiff agrees and has consented to the dismissal of his claims for declaratory and injunctive relief. Resp. at p. 11. Accordingly, the Court recommends that all claims for such relief be **DISMISSED**. Because the Court recommends that Plaintiff's claims for declaratory and injunctive relief be dismissed, the Court also recommends

that any claims asserted by Plaintiff against Defendants in their official capacity be **DISMISSED** pursuant to the Eleventh Amendment. *See Rourke v. New York State Dep't of Corr. Servs.,* 915 F. Supp. 525, 539 (N.D.N.Y. 1995) ("To the extent a state official is sued for damages in his or her official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state.").

### F. Plaintiff's State Law Claims

 **\*14** In addition to his claims brought pursuant to 42 U.S.C. § 1983, Plaintiff also asserts state law claims for negligence and medical malpractice. Compl. at ¶ 145. Defendants contend that this claim is barred by N.Y. Corrections Law § 24, which states:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. CORRECT. LAWW § 24.

The Second Circuit has held that "the immunity from suit in state court provided to DOCS employees by § 24 extends to suits for tort claims based on state law against DOCS employees in federal court." *Brown v. Dep't of Corr. Servs.,* 2011 WL 2182775, at \*9 (W.D.N.Y. June 2, 2011) (citing *Baker v. Coughlin,* 77 F.3d 12, 14 (2d Cir. 1996)). Here, Plaintiff has alleged acts that clearly would fall within the scope of employment of the state prison officials. Thus, Plaintiff is barred from bringing state law claims against the Defendants in their individual capacities in federal court. *See Baker v. Coughlin,* 77 F.3d at 15-16. As a result, the Court recommends **DISMISSING** Plaintiff's state law claims.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 40) be **DENIED** as to Plaintiff's Eighth Amendment claims against Defendants Nurse Cornall and Nurse Coryer and **GRANTED** in all other respects and with all other Defendants being **DISMISSED** from this action; and it is further

**RECOMMENDED**, that if the above recommendation is accepted, that this case be deemed trial ready on the claims that survive, namely, Plaintiff's Eighth Amendment claims against Defendants Nurse Cornall and Nurse Coryer; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date: September 12, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 5854551

Footnotes

1  Citations to Plaintiff's Exhibits are to the pagination automatically assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

2  The Exhibits to the Farrell Declaration were filed at a separate docket entry because they contain medical records. *See* Dkt. No. 41.

3  Under DOCCS regulations, the selection of an inmate for double cell housing requires an assessment of certain eligibility, suitability, and compatibility criteria. N.Y. COMP. CODES R. & REGS. tit. 7, § 1701.5(a). As part of the assessment, there must be a medical screening, which comprises a review of the inmate's medical records and a physical assessment. *Id.* § 1701.5(c)(6). The form that facility health staff must use for such medical screening is contained at 7 NYCRR § 1701.9. *Id.* § 1701.9. The Court shall refer to such form as the "Screening and Physical Assessment Form."

4  This form is the "double-cell information sheet," which, together with the Screening and Physical Assessment Form, is contained at 7 NYCRR § 1701.9. N.Y. COMP. CODES R. & REGS. tit. 7, §§ 1701.5(e) & 1701.9. The Court shall refer to such form as the "Double Cell Information Sheet."

5  Defendants have provided the Court with a copy of DOCCS Policy No. 1.49; however, the verison provided is dated June 4, 2014, after the events of this action. Farrell Decl., Ex. 5. Nonetheless, the Policy states that placement in a bottom bunk may be warranted where the inmate has "[d]ocumented back problems through physician review of history and medical records (e.g., radiological or surgical) that significantly limits climbing." *Id.*

6  Citations to Plaintiff's AHR are to the pagination assigned by the Court's CM/ECF System.

7  The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) upon the categories of supervisory liability under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). *See Grullon v. City of NewHaven*, 720 F.3d 133 (2d Cir. 2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y. 2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed.Appx. 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five factor *Colon* test.

8    Citation is to the pagination assigned by the Court's CM/ECF System.

9    The Court notes that the Screening and Physical Assessment Form and DOCCS Policy No. 1.49 contain slightly different language in referring to back problems that will warrant the issuance of a bottom bunk order. The Screening and Physical Assessment Form refers to "medically documented –back problems (through radiologic or surgical physician review." Farrell Decl., Ex. 1. DOCCS Policy No. 1.49, on the other hand, states that placement in a bottom bunk will only be issued for "[d]ocumented back problems through physician review of history and medical records (e.g. radiologic or surgical) that *significantly limits climbing.*" *Id.*, Ex. 5 (emphasis added).

10   Because the Court finds that Defendant Dr. Koenigsmann was not personally involved in the alleged constitutional violations, it does not reach Defendants' arguments that Plaintiff's claims against Dr. Koenigsmann should be dismissed for failure to exhaust or on the ground of qualified immunity.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Called into Doubt by Shomo v. New York Dept. of Correctional
Services, N.D.N.Y., September 4, 2007

2006 WL 2805242
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Thernell SMITH, Plaintiff,
v.
John BURGE, Superintendent; John Rourke,
Captain; William Chilson, Sgt.; D. Myers,
C.O.; T. Christopher, Sgt., Defendants.

No. 9:03-CV-0955 (LEK/GHL).
|
Sept. 28, 2006.

**Attorneys and Law Firms**

Thernell Smith, Auburn, NY, Plaintiff, Pro Se.

Hon. Elliot L. Spitzer, Attorney General of the State of
New York, Patrick F. Macrae, Esq., Assistant Attorney
General, Syracuse, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on May 5, 2006, by the
Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c)
of the Northern District of New York. Report-Rec. (Dkt.
No. 24).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," Fed.R.Civ.P. 72(b), in compliance
with L.R. 72.1. In the interval of at least fifteen days
since the Magistrate Judge filed the subject Report-
Recommendation, no objections to it have been raised.
Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
subject to attack for plain error or manifest injustice.[1]

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
24) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Plaintiff's motion for summary
judgment (Dkt. No. 17) is **DENIED;** and it is further

**ORDERED,** that Defendant's motion for summary
judgment (Dkt. No. 16) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

GEORGE H. LOWE, Magistrate Judge. [1]

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). In this pro se
civil rights complaint brought under 42 U.S.C. § 1983,
Inmate Smith ("Plaintiff") alleges that five employees
of the Auburn Correctional Facility-Superintendent
John Burge, Captain John Rourke, Sergeant Timothy
Christopher, Sergeant William Chilson, and Corrections
Officer D. Myers (collectively "Defendants")-violated his
rights under the Eighth and Fourteenth Amendments by
intentionally depriving him of various property, placing
him on a restricted prison diet, and depriving him
procedural due process during an eight-day period in
March of 2003. (Dkt. No. 1.)

More specifically, liberally construed, Plaintiff's
Complaint contains two groups of factual allegations: (1)
that from 6:15 p.m. on March 20, 2003, to 3:15 p.m.
on March 21, 2003, Defendants Rourke, Christopher,
Chilson and Myers-after transferring Plaintiff to a cold
cell-deprived Plaintiff of various property (including pants
and a sweatshirt) without issuing a deprivation order,
causing Plaintiff to suffer a cold; and (2) that from
dinnertime on March 21, 2003, to March 28, 2003,
Defendants Burge, Rourke and Chilson-in response to

Smith v. Burge, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 57 of 90
2006 WL 2805242

a minor disciplinary infraction-placed Plaintiff on a pre-hearing restricted diet (consisting of an apple and "a hard loaf of bread"), without serving him with a deprivation order or misbehavior report. (*Id.* at ¶¶ 10-15.)

**\*2** Currently before the Court is Plaintiff's motion for summary judgment (Dkt. No 17), and Defendants' cross-motion for summary judgment (Dkt. No. 16). Generally, Plaintiff's motion and Defendants' cross-motion raise the same five issues: (1) whether Plaintiff has established an Eighth Amendment claim with respect to the alleged deprivation of property; (2) whether Plaintiff has established a Fourteenth Amendment claim with respect to the alleged deprivation of property; (3) whether Plaintiff has established an Eighth Amendment claim with respect to his placement on a restricted diet; (4) whether Plaintiff has established a Fourteenth Amendment claim with respect to his placement on a restricted diet; and (5) whether Plaintiff has established the personal involvement of Defendant Burge in any of the alleged constitutional deprivations. (*Compare* Dkt. No 16 [Defs.' Mem. of Law] *with* Dkt. No. 17, Part 3 [Plf.'s Mem. of Law].)

For the reasons discussed below, I answer each of these questions in the negative. As a result, I recommend that Plaintiff's motion for summary judgment be denied, and that Defendants' cross-motion for summary judgment be granted.

## I. SUMMARY JUDGMENT STANDARD

Under *Fed.R.Civ.P. 56(c)*, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e)*; *see also Matsushita Electric*

*Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, \*8 (W .D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings and papers, and a civil rights plaintiff's pleadings and papers. *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision). For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Duran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted].

Moreover, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded such special solicitude." *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *19 & n. 10 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in the Northern District alone); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 lawsuits in Northern District alone). [3] I note that, in such cases, the overly litigious inmate is not subjected to a heightened pleading requirement, only denied the leniency normally afforded *pro se* litigants and civil rights litigants.

Here, Plaintiff has filed five other lawsuits, at least one of which is currently still pending. [4] I find that these circumstances are not sufficient to deny Plaintiff the leniency normally afforded *pro se* litigants and civil rights litigants.

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [5] and are not specifically controverted by the non-movant. [6] A district court has no duty to perform an independent review of the record to find proof of a factual dispute. [7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [8]

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [9] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [10] In addition, such an affidavit (or verified complaint) must not be conclusory. [11] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general. [12]

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct

evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [13]

**\*4** Here, the following material facts are supported by evidence in the record and are not specifically controverted:

1. At the time of the incidents alleged in Plaintiff's Complaint, Plaintiff was a longterm resident of the Auburn C.F. Special Housing Unit (SHU), having been continuously housed in SHU since December 4, 2000. [14]

### Events of March 20, 2003

2. On March 20, 2003, Plaintiff was transferred from cell number "SHU F-3" to cell number "SHU E-6." [15] At approximately 6:15 p.m., after completing a shower, Plaintiff was told by Sgt. Christopher that he would be moved to another cell. [16] Sgt. Christopher and/or C.O. Myers escorted Plaintiff to cell number "SHU E-6" while Plaintiff was wearing a T-shirt and underwear. [17] The gallery windows were open, and Plaintiff was cold. [18]

3. At some point between 9:00 p.m. and 10:00 p.m., C.O. Myers and Sgt. Christopher brought Plaintiff's property to Plaintiff's new cell. [19] However, Sgt. Christopher withheld Plaintiff's property from him, stating (in sum or substance), "You refused to follow procedures [regarding the turning on of the cell light]." [20]

### Events of March 21, 2003

4. On March 21, 2003, at approximately 7:30 a.m., a facility nurse visited Plaintiff and gave him Sudafed for sinus congestion. [21] At approximately this time, Sgt. Chilson (who had been escorting the nurse during her sick call rounds) encountered Plaintiff, who told him that Sgt. Christopher had deprived Plaintiff of his property. [22] Specifically, Plaintiff argued that "I never refused to turn on the light." [23] Sgt. Chilson told Plaintiff that he would not return the property until he had discussed the matter with Sgt. Christopher (to determine if a deprivation order

had been issued or was being issued). [24] Sgt. Chilson believed that he would have an opportunity to talk to Sgt. Christopher when Sgt. Christopher relieved him at about 3:00 p.m. [25]

5. At some point between 8:00 a.m. and 8:45 a.m., Capt. Rourke encountered Plaintiff while making his rounds. [26] Plaintiff told Captain Rourke about the events of the previous evening. [27] He also told Capt. Rourke that he was cold and would appreciate it if someone brought him his property. [28] Capt. Rourke told Plaintiff that he would have a corrections officer bring Plaintiff his property. [29]

6. At approximately 2:45 p.m., when Sgt. S. Yorkey arrived to relieve Sgt. Chilson of duty, Sgt. Chilson learned that he would not have an opportunity to speak to Sgt. Christopher about Plaintiff's property; as a result, Sgt. Chilson discussed the issue of Plaintiff's property with Sgt. S. Yorkey. [30] Upon conducting an investigation of the matter, Sgt. Yorkey determined that there was no deprivation order or misbehavior report on record, and concluded that Plaintiff's property should be returned (and Sgt. Chilson concurred with this conclusion). [31]

7. At approximately 3:15 p.m., Plaintiff received his property. [32]

**Events of March 21, 2003, to March 28, 2003**

*5 8. Meanwhile, at approximately 12:25 p.m. on March 21, 2003, after finishing lunch, Plaintiff refused to obey a direct order from C.O. R. Smith to return his food tray, because Plaintiff had not yet received the property at issue. [33]

9. At some point on March 21, 2003, as a result of Plaintiff's refusal to comply with a direct order (i.e., to return the food tray), C.O. Smith wrote an Inmate Misbehavior Report. [34] (There is no copy of this misbehavior report on file; it appears that the misbehavior report was submitted but then was dismissed.) [35]

10. Also at some point on March 21, 2003, as a result of the misbehavior report, Sgt. Chilson recommended, and Capt. Rourke ordered, a pre-hearing restricted diet

for Plaintiff. [36] The order provided that Plaintiff would receive the restricted diet from March 21, 2003, to March 28, 2003. [37]

11. At approximately 1:18 p.m. on March 21, 2003, Plaintiff was medically cleared to receive a restricted diet. [38] During the evening of March 21, 2003, Plaintiff began the pre-hearing restricted diet. [39] The diet consisted of one apple and a loaf of bread. [40]

12. Plaintiff claims that he was never served with a copy of the March 21, 2003, pre-hearing restricted diet order. [41] However, he admits that, on March 24, 2003, he received a copy of an order depriving him of "feed up" trays, which stated that (1) the reason for the order was that "you refused to turn in your feed up tray during garbage collection," and (2) "[y]ou may write to the Deputy Superintendent for Security or his/her designee to make a statement on the need for continuing this deprivation order." [42]

13. On March 25, 2003, Plaintiff wrote a letter to Superintendent Burge complaining, in part, about being kept on a restricted diet. [43] In that letter, Plaintiff acknowledged that he had been placed on the restrictive diet as a result of his refusing to return his food tray after lunch on March 21, 2003. [44] In addition, he argued that he not should not be punished for refusing to return his food tray, since Sgt. Christopher had not been punished for withholding his property. [45]

14. On March 27, 2003, Plaintiff filed a grievance (No. 39005) complaining about, in part, his unjustified placement on the restricted diet. [46]

15. Plaintiff was taken off the diet on March 28, 2003. [47]

16. Throughout the period of time that Plaintiff was on the restricted diet (March 21, 2003, to March 28, 2003), Plaintiff was visited each day by a member of the Auburn C.F. medical staff, who kept notes of the visits in Plaintiff's medical records. [48] However, those medical records do not reflect that Plaintiff made any complaints to medical personnel regarding any illness associated with, or resulting from, his alleged exposure to cold temperatures on the evening of March 20-21,

2003. [49] Nor do those medical records reflect that he made any complaints to medical personnel regarding any other illness (such as headaches, stomachaches, dizzy spells or gas). [50]

## III. ANALYSIS OF PLAINTIFF'S MOTION

**\*6** In support of his motion, Plaintiff failed to submit a Statement of Material Facts that complies with the Local Rules of Practice for this Court. Local Rule 7.1(a)(3) requires that, in such a Statement of Material Facts, "[e]ach fact listed shall set forth a specific citation to the record where the fact is established." N.D.N.Y. L.R. 7.1(a)(3). However, with very few exceptions, none of the "facts" set forth in either of the two documents that Plaintiff offers as a Rule 7.1 Statement complies with this citation requirement. (*See generally* Dkt. No. 17, Part 1 [purporting to contain factual assertions filed "Pursuant to Rule 7.1 of the Civil Rules of this Court"]; Dkt. No. 17, Part 2 [labeled as an "Affidavit of Undisputed Facts"].) This failure to submit an accurate and complete Rule 7.1 Statement provides sufficient reason to recommend denial of Plaintiff's motion. N.D.N.Y. L.R. 7.1(a)(3) ("*Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*") [emphasis in original].

Even if I were to rely on the few record citations offered by Plaintiff, and I were to conduct an independent review of the record with respect to the remainder of Plaintiff's factual assertions, I would conclude that Plaintiff's factual assertions are supported by the record *only* to the extent that those factual assertions conformed with the eleven factual assertions stated above in Part II of this Report-Recommendation. These facts are not sufficient to entitle Plaintiff to judgment as a matter of law. (Indeed, they entitle *Defendants* to judgment as a matter of law, for the reasons discussed below in Part IV of this Report-Recommendation.) Nor are the factual insufficiencies of Plaintiff's motion somehow overcome by his legal arguments, which are unpersuasive. (Dkt. No. 17, Part 3 at 4-37.)

As a result, I recommend denial of Plaintiff's motion for summary judgment.

## IV. ANALYSIS OF DEFENDANTS' CROSS-MOTION

### A. Whether Plaintiff Has Established an Eighth Amendment Claim with Respect to the Alleged Deprivation of His Personal Property

Plaintiff's allegations of inadequate conditions of confinement are appropriately analyzed under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Rhodes v. Chapman,* 452 U.S. 337, 346-347 (1981). "[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer,* 511 U.S. at 834.

With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes,* 452 U.S. at 347). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

**\*7** Specifically, a prisoner must prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Heat is a basic human need; and claims of lack of heat may state a claim. *Benjamin v. Fraser* 343 F.3d 35, 52 (2d Cir.2003). If, however, the condition is not sufficiently prolonged or severe, it does not rise to the level of an Eighth Amendment violation. *Trammel v. Keane,* 338 F.3d 155, 164-65 (2d. Cir.2003).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. In other words, "this standard requires that only the

Smith v. Burge, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 61 of 90
2006 WL 2805242

deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841).

Generally, I agree with Defendants' application of the above legal standard to the relevant facts of this case (Dkt. No. 17, Part 1, Mem. of Law, at 5-6), and I reject Plaintiff's application of the standard to the facts (Dkt. No. 21, Part 1, Mem. of Law, at 12-14). At most, Plaintiff was deprived of various property (except for a T-shirt and underwear) for less than one day while confined to a cell that was "cold" or "very cold" due to some gallery windows being open in late-March in Auburn, New York. (*See, supra,* Statement of Fact Nos. 2-7.) I can find no allegation in Plaintiff's Complaint, or any evidence in the record, that the temperature in Plaintiff's cell was near or below freezing (e.g., that the water in his sink or toilet was frozen), or even that the heating system serving the cell block was not working. Even assuming Plaintiff's mattress, pillow and cell light provided no warmth to him, and even assuming Plaintiff acquired a cold as a result of the deprivation of property,[51] I simply cannot find that the deprivation was sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation.[52] (Cases finding such a violation are clearly distinguishable.)[53]

Moreover, even if Plaintiff had established a sufficiently serious deprivation for purposes of the Eighth Amendment, I would not find that he had established that any Defendant acted with a sufficiently culpable state of mind with regard to that deprivation.[54] Plaintiff concedes that, in the middle of the deprivation in question (at approximately 7:30 a.m. on March 21, 2003), he was seen by a facility nurse, who gave him Sudafed for sinus congestion. (*See, supra,* Statement of Fact No. 4.) Moreover, Defendants Chilson and Rourke appeared to have acted in good faith in responding to Plaintiff's complaints of being cold. (*See, supra,* Statement of Fact Nos. 4-7.)[55] At *most,* Plaintiff may have suggested some neglect on the part of Defendants Christopher and/or Myers with respect to Plaintiff's comfort. (*See, supra,* Fact Nos. 2-3.)[56] However, negligence is not sufficient to establish an Eighth Amendment claim. *Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").[57]

**\*8** As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim with respect to the alleged deprivation of his personal property.

**B. Whether Plaintiff Has Established a Fourteenth Amendment Claim with Respect to the Alleged Deprivation of His Personal Property**

Defendants argue that Plaintiff's Fourteenth Amendment claim is only a substantive due process claim,[58] while Plaintiff appears to argue that his Fourteenth Amendment claim is actually a procedural due process claim.[59] Given my duty to liberally construe a *pro se* civil rights inmate's pleadings and papers, and in the interest of thoroughness, I will consider Plaintiff's Fourteenth Amendment claim under both a substantive due process analysis and a procedural due process analysis.

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

**1. Substantive Due Process Claim**

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y.Jan.26, 1993) (DiBianco, M.J.) (granting

summary judgment to defendants in inmate's civil rights action).

The first step in a substantive due process analysis is to identify the precise constitutional right at stake. Here, I will assume for the sake of argument that Plaintiff had a substantive due process right to possess the property in question (e.g., pants and a sweatshirt) unless grounds existed for a corrections officer to determine the existence of a threat to the safety or security of the facility's staff. *See* 7 N.Y.C.R.R. § 305.2(a),(b) ("An order depriving an inmate of a specific item ... may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists....").

**\*9** Having identified the constitutional interest at stake, I must now consider whether the state action-the withholding of that property-was arbitrary in the constitutional sense and therefore violative of substantive due process. The basis (proffered by Defendants) for the withholding of the property in question was Plaintiff's extreme agitation upon Defendant Christopher's entrance into his cell, and Plaintiff's refusal to obey Defendant Christopher's direct order to turn on the cell's light. [60] Under the circumstances, I find that the conduct attributed to Plaintiff by Defendant Christopher, which occurred in a dark prison cell in the facility's SHU, *arguably* created a threat to the safety or security of Defendant Christopher (and any other corrections officer who would dare carry property into such an agitated inmate's small dark cell). [61] Thus, I find that the subsequent deprivation of the property in question was not *arbitrary* or *conscience shocking. See generally Lowrence,* 20 F.3d at 537 (reaching similar conclusion after similar analysis).

As a result, I conclude that Plaintiff has failed to establish a substantive due process claim with respect to the alleged deprivation of his property.

### 2. Procedural Due Process Claim

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

Relying on 7 N.Y.C.R.R. § 305.2, Plaintiff argues that he had a procedural due process right to possess the property in question (e.g., pants and a sweatshirt) unless notice of a deprivation order and an opportunity to be heard had been provided to him before the deprivation, or were provided to him *within 21 hours* after the deprivation (i.e., between 6:15 p.m. on March 20, 2003, and 3:15 p.m. on March 21, 2003). (Dkt. No. 21, Part 1, Plf.s Opp. Mem. of Law, at 14-16.) Plaintiff is mistaken for three independent reasons.

First, I do not believe that 7 N.Y.C.R.R. § 305.2 confers on Plaintiff a procedural due process right. The only two cases that I could find suggesting that 7 N.Y.C.R.R. § 305.2 might confer a procedural due process liberty interest were based on a rule that is no longer valid. [62] Before the Supreme Court's decision in *Sandlin v. Connor* on June 19, 1995, the rule was that a state could create a liberty interest protected by the Fourteenth Amendment's Due Process Clause if the state law repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates. [63] However, over time, the Supreme Court recognized that such a rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." [64] As a result, the Supreme Court changed the rule, shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation. [65] Specifically, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [66] I have found no cases, since the Supreme Court's issuance of its decision in *Sandlin,* holding that 7 N.Y.C.R.R. § 305.2 confers on Plaintiff a procedural due process right.

**\*10** Second, even if 7 N.Y.C.R.R. § 305.2 did confer on Plaintiff a procedural due process right, 7 N.Y.C.R.R. § 305.2 does not appear to require that Plaintiff be provided with notice and an opportunity to be heard *within 21 hours* after a deprivation. [67] Indeed, 7 N.Y.C.R.R. § 305.2 expressly provides only that inmates be provided a copy of the deprivation order *within 24 hours* of the deprivation. [68] I find that this 24-hour filing-and-service deadline, at least with respect to deprivations of the sort of property at issue in this case, does not deprive inmates of an opportunity to be heard "at a meaningful time," as required by the Supreme Court. [69] As a district court stated in a case relied on by Plaintiff: "[A]n inmate is not necessarily entitled to a full panoply of procedural safeguards. The process required is determined by balancing the private interests affected against the interests and concerns of the government." *Young,* 1993 WL 88144, at \*3. Requiring that an inmate be provided notice and an opportunity to be heard within a few hours of a deprivation of property, under circumstances such as these, would appear to be administratively unfeasible from a correctional facility's perspective. (For example, here, the deprivation occurred late at night and was effected by a corrections officer who was not on duty the following morning.)

Third, a credible argument can be made that, here, Plaintiff was indeed provided notice and an opportunity to be heard within 21 hours of the deprivation. Specifically, Plaintiff concedes that, at the time of the deprivation, Defendant Christopher told him, "You refused to follow procedures [regarding the turning on of the cell light]." [70] Thus, Plaintiff was arguably provided *notice* of the reason for the deprivation sufficient for him later to be able to dispute that reason. In addition, Plaintiff concedes that, during the following 12 hours, he had an opportunity to speak to both Defendant (Captain) Rourke and Defendant (Sergeant) Chilson-two fairly high-ranking employees of Auburn C.F.-about the deprivation at issue. [71] In at least one of the conversations, Plaintiff specifically argued that "I never refused to turn on the light." [72] These conversations resulted in Defendant Chilson speaking to Sgt. Yorkey about the matter, who (after conducting an investigation) decided to return the property at issue (which was immediately returned to Plaintiff). [73] Thus, Plaintiff was arguably provided an *opportunity to be heard* with regard to the deprivation.

For these reasons, I conclude that Plaintiff has failed to establish either part of the above-stated two-part test: Plaintiff has not established that he had any property interest *that was interfered with by the State;* and, even if Plaintiff had established such a property interest interfered with by the State, he has not established that the procedures provided upon that deprivation were *constitutionally insufficient.* As a result, I conclude that Plaintiff has failed to establish a procedural due process claim with respect to the alleged deprivation of his personal property.

### C. Whether Plaintiff Has Established an Eighth Amendment Claim with Respect to His Placement on a Restricted Diet

**\*11** As stated above, "a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer,* 511 U.S. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15-16 (2d Cir.1983) [citations omitted]. For example, "the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food .... [that does not] present an immediate danger to health and well being of the inmates who consume it." *Robles,* 725 F.2d at 15 [internal quotation marks and citation omitted]. [74]

With respect to the second prong, as stated above, a deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to inflict pain. See *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002) (by alleging that prison officials knew a diet was inadequate and likely to inflict pain, the plaintiff sufficiently pleaded the second element of an Eighth Amendment claim).

Generally, I agree with Defendants' application of the above legal standard to the relevant facts of this case (Dkt. No. 17, Part 1, Mem. of Law, at 8-12), and I reject Plaintiff's application of the standard to the facts (Dkt. No. 21, Part 1, Mem. of Law, at 16-20). At most, Plaintiff

was deprived of food that tasted good for a period of seven days. (*See, supra,* Statement of Fact Nos. 8-11.) Plaintiff does not establish, or even specifically allege, that (1) the food he was served was nutritionally inadequate (e.g., with respect to the total calories it contained, its grams of carbohydrates, protein, fiber, and fat, or its units of vitamins and minerals, etc.),[75] (2) that he was physically unable to eat the food, or (3) that he lost weight during the week in question.[76] Rather, Plaintiff seems to rely only on the fact that medical records exist indicating that he complained of a headache and gas two days after he was taken off the diet, and headaches, stomachaches, dizzy spells and gas six days after he was taken off the diet (but not during the diet).[77] Under the circumstances, I simply cannot find that Plaintiff has established that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment.[78] (The relatively few cases finding such a sufficiently serious deprivation are clearly distinguishable.)[79]

Moreover, even if Plaintiff had established a sufficiently serious deprivation for purposes of the Eighth Amendment, I would not find that he had established that any Defendant acted with a sufficiently culpable state of mind with regard to that deprivation.[80] It is uncontroverted that (1) Plaintiff had been medically cleared, and a Restricted Diet Order had been issued, before Plaintiff was placed on the restricted diet, (2) during the seven days that he was on the restricted diet, Plaintiff received daily visits from members of the Auburn C.F. medical staff, who kept notes of the visits in Plaintiff's medical records, and (3) those medical records do not indicate that, during the duration of the restricted diet, Plaintiff complained to medical personnel regarding any illness (such as headaches, stomachaches, dizzy spells or gas).[81]

**\*12** As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim with respect to his placement on a restricted diet.

### D. Whether Plaintiff Has Established a Fourteenth Amendment Claim with Respect to His Placement on a Restricted Diet

Again, Defendants argue that Plaintiff's Fourteenth Amendment claim is only a substantive due process claim,[82] while Plaintiff appears to argue that his

Fourteenth Amendment claim is actually a procedural due process claim.[83] In the interest of fairness and thoroughness, I will consider Plaintiff's Fourteenth Amendment claim under both a substantive due process analysis and a procedural due process analysis.

#### 1. Substantive Due Process Claim

As stated above, "[s]ubstantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance,* 20 F.3d at 537.

The first step in a substantive due process analysis is to identify the precise constitutional right at stake. Here, I will assume for the sake of argument that Plaintiff had a substantive due process right to not be placed on a restricted diet unless grounds existed for a corrections officer to determine that Plaintiff had refused to obey a direct order to return his food tray at the conclusion of lunch. *See* 7 N.Y.C.R.R. § 304.2(b)(3) ("Inmates may be placed on a restricted diet in accordance with the provisions of Chapter V of this Title, for the following reasons: ... refusing to obey a direct order to return a food container or utensil at the conclusion of a meal, while assigned to SHU.").

Having identified the constitutional interest at stake, I must now consider whether the state action-the imposition of a restricted diet-was arbitrary in the constitutional sense and therefore violative of substantive due process. The basis (proffered by Defendants) for the imposition of the restricted diet was Plaintiff's refusal to obey a direct order to return his food tray at the conclusion of lunch. Indeed, Plaintiff concedes that, at approximately 12:25 p.m. on March 21, 2003, after finishing lunch, he refused to obey a direct order from C.O. R. Smith to return his food tray, because he had not yet received his property.[84] Under the circumstances, I find that the subsequent imposition of a restricted diet was not *arbitrary* or *conscience shocking.*

As a result, I conclude that Plaintiff has failed to establish a substantive due process claim with respect to the imposition of a restricted diet.

#### 2. Procedural Due Process Claim

As stated above, "[courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr.,* 490 U.S. at 460.

**\*13** Relying on 7 N.Y.C.R.R. § 304.2, [85] Plaintiff argues that he had a procedural due process right to not be kept on a restricted diet after Defendants' failure (1) to serve him with a copy of the pre-hearing restricted diet order within 24 hours of that order's issuance on March 21, 2003, and (2) to schedule a superintendent's hearing (on the misbehavior report authored by C.O. Smith) within seven days of the initiation of the diet on March 21, 2003 (or even serve him with a copy of any misbehavior report authored by C.O. Smith). (Dkt. No. 21, Part 1, Plf.s Opp. Mem. of Law, at 21-24.) Plaintiff is mistaken for two independent reasons.

First, I do not believe that 7 N.Y.C.R.R. § 304.2 confers on Plaintiff a procedural due process right. As with respect to cases applying 7 N.Y.C.R.R. § 305.2, there appears to be a dearth of cases on point with respect to cases applying 7 N.Y.C.R.R. § 304.2. [86] However, as explained above in Part IV.B.2. of this Report-Recommendation, to establish a Fourteenth Amendment claim based on a violation of 7 N.Y.C.R.R. § 304.2, Plaintiff must show that the restricted diet constituted an *atypical and significant hardship* in relation to the ordinary incidents of prison life. [87] Several courts (including this Court) have specifically held that the imposition of a seven-day pre-hearing restricted diet of "loaf" (imposed without the issuance of a deprivation order or the holding of a hearing during the seven-day period) did not create an atypical and significant hardship for purposes of the Fourteenth Amendment. [88]

Second, even if Plaintiff had a Fourteenth Amendment procedural due process right to remain free from being placed on the restricted diet, I find that he was, under the circumstances, afforded all the process that he was due. It is uncontroverted that a Restricted Diet Order was issued in this case. [89] While it is unclear whether Plaintiff was served with a copy of that Order within 24 hours of its issuance, I find that Plaintiff had adequate notice of the contents of that Order within a few hours of its issuance. Specifically, I find that no reasonable fact finder could,

under the circumstances, credit any assertion by Plaintiff that, on the evening of March 21, 2003, when he started his restricted diet, he did not know that the diet resulted from his intentionally withholding his food tray after lunch that day. [90] Furthermore, by March 24, 2003 (at the very latest), Plaintiff was on notice that, if he wanted to make a statement regarding the need for the continuation of a deprivation order (such as the restricted diet), he may write to the deputy superintendent of security or his/her designee. [91] On March 25, 2003, and March 27, 2003, he exercised that right, sending a letter of complaint to the Superintendent, and filing a grievance with the grievance committee. [92] In the letter of complaint, Plaintiff argued that he should not be punished for refusing to return his food tray, since Sgt. Christopher had not been punished for withholding his property. [93] Thus, I find that Plaintiff was given sufficient notice and an opportunity to be heard for purposes of due process. As one district judge stated when dismissing an inmate's due process challenge to the imposition of a *14-day* restricted diet, " § 1983 actions do not exist for the purpose of having the federal courts become involved in minor restrictions of a prisoner's diet." *Prewitt v. Coughlin,* 92-CV-4290, 1992 WL 331274, at \*1 (S.D.N.Y. Nov. 4, 1992).

**\*14** As a result, I conclude that Plaintiff has failed to establish a procedural due process claim with respect to the imposition of a restricted diet.

### E. Whether Plaintiff Has Established the Personal Involvement of Defendant Burge in any of the Alleged Constitutional Deprivations

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)

Smith v. Burge, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 66 of 90
2006 WL 2805242

(adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Generally, I agree with Defendants' application of the facts to the above legal standard (Dkt. No. 16, at 14-15 [Defs.' Mem. of Law] ), and I reject Plaintiff's application of the facts to that legal standard (Dkt. No. 21, Part 1, at 24-26). As an initial matter, I note that the primary forms of personal involvement by Defendant Burge that Plaintiff alleges and/or argues are the second and fifth forms of personal involvement (described above): i.e., Defendant Burge's failure to take Plaintiff off the restricted diet after learning of it.[94] While Plaintiff also argues that Defendant Burge was grossly negligent in managing subordinates who caused the violation,[95] he provides absolutely no evidence in support of that conclusory argument, nor can I find any such evidence.

With respect to the two primary forms of personal involvement alleged by Plaintiff, both those forms of personal involvement hinge on Defendant Burge's knowledge of the constitutional deprivations alleged by Plaintiff. Plaintiff argues that Defendant Burge became aware of these constitutional deprivations through Plaintiff's March 25, 2003, letter to him.[96] (To the extent that Plaintiff argues that Defendant Burge became aware of the constitutional deprivations through *other* written communications from Plaintiff, Plaintiff does not provide a citation to the portion of the record that presumably contains such written communications.[97] The Court has no duty to perform an independent review of the record to find proof of a factual issue.[98] However, I have conducted an independent review of the record, and I cannot find any such written communications during the relevant time period, other than Plaintiff's March 25, 2003, letter.)

**\*15** Under the circumstances, I find that no question of fact exists about whether Defendant Burge was personally involved in the alleged constitutional deprivations; based on the evidence of record, no reasonable fact-finder could find that he was so personally involved. As an initial matter, it is unclear how a communication received by Defendant Burge on or after March 25, 2003, could have possibly personally involved Defendant Burge in any constitutional deprivation that had occurred *before* March 25, 2003 (i.e., during the first four days that Plaintiff was on the diet). Moreover, I find that the letter did not notify Defendant Burge of any violations of the

Eighth or Fourteenth Amendments (given the limited factual allegations contained in that letter).[99] Finally, even if the letter did notify Defendant Burge of any violations of the Eighth or Fourteenth Amendments, I find that, because those violations did not in fact occur (for the reasons stated above in Parts IV.A.-IV.D. of this Report-Recommendation), there were no violations in which Defendant Burge could possibly have participated.

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Burge due to his lack of personal involvement in the alleged constitutional deprivations.

### F. Whether Plaintiff's Claim Against C.O. Myers Should Be Dismissed on Alternative Grounds

Although Defendants did not raise this issue in their motion papers, an alternative ground exists for dismissing Plaintiff's claim against C.O. Myers. In his opposition papers, Plaintiff repeatedly states that, "[a]lthough the caption of this matter includes Officer D. Myers, he is not a defendant."[100] I construe this statement as a request by Plaintiff to voluntary dismiss his claim against C.O. Myers under Rule 41 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 41(a)(2). After reviewing the docket sheet in this matter, I find that good cause exists for granting Plaintiff's request: C.O. Myers was never served with process in this action.[101]

I note that it appears that this failure to serve was not the fault of the U.S. Marshal's Service, but the fault of Plaintiff. Specifically, it appears that Plaintiff failed to properly identify Mr. Myers when he filled out the U.S. Marshal's Service's "Process Receipt and Return" Form, despite this Court's Order directing "Smith [to] comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action."[102] I further note that Plaintiff's resulting violations of several local and federal rules would constitute additional grounds for dismissing his claim against C.O. Myers. *See, e.g.,* N.D.N.Y. L.R. 4.1(b); Fed.R.Civ.P. 4(m); Fed.R.Civ.P. 16(f).

As a result, I recommend that, even if there exists no grounds to dismiss Plaintiff's claim against C.O. Myers on the merits, the Court should dismiss Plaintiff's claim against C.O. Myers on procedural grounds.

Smith v. Burge, Not Reported in F.Supp.2d (2006)
2006 WL 2805242
Case 9:17-cv-00916-GLS-TWD   Document 19   Filed 07/26/18   Page 67 of 90

**\*16  ACCORDINGLY,** it is

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 17) be **DENIED;** and it is further

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 16) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.


**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2805242


Footnotes

1    The Court notes several errors, which do not, however, impact materially upon the content of the Report-Recommendation. First, *Thomas v. Irvin* is incorrectly cited as *Thomas v. Irving,* 981 F.Supp. 794, 799, but the correct citation is *Thomas v. **Irvin,*** 981 F.Supp. 794, **798.** Report-Rec. (Dkt. No. 24) at 4. Second, *Patterson v. County of Oneida* is incorrectly cited as *Patterson v. County of Oneida,* 375 F.2d 206, 219, but the correct citation is *Patterson v. County of Oneida,* 375 **F.3d** 206, 219. Report-Rec. (Dkt. No. 24) at 7 n. 4. Third, *Meiri v. Dacon* is incorrectly cited as *Meiri v. Dacon,* 759 F.2d 989, 997, but the correct citation is *Meiri v. Dacon,* 759 F.2d 989, **998.** Report-Rec. (Dkt. No. 24) at 8 n. 12. Fourth, citation to Dkt. No. 21 is incorrectly cited as (Dkt. No. 21, Part 1, ¶ 5), but the correct citation should be (Dkt. No. 21, Part 1, **¶ 8).** Report-Rec. (Dkt. No. 24) at 13 n. 33. Fifth, *Blyden v. Mancusi* is incorrectly cited as *Blyden v. Mancusi,* 186 F.3d 252, 263, but the correct citation is *Blyden v. Mancusi,* 186 F.3d 252, **262.** Report-Rec. (Dkt. No. 24) at 19. Sixth, *Thomas v. Commonwealth of Virginia* is incorrectly cited as *Thomas v. Virginia,* 04-CV-0273, 2005 WL 15517, at *10-11, but the correct citation is *Thomas v. **Commw. of Virginia,*** 04-CV-0273, 2005 WL **1801672,** at **\*2-\*3.** Report-Rec. (Dkt. No. 24) at 36 n. 88.

1    I would like to thank my extern, Jason Kane, currently a second-year law student at Syracuse University College of Law, who assisted in the researching and writing of this Report-Recommendation.

2    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3    *See also Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford a *pro se* civil rights inmate the sort of lenient treatment normally afforded *pro se* civil rights litigants, because the inmate was "an extremely litigious inmate who is quite familiar with the legal system and with pleading requirements," who at one point had at least 30 simultaneously pending lawsuits); *Johnson v. Eggersdorf,* 97-CV-0938, Report-Recommendation, at 1, n. 1 (N.D.N.Y. Apr. 28, 1999) (Smith, M .J.) (denying leniency to *pro se* civil rights inmate who at one point had 12 simultaneously pending lawsuits in Northern District), *adopted,* 97-CV-0938, Decision and Order (N.D.N.Y. May 28, 1999) (Kahn, J.), *aff'd,* No. 99-0174, 8 Fed. Appx. 140 (2d Cir. May 17, 2001) (unpublished opinion); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* civil rights inmate who had 10 suits pending in district); *Brown v.. Selsky,* 93-CV-0268, 1995 U.S. Dist. LEXIS 213, at *2, n. 1 (W.D .N.Y. Jan. 10, 1995) (denying leniency to *pro se* civil rights inmate who had seven cases pending in district); *but see McFadden v. Goord,* 04-CV-0799, 2006 WL 681237, at * 1, n. 3 (N.D.N.Y. March 14, 2006) (Kahn. J.) (refusing to deny leniency to *pro se* civil rights inmate, despite fact that he had seven cases pending in other districts in mid-1990s).

4    Specifically, these cases are the following:
   1. *Smith v. Yando,* 99-CV-0061, N.D.N.Y., filed 6/93, still pending (McAvoy, J.).
   2. *Smith v. Marcellus,* 93-CV-0423, W.D.N.Y., filed 5/93, dismissed 3/95.
   3. *Smith v. Goord,* 03-CV-0465, N.D.N.Y., filed 4/03, transferred to W.D.N.Y.
   4. *Smith v. Goord,* 03-CV-1111, N.D.N.Y., filed 9/03, transferred to W.D.N.Y.
   5. *Smith v. New York,* N.Y. Ct. Cl., filed 7/03.
   (*See* Dkt. No. 1 at 11-12.)

5    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether

the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; see, e.g ., *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

6     See Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*").

7     See *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that *Fed.R.Civ.P. 56* does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

8     See Patterson v. County of Oneida, 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

9     *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

10    See *Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under *Rule 56* to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

11    See *Fed.R.Civ.P. 56(e)* (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of *Rule 56[e]* is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

12    See, e.g., *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of *Rule 56[e]*), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

13    See, e.g., *Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated

by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

14    (Dkt. No. 16, ¶ 1 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. A ["Inmate Disciplinary History"]; Dkt. No. 21, Part 1, ¶ 1 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

15    (Dkt. No. 16, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. B ["Internal Movement History"]; Dkt. No. 21, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

16    (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Complaint]; Dkt. No 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

17    (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

18    (Dkt. No. 17, Part 2, ¶ 5 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

19    (Dkt. No. 17, Part 2, ¶ 4 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook]; *cf.* Dkt. No. 16, ¶ 3 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

20    (Dkt. No. 17, Part 2, ¶ 5 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 10 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook]; Dkt. No. 16, ¶ 3 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

21    (Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement]; Dkt. No. 21, Part 1, ¶ 4 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Lt. Estabrook]; Dkt. No. 16, Ex. N [Plf.'s medical record, dated 3/21/03]; Dkt. No. 21, Part 1, ¶ 5 [Plf.'s Aff. in Opp. to Defs.' Cross-Motion for Summ. Judg., admitting fact that he received Sudafed on 3/21/03]; Dkt. No. 21, Part 1, ¶¶ 5, 7 [ Plf.'s Aff. in Supp. of Opp. to Defs.' Cross-Motion for Summ. Judg., admitting fact that he received Sudafed from nurse during morning of 3/21/03].)

22    (Dkt. No. 17, Part 2, ¶ 7 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 12 [Plf.'s Verified Compl.]; Dkt. No. 21, Part 1, Plf.'s Aff. in Supp. of Opp. to Defs.' Cross-Motion for Summ. Judg., ¶ 7; Dkt. No 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke]; *cf.* Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

23    (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, in which he states, in part, that when he spoke to Sgt. Chilson on the morning of 3/21, "I then informed Sgt. Chilson[ ] that I never refused to turn on the light, or take my personal or State property."].)

24    (Dkt. No. 17, Part 2, ¶ 7 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 12 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke]; *cf.* Dkt. No. 16, ¶ 4 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

25    (Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Captain Rourke].)

26    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

27    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

28    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

29    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact].)

30    (Dkt. No. 16, ¶ 10 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 16, Ex. E [Auburn C.F. Memorandum dated 6/2/03 from Sgt. Chilson to Lt. Estabrook; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; Dkt. No. 21, Part 1, ¶ 10 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

31    (Dkt. No. 16, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; Dkt. No. 16, Ex. D [Auburn C.F. Inter-Departmental Communication dated 3/28/03 from Sgt. Chilson to Captain Rourke]; Dkt. No. 21, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

32    (Dkt. No. 17, Part 2, ¶ 6 [Plf.'s Rule 7.1 Statement]; Dkt. No. 1, ¶ 11 [Plf.'s Verified Compl.]; Dkt. No. 16 [Defs.' opposition papers, not containing a Rule 7.1 Response specifically controverting the asserted fact]; Dkt. No. 16, Ex. F [Auburn C.F. Memorandum dated 3/28/03 from Sgt. Yorkey to Lt. Estabrook]; *cf.* Dkt. No. 16, ¶ 11 [Defs.' Rule 7.1 Statement, admitting the asserted fact].)

33    (Dkt. No. 16, ¶ 5 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Exs. D, E, F, G, and L [four Auburn C.F. memoranda, and two pages of SHU logbook entries, supporting the asserted fact]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order, referring to Plf.'s "refusing to obey a direct order" as the "reason" for the restricted diet order]; Dkt. No. 21, Part 1, ¶ 5 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 1, ¶ 13 [Plf.'s Verified Compl., admitting that he had not returned his food tray after lunch].)

34    (Dkt. No. 16, Defs.' Rule 7.1 Statement, ¶ 6; Dkt. No. 16, Exs. D, E, G, H, and J [three Auburn C.F. memoranda, two pages of SHU logbook entries, and a Pre-Hearing Restricted Diet Order, supporting the asserted fact]; Dkt. No. 21, Part 1, ¶ 6 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact] .)

35    (Dkt. No. 16, ¶ 7 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. I [Auburn C.F. Memorandum dated 4/4/03 from Lt. Estabrook to Capt. Rourke]; Dkt. No. 21, Part 1, ¶ 7 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; *cf.* Dkt. No. 17, Part 4, Ex. Q [Plf.'s proffered "evidence" in opposition to this factual assertion, which "evidence" suggests, at most, that there was "no [such misbehavior] report on [the DOCS] statewide computer [system] for 3-21-03," but not indicating whether there was a record of such a report having been filed during the days following 3/21/03].)

36    (Dkt. No. 16, ¶ 8 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating that Sgt. Chilson had been notified after the writing of a misbehavior report]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order dated 3/21/03, referring to the misbehavior report as the "reason" for the restricted diet order]; Dkt. No. 21, Part 1, ¶ 8 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact]; Dkt. No. 1, ¶¶ 13-14 [Plf.'s Verified Compl., admitting the fact asserted]; *cf.* Dkt. No. 17, Part 4, Ex. Y [attaching copy of Deprivation Order dated 3/21/03 referring to Plaintiff's refusal to return his lunch tray].)

37    (*Id.*)

38    (Dkt. No. 16, ¶ 9 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating communication from medical staff]; Dkt. No. 16, Ex. J [Pre-Hearing Restricted Diet Order, indicating approval]; Dkt. No. 21, Part 1, ¶ 9 [Plf.'s Rule 7.1 Response, not specifically controverting the asserted fact].)

39    (Dkt. No. 16, Ex. G [two pages of SHU logbook entries, indicating that diet was to start at dinner]; Dkt. No. 16, Ex. K [medical record dated 3/22/03 referring to restricted diet as if it were already being imposed]; Dkt. No. 16, Ex. N [medical records of 3/22, indicating that Plaintiff was already on the diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

40    (Dkt. No. 16, Ex. N [medical records of 3/22, 3/23, 3/24, 3/25, and 3/28 indicating that Plaintiff was on "loaf" diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

41    (Dkt. No. 1, ¶ 14; Dkt. No. 17, Part 2, ¶ 18; Dkt. No. 21, Plf.'s Rule 7.1 Response, ¶ 15.)

42    (Dkt. No. 17, Part 4, Ex. Y [Deprivation Order dated 3/21/03]; Dkt. No. 17, Part 2, ¶¶ 10, 19; Dkt. No. 17, Part 4, Ex. E [Grievance No. 39005, dated 3/27/03, stating, in part, "I showed the Officer who passed out mail the deprivation order.

2006 WL 2805242

He told Sgt. Christopher [ ] about my situation, and no actions were taken to get me another dinner tray."], Dkt. No. 17, Part 4, Ex. H [Grievance No. 39033, dated 3/30/03, stating, in part, "I received a deprivation order on 3/24/03 stating: 'I'm being deprived of Feed up tray.' "]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Complaint, alleging, "Plaintiff only received two 'Deprivation Order forms, depriving me of hard plastic trays."].)

43    (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03].)

44    (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, stating, in part, "I am requesting that you take me off this restricted diet. No actions were taken against the Officer's [sic] that deprived me of my property [on March 20-21, 2003]. Soon as I hold my tray [on March 21, 2003], swift actions is taken against me."].)

45    (Id.)

46    (Dkt. No. 16, ¶ 7 [Defs.' Statement of Facts]; Dkt. No. 21, Part 1, ¶ 7 [not specifically controverting the asserted fact]; Dkt. No. 17, Part 4, Ex. D [attaching Grievance No. 39005, dated 3/27/03]; Dkt. No. 16, Ex. I [Auburn C.F. Memorandum dated 4/4/03 from Lt. Estabrook to Capt. Rourke reporting findings from investigation concerning Grievance No. 39005].)

47    (Dkt. No. 16, Ex. N [medical record of 3/28 indicating that Plaintiff had "finished loaf [diet]," and medical records of 3/30, 4/4, 4/5, and 4/6, not mentioning "loaf" diet]; Dkt. No. 1, ¶ 14 [Plf.'s Verified Compl., asserting fact].)

48    (Dkt. No. 16, Ex. N [containing daily medical records during this time period].)

49    (Dkt. No. 16, ¶ 14 [Defs.' Rule 7.1 Statement]; Dkt. No. 16, Ex. N [containing daily medical records during this time period]; Dkt. No. 21, Part 1, Plf.'s Rule 7.1 Response, ¶ 14 [not specifically controverting the asserted fact].)

50    (Dkt. No. 16, Ex. N [containing daily medical records during this time period].)

51    I note, incidentally, that Plaintiff's medical records suggest that any cold that Plaintiff was allegedly suffering from on March 21, 2003, may have been bothering him for a week before the night of March 20-21, 2003. (Dkt. No. 16, Ex. N [Plf.'s medical record of 3/15/03, stating "Seen on Sick Call ... Requesting Throat Lozenges."].)

52    See Trammel v. Keane, 338 F.3d 155, 158-159, 164 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough); Davis v. Buffardi, 01-CV-0285, 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (Magnuson, J.) (granting defendants' motion for summary judgment dismissing claim of inadequate prison conditions under Fourteenth Amendment based on denial of extra blankets and clothing for ten days in February, during which period prison's boiler was not working, because pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm"); Grant v. Riley, 89-CV-0359, 1993 WL 485600, at *4 (S.D.N.Y. Nov. 24, 1993) (granting defendants' motion for summary judgment dismissing Eighth Amendment claim because "plaintiff ... has alleged only a three-day period of exposure" to cold without adequate clothing); Scot v. Merola, 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken, and temperature dropped below fifty degrees); see also Hadley v. Peters, No. 92-2726, 1993 WL 475407, at *1 (7th Cir. Nov. 18, 1993) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on exposure to cold for five days in early April due to malfunctioning heating system, because "the temperatures in area of the prison ranged from 29 to 68 degrees Fahrenheit").

53    See, e.g., Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir.1988) (reversing grant of defendants' motion for summary judgment dismissing Eighth Amendment claim where inmate established that he had been exposed to subfreezing temperatures for the majority three month period in fall and winter); Gaston v. Coughlin, 249 F.3d 156, 165 (2d Cir.2001) (reversing grant of defendants' motion for summary judgment dismissing Eighth Amendment claim where inmate established that he had been exposed to, inter alia, temperatures near or well below freezing for five-month period during winter); see also Wright v. McMann, 387 F.2d 519, 521-522, 526 (2d Cir.1967) (reversing Rule 12[b][6] dismissal of Eighth Amendment claim alleging that inmate was, inter alia, stripped completely nude and exposed to subfreezing temperatures for 11 days during winter in Upstate New York, then was provided a "thin pair of underwear" for another 22 days under similar conditions, and then a year later-was confined for 21 days under similar conditions).

54    See, e.g., Trammel, 338 F.3d at 164-165 (no deliberate indifference where nurse regularly observed inmate to ensure that his health was not jeopardized during period of deprivation, which included having to wear only undershorts while being exposed to "bitter cold" for seventeen days).

55    For example, Defendant Chilson-once he realized that he would not have an opportunity to speak to Defendant Christopher during the 3:00 p.m. shift change to determine if a deprivation order or misbehavior report had been filed-

agreed with the sergeant who was replacing him (Sgt.Yorkey) that Plaintiff's personal property should be returned to him. (*See, supra,* Statement of Fact Nos. 5-6.)

56    I note that Defendants assert that Defendant Christopher withheld Plaintiff's property because Plaintiff had become agitated when Defendant Christopher had entered his cell, and Plaintiff had refused a direct order to turn on his cell light. (Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook]; *see also, supra,* Statement of Fact No. 3.)

57    *See also Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Trammel,* 338 F.3d at 165 ("Negligence does not ... satisfy the scienter requirement necessary to support a claim for 'cruel and unusual punishment.' ") [citation omitted].

58    (Dkt. No. 16, at 6-8 [Defs.' Mem. of Law].)

59    (Dkt. No. 17, Part 3, at 10-11, 21-23 [Plf.'s Mem. of Law, Point I, ¶¶ 10-11, 13; Point II, ¶¶ 11-12, 14]; Dkt. No. 21, Part 1, at 14-16, 21 [Plf.'s Opp. Mem. of Law].)

60    (Dkt. No. 16, Ex. C [Auburn C.F. Memorandum dated 3/29/03 from Sgt. Christopher to Lt. Estabrook].) I note that this asserted refusal by Plaintiff to comply with a direct order to turn on the cell light is consistent with Plaintiff's admitted refusal, approximately fourteen hours later, to return his lunch tray, which was also motivated by Plaintiff's unhappiness with feeling cold.

61    I note that it is not material to a substantive due process claim whether an inmate's conduct "in fact gave [a corrections officer] reasonable grounds to believe that [the inmate] posed a threat to the order of the [correctional] facility or whether [the alleged deprivation sustained by the inmate] therefore in fact violated [a particular DOCS rule or regulation]." *Lowrence,* 20 F.3d at 537, n. 6. This is because the standard on such a claim is whether Defendants' conduct was *arbitrary.*

62    *See DeMaio v. Mann,* 877 F.Supp. 89, 94 (N.D.N.Y.) (Kaplan, J.) ("*Section 305.2* is *sufficiently definite* to create a [Fourteenth Amendment procedural due process] liberty interest in the inmate ....") [emphasis added and citation omitted], *aff'd,* 122 F.3d 1055 (2d Cir.1995); *Young v. Scully,* 91-CV-4801, 1993 WL 88144, at *3 (S.D.N.Y. March 22, 1993) ("[T]he language in Regulation 7 N.Y.C.R.R. § 305.2(a), by requiring *specific substantive predicates* for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process.") [emphasis added].

63    *Hewitt v. Helms,* 459 U.S. 460, 466-472 (1983).

64    *Sandlin v. Connor,* 515 U.S. 472, 477-484 (1995).

65    *Sandlin,* 515 U.S. at 483-484; *see also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N.Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

66    *Sandlin,* 515 U.S. at 483-484.

67    *See DeMaio,* 877 F.Supp. at 94 ("[The] due process [required by 7 N.Y.C.R.R. § 305.2] is satisfied if the inmate is provided with notice and an opportunity to make a statement to the official responsible for the [deprivation] order."); *Young,* 1993 WL 88144, at *3 ("[A]n informal, nonadversary review is sufficient to satisfy the due process requirement [imposed by 7 N.Y.C.R.R. § 305.2].") [internal quotation marks and citations omitted].

68    *See* 7 N.Y.C.R.R. § 305.2(b) ("A deprivation order must be authorized by the officer of the day ... or the deputy superintendent for security services or higher ranking authority. Initial authorization may be given verbally but must be confirmed in writing *within 24 hours* with a copy to the superintendent, and one copy to the inmate.") [emphasis added].

69    *See Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) [citations omitted].

70    (*See, supra,* Statement of Fact No. 3.)

71    (*See, supra,* Statement of Fact Nos. 4-5.)

72    (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03, in which he states, in part, that when he spoke to Sgt. Chilson on the morning of 3/21, "I then informed Sgt. Chilson[ ] that I never refused to turn on the light, or take my personal or State property."].)

73    (*See, supra,* Statement of Fact Nos. 6-7.)

74    *See Chapdelaine v. Keller,* 95-CV-1126, 1998 WL 357350, at *12 (N.D.N.Y Apr. 16, 1998) (Sharpe, M.J.) ("[T]he Eighth Amendment requires that prisoners receive nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it").

Smith v. Burge, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-00916-GLS-TWD   Document 19   Filed 07/26/18   Page 73 of 90
2006 WL 2805242

75    (*See, e.g.,* Dkt. No. 1, ¶¶ 14, 17, 19, 20 [Plf.'s Verified Compl., alleging conclusorily that the diet, which consisted of "1-apple, and a hard loaf of bread," did not meet Plaintiff's "basic minimum needs" and constituted a "reckless disregard of plaintiff's health"].)

76    Nor can Plaintiff make this argument, since he refused to let a nurse weigh him during the week in question. (Dkt. No. 16, Ex. N [Plf.'s medical record of 3/22, stating "Refuses Wt. & BP"]; Dkt. No. 21, Part 4 at 25 ["Refusal of Medical Examination and/or Treatment" Form, dated 3/22].)

77    (Dkt. No. 16, Ex. N [Plf.'s medical record of 3/30, noting request for Tylenol and complaint of gas, and medical record of 4/4, noting complaints of headaches, stomachaches, dizzy spells, and gas] .)

78    *See McEachin v. McGuinnis,* 357 F.3d 197, 199-201 (2d Cir.2004) (affirming district court's Rule 12 dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days); *Johnson v. Gummerson,* 98-CV-0004, Memorandum-Decision & Order (N.D.N.Y. March 1, 1999) (Scullin, C.J.) (no Eighth Amendment violation where inmate was placed on restricted diet consisting of "food loaf" for seven days), *aff'd,* 198 F.3d 233 (2d Cir.1999) (unpublished opinion); *Dumpson v. Rourke,* 96-CV-0621, 1997 WL 610652, at *1, 7-8 (N.D.N.Y. Sept. 26, 1997) (Pooler, J.) (no Eighth Amendment violation where plaintiff was placed on restricted "loaf and cabbage" diet for seven days); *Porter v. Coombe,* 97-CV-2394, 1999 WL 587896, at *1, 3 & n. 2 (S.D.N.Y. Aug. 4, 1999) (no Eighth Amendment violation where plaintiff was placed on restricted diet of "cabbage-loaves" for 22-day period, 18-day period and 14-day period within a span of two months, even where inmate was allergic to two of the ingredients in the "cabbage-loaves"); *Breazil v. Bartlett,* 998 F.Supp. 236, 240-242 (W.D.N.Y.1997) (no Eighth Amendment violation where inmate was placed on pre-hearing restricted diet consisting of "Nutriloaf" and one cup of raw cabbage for one week [i.e., from 6/27-7/4], and a post-hearing restricted diet consisting of Nutriloaf and cabbage for 45 days); *James v. Coughlin* 13 F.Supp.2d 403, 412 (W.D.N.Y.1998) (no Eighth Amendment violation where plaintiff was placed on a pre-hearing restricted diet for three days); *Adams v. Kincheloe,* 743 F.Supp. 1385, 1388-1393 (E.D.Wash.1990) (no Eighth Amendment violation where plaintiff was placed on pre-hearing restricted diet consisting of "nutra-loaf" for five days); *cf. U.S. v. State of Mich.,* 680 F.Supp. 270, 271-272, 279 (W.D.Mich.1988) (prisons' use of "food loaf" to feed inmates who engaged in prohibited cafeteria behavior did not violate Eighth Amendment).

79    *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (Kahn, J.) (material issue of fact existed with regard to inmate's Eighth Amendment claim where evidence showed that inmate was deprived of two out of three meals per day for eight days); *Moss v. Ward,* 450 F.Supp. 591, 594, 597 (W.D.N.Y.1978) (material issue of fact existed with regard to inmate's Eighth Amendment claim where evidence showed that inmate was *completely* deprived of food for four consecutive days, and was given only one meal a day for next three days).

80    *See Trammel,* 338 F.3d at 158-159, 162-164 (no deliberate indifference where nurse regularly observed inmate while he was on restricted diet of "nutriloaf" for 95 days); *Breazil,* 998 F.Supp. at 242 (no deliberate indifference where defendants sufficiently demonstrated that the dietary restrictions were imposed in good-faith effort to restore or maintain discipline after inmate's prohibited act); *Dumpson,* 1997 WL 610652, at *1, 7-8 (no deliberate indifference where inmate received medical attention before and during the seven-day period in which he was on restricted "loaf and cabbage" diet); *Phelps v. Kapnolas,* 94-CV-7543, 2005 WL 1313444, at *6-8 (W.D.N.Y. June 1, 2005) (no deliberate indifference where there was no evidence to establish that defendants were put on notice that the food being served to plaintiff on the restricted diet was causing him to receive inadequate nutrition); *Porter,* 1999 WL 587896, at *1, 3 & n. 2 (no deliberate indifference where inmate received medical attention before and during the two-month time period that he was on restricted diet of "cabbage-loaves").

81    (*See, supra,* Statement of Fact Nos. 10, 11, 16.)

82    (Dkt. No. 16, at 12-14 [Defs.' Mem. of Law].)

83    (Dkt. No. 17, Part 3, at 17-27 [Plf.'s Mem. of Law, Point II, ¶¶ 4, 6-7, 10-12, 14]; Dkt. No. 21, Part 1, at 21-24 [Plf.'s Opp. Mem. of Law].)

84    (*See, supra,* Statement of Fact No. 8.)

85    Title 7, Section 304.2 of the New York Code of Rules and Regulations provides, in pertinent part:

> The superintendent or his designee may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section [which conduct includes refusing to obey a direct order to return a food container at the conclusion of a meal] on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing. The order shall briefly state the reason(s) for the imposition of the restricted diet and contain the following notice to the inmate: 'You may write to the deputy superintendent of security or his/her designee to make a statement as to the need for the continued pre-hearing imposition of the restricted diet.' One

copy of the order shall be given to the inmate and another copy forwarded to the commissioner within 24 hours of issuance.

7 N.Y.C.R.R. § 304.2.

86  I note that the few cases I have found that expressly address the issue (of whether 7 N.Y.C.R.R. § 304.2 creates a due process interest) either do not decide the issue or indicate that 7 N.Y.C.R.R. § 304.2 does not create such an interest. *See, e.g., Breazil v. Bartlett,* 998 F.Supp. 236, 243 (W.D.N.Y.1997) ("[E]ven assuming for the purposes of this case that plaintiff had a protected liberty or property interest in remaining free from ... dietary restrictions [pursuant to 7 N.Y.C.R.R. § 304.2], ... I find that plaintiff received all the process he was due under the circumstances."); *Flemmings v. Kinney,* 02-CV-9989, 2004 WL 1672448, at *5 (S.D.N.Y. July 27, 2004) ("[T]o the extent that plaintiff alleges that the restrictions imposed by the regulations [including 7 N.Y.C.R.R. § 304.2] constitute a due process violation, such restrictions, by themselves, do not add to plaintiff's [Fourteenth Amendment] claim."); *cf. Porter v. Coombe,* 97-CV-2394, 1999 U.S. Dist. LEXIS 11924, at *11-12 (S.D.N.Y. Aug. 4, 1999) (holding that inmate did not establish that New York State, by regulation or statute, had granted him a protected liberty interest in remaining free from being placed on a *post*-hearing restricted diet).

87  *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (requiring both the existence of a state law creating a liberty interest and the existence of an atypical and significant hardship to show a due process interest in remaining free from being placed on a *post*-hearing restricted diet); *Beckford,* 151 F.Supp.2d at 219 (requiring both the existence of a state law creating a liberty interest and the existence of an atypical and significant hardship to show a due process interest in remaining free from being placed on a *pre*-hearing restricted diet).

88  *See, e.g., Beckford,* 151 F.Supp.2d at 208-209, 218-219 & n. 4 (not mentioning 7 N.Y.C.R.R. § 304.2, but granting defendants' motion for summary judgment as to plaintiff's due process claims because a seven-day *pre*-hearing restricted diet-imposed between 1/17/97 and 1/24/97-did not impose an atypical and significant hardship; stating, "In light of the minimal amount of time that Plaintiff's dietary ... restrictions were put in place, the Court holds, as a matter of law, that his confinement was not sufficiently atypical to implicate a protected liberty interest"); *Turnboe v. Gundy,* 25 Fed. Appx. 292, 293 (6th Cir.2001) (being placed on a pre-hearing restricted diet consisting of "food loaf" for seven days does not constitute an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life) [citations omitted]; *accord, Thomas v. Virginia,* 04-CV-0273, 2005 WL 15517, at *10-11 (W.D.Va. July 28, 2005); *see also McEachin,* 357 F.3d at 200 (not deciding whether such a state law exists, after finding that a seven-day *post*-hearing restricted diet did not impose an atypical and significant hardship).

89  (*See, supra,* Statement of Fact No. 10.)

90  (*See, e.g., supra,* Statement of Fact No. 13.)

91  (*See, supra,* Statement of Fact No. 12.)

92  (*See, supra,* Statement of Fact Nos. 13-14.)

93  (*See, supra,* Statement of Fact No. 13.)

94  (Dkt. No. 1, ¶ 15 ["Superintendent Burge, or his designee, was supposed to take me off the pre-hearing diet. Plaintiff was unlawfully kept on the diet for seven days, without a Deprivation [sic], or misbehavior report pending a hearing [sic]."], ¶ 19 ["Defendant Burge [ ] acted ... with deliberate indifference to Plaintiff [sic] well-being ... [a]nd ... with actual knowledge that impending harm to plaintiff was easily preventable. Defendant Burge[ ] failed to remedy the wrong. Defendant Burge[ ] had the authority to take Plaintiff off the restricted diet. However, Plaintiff were [sic] unlawfully kept on the diet for seven days."]; Dkt. No. 21, Part 1 at 24-26 [Plf.'s Mem. of Law, arguing that "Plaintiff wrote defendant Burge[ ] on March 25, 2003 requesting to be taken off the unlawful restrictive diet.... [W]hen Plaintiff complained of the unlawful diet [Defendant Burge or his designees] should've checked the record and remedied the wrong."].)

95  (Dkt. No. 17, Part 3 at 30 [Plf.'s Mem. of Law, Point III, ¶ 3, citing only to Plf.'s Exhibits N and K, which do not support Plaintiff's argument].)

96  (*See, supra,* Statement of Fact No. 13; Dkt. No. 21, Part 1, at 24-25 [Plf.'s Opp. Mem. of Law, referencing Plf.'s 3/25/03 letter to Def. Burge, but citing only to Plf.'s Exhibits I and W, which do not constitute the letter in question]; Dkt. No. 16, at 14 [Defs.' Mem. of Law].)

97  (*See* Dkt. No. 17, Part 3, Point III, ¶ 30 [Plf.'s Mem. of Law, mentioning Plf.'s "complaints" to Def. Burge but not providing record cites to those complaints; citing only to Plf.'s Exhibits Kand N, which do not constitute the complaints in question] .)

98  *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin,

Smith v. Burge, Not Reported in F.Supp.2d (2006)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 75 of 90
2006 WL 2805242

J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

99    Specifically, the letter informed Defendant Burge only of the following (alleged) facts: (1) the sink in Plaintiff's new cell was (allegedly) "stopped up"; (2) Plaintiff was initially deprived of his "personal and state property" from 6:15 p.m. to 9:45 p.m. on March 20, 2003; (3) he was subsequently deprived of that property by Defendant Christopher, from 9:45 p.m. on March 20, 2003, to 3:00 p.m. on March 21, 2003, because Defendant Christopher stated that Plaintiff had failed to comply with prison procedures when in fact Plaintiff (allegedly) had complied with those procedures, as evidenced by the fact that Plaintiff never received a misbehavior report for any rule violation; and (4) Sergeant Chilson refused to return the property in question despite Plaintiff's requests, because Sergeant Chilson wanted to talk to Defendant Burge first (to see if a deprivation order had been issued). (Dkt. No. 17, Part 4, Ex. O [Plf.'s letter to Sup. Burge, dated 3/25/03].) Noticeably absent from the letter are (1) any allegation that Plaintiff had, during the relevant time period, been experiencing the sort of cold that is necessary to give rise to an Eighth Amendment violation, (2) any allegation that Plaintiff told Defendant Christopher or Sergeant Chilson that he was even the least bit cold, or (3) any allegation that Defendant Christopher had deprived Plaintiff of the property in question without informing Plaintiff of the (purported) reason for the deprivation. (*Id.*)

100    (Dkt. No. 21, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response]; Dkt. No. 21, Part 1, ¶ 19 [Plf.'s Aff. in Support of Plf.'s Opp. to Defs.' Cross-Mtn. for Summ. Judg.].)

101    (Dkt. No. 6 [U.S. Marshal's Service Process Receipt and Return dated 9/18/03, indicating that the DOCS Liaison Officer was unable to locate "Mr. D. Myers, Officer [at Auburn C.F.]" since the Liaison Officer had no record of anyone by that name employed by Auburn C.F.].)

102    (Dkt. No. 4 at 4 [Order of 8/19/03, issued by then-M.J. Sharpe].)

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 76 of 90

2011 WL 4369096
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone WALKER, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 9:08–CV–1078 (TJM/ATB).
|
Sept. 19, 2011.

**Attorneys and Law Firms**

Tyrone Walker, Dannemora, NY, pro se.

Justin C. Levin, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

 **\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his July 25, 2011 Report–Recommendation, Magistrate Judge Baxter recommended that Defendants' motion for summary judgment (Dkt. No. 109) be granted and the action dismissed. Plaintiff has filed objections to this recommendation, dkt. # 117, and Defendants have file a letter brief in response to Plaintiff's objections. Dkt. # 118.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1) (C); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must

be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole,* 2011 WL 3809920, at \* 2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. *See Calderon v. Wheeler,* 2009 WL 2252241, at \*1, n. 1 (N.D.N.Y. July 28, 2009); [1] *Green v. City of New York,* 2010 WL 148128, at \* 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

**III. DISCUSSION**

With this standard in mind, and after having reviewed Plaintiff's objections, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Baxter's thorough report. Petitioner has not pointed any error in Magistrate Judge Baxter's analysis, and the Court finds that those portions of the Report–Recommendation and Order that Plaintiff has chosen to reargue are not clearly erroneous. To the extent Plaintiff's objections raise new theories or arguments based on a February 28, 2011 restraint order that was not presented in the prior pleadings or in opposition to the Defendants' motion, the arguments or theories are rejected inasmuch as Plaintiff has failed to offer a valid justification for failing to raise the claim previously.

**IV. CONCLUSION**

 **\*2** Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Baxter in their entirety.

Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 109) is **GRANTED** and the complaint is **DISMISSED IN ITS ENTIRETY.**

**IT IS SO ORDERED**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4369096

Footnotes

1      As Judge Suddaby noted in *Calderon:*

On *de novo* review, "[t]he judge may ... receive further evidence .... " 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

2011 WL 4369116
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone WALKER, Plaintiff,
v.
Brian FISCHER, et al., Defendant.

No. 9:08–CV–1078 (TJM/ATB).
|
July 25, 2011.

**Attorneys and Law Firms**

Tyrone Walker, pro se.

Justin C. Levin, Assistant Attorney General, for Defendants.

**REPORT and RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In his Amended and Supplemental Complaints (Dkt.Nos.42, 97), Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments. Plaintiff seeks monetary and injunctive relief. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 109). Plaintiff responded in opposition to the motion. (Dkt. No. 115). For the following reasons, the Court recommends granting Defendants motion, and dismissing the complaint in is entirety.

**I. Background**

Plaintiff is an inmate in the custody and control of the New York State Department of Correctional Services ("DOCS"). [1] (Dkt. No. 42, Am.Compl.¶ 4). He is currently incarcerated at Clinton Correctional Facility ("Clinton"). (*Id.;* Dkt. No. 109–4, Pl.'s Dep. at 13 [2]). He transferred to Clinton from Great Meadow

Correctional Facility ("Great Meadow") on January 15, 2008. (Am.Compl.¶ 24).

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care and Fourteenth Amendment right of equal protection under the law by depriving him of adequate medical treatment when other similarly situated inmates received such treatment. (Am. Compl. ¶¶ 131, 133; Supplemental Compl. ¶¶ 161–62). He also claims the ice covering the recreation areas aggravate his medical conditions. [3] Additionally, Plaintiff claims that he was deprived of due process in violation of the Fourteenth Amendment when he was placed under a restraint order without being issued a misbehavior report. (Am.Compl.¶ 123). Finally, although Plaintiff does not explicitly state an Eighth Amendment cause of action arising from the restraint orders, the restraints may also implicate the Eighth Amendment as Plaintiff has claimed that prison officials placed him in restraints "as a form of punishment." (Pl.'s Dep. at 70).

**A. Plaintiff's Medical Conditions**

1. *Foot Pain*

Plaintiff was diagnosed with plantar fasciitis in November 2007 while he was incarcerated at Great Meadow. (Dkt. No. 111, Pl.'s Medical R. I at 84). Plantar fasciitis is an inflammation of the plantar fascia, which is a thick band of tissue that "runs across the bottom of the foot and connects the heal bone to the toes." (Johnson Decl. ¶ 19; Lashway Decl. ¶ 21). The condition causes pain in the feet. (Pl.'s Medical R. I at 84). Treatment options include rest, stretching, and orthotic shoe inserts. (Johnson Decl. ¶ 20; Lashway Decl. ¶ 22; Pl.'s Medical R. I at 84). Dr. Thompson, who diagnosed Plaintiff with plantar fasciitis at Great Meadow, noted that "orthotics would help with [the condition] and boots would also help give ... support to help this condition." (Pl.'s Medical R. I at 84).

**\*2** Plaintiff also claims that he suffers from Raynaud's Syndrome. (Am. Compl. ¶ 21; Pl.'s Dep. at 31). Raynaud's Syndrome "is a condition in which blood vessels in the hands and feet appear to overreact to cold." (Johnson Decl. ¶ 31; Lashway Decl. ¶ 33). Plaintiff says that his "feet become painfully cold when there is a slight decrease in temperature" even if his overall body temperature remains warm. (Am.Compl.¶ 21). Plaintiff admits that he has never been diagnosed with Raynaud's Syndrome and admits

that there is no indication of it in his medical file, but he claims that a doctor and a physician have told him that he has it. (Pl.'s Dep. at 31). He believes that medical boots will help with this condition too. (Pl.'s Dep. at 34).

Plaintiff wants to wear his medical boots at all times, or, at the very least, when he leaves his cell to go to recreation or to other call-outs within the facility. (Pl.'s Dep. at 42). He also wants to be able to keep the medical boots at the back of his cell so that he has access to them whenever he leaves his cell. (Pl.'s Dep. at 43–44). Currently, Plaintiff is allowed to wear his boots when he goes on "outside trips." (Defs. 7.1 Statement ¶ 12; Pl.'s 7.1 Statement ¶ 12). Clinton's medical staff concluded that the "boots were only medically necessary when he went on outside trips that required extensive walking." (Defs.' 7.1 Statement ¶ 11; see also Dkt. No. 111–1, Pl's Medical R. II at 165, 172, 182). Medical staff provided Plaintiff with orthotic inserts and painkillers, and they recommended exercises to ease his discomfort. (Defs.' 7.1 Statement ¶¶ 4–5, 7, 13; Pl.'s 7.1 Statement ¶¶ 4–5, 7, 11).

### 2. Back Pain

Plaintiff claims that he injured his back on February 18, 2009, while attempting "cherry picker" exercises[4] in his cell. (Dkt. No. 97, Pl.'s Supplemental Compl. ¶ 142). The next day, Plaintiff informed Defendant Amber Lashway, a nurse practitioner at Clinton during the events giving rise to this action, that he was experiencing back pain. (Id.; Lashway Decl. ¶ 57). Defendant Lashway prescribed Phenylgesic, which is a painkiller made from acetaminophen and phenyltolox. (Pl.'s Medical R. I at 96). Approximately one week later on February 27, 2009, Plaintiff told Defendant Lashway that the medication was "doing little to subside the pain in the back ...." (Pl.'s Supplemental Compl. ¶ 143). Defendant Lashway allegedly told Plaintiff to continue taking the Phenylgesic and that he would not be receiving stronger medication. Id.

Two months later, on April 30, 2009, Plaintiff complained again to Defendant Lashway about back pain. (Lashway Decl. ¶ 63; Pl.'s Supplemental Compl. ¶ 145). Defendant Lashway "concluded that [Plaintiff] ... was exhibiting drug-seeking behavior." (Lashway Decl. ¶ 64). Once again, Defendant Lashway told Plaintiff that he would not receive stronger medication, but continued the Phenylgesic and recommended a home exercise program

for treating back pain. (Lashway Decl. ¶¶ 64–65; Pl.'s Supplemental Compl. ¶ 145). One of these exercises was supposedly "similar to the cherry pickers exercise." (Pl.'s Supplemental Compl. ¶ 145). After a couple of weeks of completing the other exercises successfully, Plaintiff claims that he injured his back even more by "attempt[ing] to do the [exercise that was] like the cherry picker exercise ...." Id.

**\*3** Defendant Lashway conducted a followup examination of Plaintiff's back on May 28, 2009. (Lashway Decl. ¶ 67). She states that examination was normal and that "it revealed no functional deficits ." (Lashway Decl. ¶ 68; see also Dkt. No. 111–2, Pl.'s Medical R. III at 29). Plaintiff, however, claims that he was "experienc[ing] excruciating back pain." (Dkt. No. 115, Pl.'s 7.1 Statement ¶ 52). Plaintiff wanted an x-ray of his back but Defendant Lashway said that an x-ray was not medically indicated. (Lashway Decl. ¶ 69). Defendant Lashway, however, submitted a physical therapy consult to address Plaintiff's complaints. Id. ¶ 71. On June 2, 2009, Dr. Gerald Amatucci,[5] the Regional Medical Director, denied the consult "because of a lack of medical necessity at the time." Id. ¶ 73. On September 1, 2009, Defendant Lashway submitted another physical therapy consult, which was also denied "because of a lack of medical necessity." Id. ¶ 76.[6]

### 3. Gastrointestinal Problems

Plaintiff has complained of constipation, stomach cramps, and hemorrhoids. (Am. Compl. ¶¶ 42, 59, 61–63, 65, 67; Pl.'s Dep. at 48–49). He complains that the "Controlled A Diet," which is a high fiber diet that Plaintiff receives to treat constipation and hemorrhoids, consists of "bland food." (Pl.'s Dep. at 51; Dkt. No. 109–1, Defs.' 7.1 Statement ¶ 24; Dkt. No. 115, Pl.'s 7.1 Statement ¶ 24). He also claims that the diet consists of too much meat, insufficient wheat bread and fresh fruits, and overcooked vegetables. (Pl.'s Dep. at 51–52). Plaintiff states that this diet is "ineffective," and that the "Cold Alternative Diet" (also known as Kosher Diet) would better treat his digestive problems. (Pl.'s 7.1 Statement ¶¶ 25, 28). Rabbi Alec H. Friedman[7] is accused of denying Plaintiff's request for the Kosher Diet because Plaintiff is Muslim. (Defs.' Mem. of Law at 16; see also Dkt. No. 115–7, Pl.'s Exh. 30).

In addition to a high fiber diet, Plaintiff also receives Metamucil to ease his constipation, which Plaintiff admits has been "pretty effective." (Defs.' 7.1 Statement ¶¶ 21–23; Pl.'s 7.1 Statement ¶¶ 21–23; Pl.'s Dep. at 50). Defendants have also provided Plaintiff with ointment to treat his hemorrhoids, which Plaintiff acknowledges has helped "[c]onsiderably." (Defs.' 7.1 Statement ¶¶ 29–31; Pl.'s 7.1 Statement ¶¶ 29–31; Pl.'s Dep. at 50).

#### 4. *Vision Problems*

Plaintiff's eyesight has deteriorated since his incarceration. (Pl.'s Dep. at 58). He states that he had 20/20 vision when he was arrested approximately twenty years ago, but he now needs bifocals. *Id.* Plaintiff also accuses Defendants of ignoring his light sensitivity. (Am.Compl.¶ 89). This sensitivity causes headaches and makes it difficult for Plaintiff to go to the recreation because the sunlight hurts his eyes. (*Id.;* Pl.'s Dep. at 59). He must also leave the lights off in his cell due to the sensitivity. (Pl.'s Dep. at 60). Plaintiff's requests for "photo-ray or tinted glasses" were denied. (Am.Compl.¶ 90).

#### 5. *Dental Issues*

**\*4** Plaintiff accuses Defendants of ignoring his dental problems. (Am.Compl. ¶¶ 98–100). Plaintiff lost his partial dentures when he transferred to Clinton from Great Meadow in January 2008. (Am.Compl.¶ 98). He suffers from a receding gum line, which causes pain and swelling. *Id.* He was also scheduled to have this teeth cleaned but that has not occurred. *Id.* He claims that he has only seen a dentist once and that no treatment has been provided. (Pl.'s Dep. at 62).

#### 6. *Colonoscopy*

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by delaying a colonoscopy. (Am.Compl.¶¶ 101–09). Plaintiff canceled a colonoscopy in September 2008 because he believed that Dr. Shah had lied to him regarding potential complications that might arise from the procedure. *Id.* ¶¶ 101–02. Plaintiff claims that his medical conditions increased the threat of colon cancer because he has a history of the disease in his family. *Id.* ¶ 72. He requested either another doctor or an alternative procedure shortly after canceling his procedure with Dr. Shah; but Plaintiff did not have a colonoscopy until March 2008. (*Id.* ¶ 103; Dkt. No. 115–7, Pl.'s Exh. 30).

#### B. Recreation Area Conditions

Plaintiff complains that the floor of the recreation cages are completely covered with ice that is at least six inches thick, making his feet "extremely painfully cold" due to his Raynaud's Syndrome. (Am.Compl.¶ 33). While prison officials provide galoshes, Plaintiff states that they do not protect his feet. (Pl.'s Dep. at 55–56). He refrains from going to recreation because the snow and ice compound the problems with his feet. *Id.* at 57. Plaintiff requests medical boots to insulate his feet when he goes to recreation. (Am.Compl.¶ 33).

#### C. Restraint Order

Plaintiff was placed on a restraint order on December 10, 2008, because he "made threatening statements regarding fighting in the S .H.U. Visiting Room with other S.H.U. inmates." (Dkt. No. 109–12, Racette Exh. D). Waist restraints, leg irons, and handcuffs were to remain on Plaintiff while he was in the visiting area. *Id.* Plaintiff states that he was never given a misbehavior report for this restraint order, violating his due process rights. (Am. Compl. ¶ 117; Pl.'s Dep. at 70). He also claims that the restraints were "too tight" and that prison officials were "trying to torture" him. (Pl.'s Dep. at 68). The leg irons also aggravate problems with his feet. *Id.* at 68–69. The restraint order was lifted on June 20, 2010. (Dkt. No. 109–12, Racette Decl. ¶ 18).

### II. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where there exists no genuine issues of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which

2011 WL 4369116

support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d at 790. "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Personal Involvement*

#### A. Legal Standards

In order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") The Second Circuit has detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* at 323. Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.* Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.

*Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323–24; *see also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*6** The "mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 WL 681323, at \*10 (N.D.N.Y. Feb.22, 2010) (Hood, J.) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 WL 4527601, at \*7 (N.D.N.Y. Sept.30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement."). Moreover, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see also Wright v. Genovese,* 694 F.Supp.2d 137, 161 (N.D.N.Y.2010) (Kahn, J.) (adopting magistrate judge's finding that an inmate's letter of complaint to a supervisor was insufficient to establish personal involvement by the supervisor because the supervisor referred the matter to a subordinate for decision and did not personally make any decisions regarding the inmate); *Vega v. Artus,* 610 F.Supp.2d 185, 199 n. 13 (N.D.N.Y.2009) (Suddaby, J.) ("Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint."). However, personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.' " *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at \*7–9 (S.D.N.Y. Apr.23, 2002) (Schendlin, J.) (internal citations omitted); *see also Rashid v. Hussain,* No. 95–Civ. 676, 1997 WL 642549, at \*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).

#### B. Analysis

##### 1. *Defendant Fischer*

Defendant Brian Fischer began serving as DOCS Commissioner on March 12, 2007. (Dkt. No. 109–7,

Fischer Decl. ¶¶ 1, 3). He served as Acting Commissioner from January 1, 2007, to March 12, 2007. *Id.* ¶ 2. Plaintiff wrote a letter to Defendant Fischer on April 22, 2008, complaining about the deprivation of the medical boots. (Dkt. No. 109–7, Fischer Exh. A; Dkt. No. 115–3, Pl.'s Exh. 10). On November 10, 2009, Plaintiff wrote another letter to Defendant Fischer which "mention[ed] the crippling and painful effect of his back condition." (Supplemental Compl. ¶ 149; Dkt. No. 109–7, Fischer Exh. C). Defendant Fischer did not respond to these letters personally. (Fischer Decl. ¶ 18). Rather, Defendants Lester Wright and Lucien LeClaire responded to these letters on Defendant Fischer's behalf. (Dkt. No. 109–7, Fischer Exhs. C–E; Dkt. No. 115–3, Pl.'s Exh. 10; Supplemental Compl. ¶ 150). Due to the large volume of letters that Defendant Fischer receives from inmates or others on their behalf, Defendant Fischer's secretaries read these letters and forward them to other individuals who may respond on Defendant Fischer's behalf. (Fischer Decl. ¶¶ 11–15).

**\*7** Without more, even construing the facts in the light most favorable to Plaintiff, Plaintiff has failed to allege, let alone establish, any factual basis upon which a jury could reasonably conclude personal involvement by Defendant Fischer. Neither the mere receipt of a complaint nor the delegation to a subordinate to respond to the complaint are sufficient to establish personal involvement.

Accordingly, I recommend that Defendant Fischer be granted summary judgment.

### 2. *Defendant LaValley*
Plaintiff alleges that Defendant Thomas LaValley, who was Clinton's First Deputy Superintendent during the time of the events giving rise to this action, directed a formal complaint to another person for review. (Am.Compl.¶ 28). This allegation alone would be insufficient to subject Defendant LaValley to personal liability. The record, however, reveals several instances where Defendant LaValley responded to Plaintiff's formal complaints by explaining and defending the alleged constitutional deprivations. (Dkt. No. 109–5, Artus Exhs. A–C). These responses may be sufficient to subject Defendant LaValley to personal liability if the deprivations violated the Constitution. [8]

Accordingly, Defendant LaValley should not be granted summary judgment on this basis.

### 3. *Defendant Bezio*
Defendant Jeffrey Bezio, a sergeant at Clinton, argues that he was not personally involved in any constitutional violation because the denial of the medical boots did not violate the Constitution. (Defs.' Mem. of Law at 27). The standard, however, requires that the plaintiff allege personal involvement in the *"alleged* constitutional deprivations." *See Wright v. Smith,* 21 F.3d at 501 (emphasis added). Defendant Bezio is accused of denying Plaintiff the use of medical boots in violation of the Eighth and Fourteenth Amendments. (Am.Compl.¶ 25). Defendant Bezio, citing policy, admits to denying Plaintiff access to medical boots on at least one occasion. (Dkt. No. 109–6, Bezio Decl. ¶ 9). Thus, Plaintiff has sufficiently alleged Defendant Bezio's personal involvement in an *alleged* constitutional violation. [9]

Accordingly, Defendant Bezio should not be granted summary judgment on this basis.

### 4. *Defendant Artus*
Defendant Dale Artus was the Superintendent of Clinton during the time of the events giving rise to this action. (Dkt. No. 109–5, Artus Decl. ¶ 4). The record reveals a number of letters and grievances from Plaintiff to Defendant Artus, in which Plaintiff complained of the lack of medical treatment and other prison conditions. (*See generally* Artus Decl.). Plaintiff also claims that he complained to Defendant Artus personally when Defendant Artus "walked on the rounds." (Pl.'s Dep. at 95). Defendant Artus states that all complaints from Plaintiff were delegated to Defendant Artus's subordinates for review and action. (Artus Decl. ¶¶ 11, 13, 16, 18, 20, 28, 36, 38). Plaintiff concedes that Defendant Artus referred most, if not all, of these matters to subordinates. (Am. Compl. ¶¶ 28, 32; Supplemental Compl. ¶ 152).

**\*8** Other than to inform Plaintiff that his complaints were referred to subordinates for review, the record fails to reveal any responses from Defendant Artus that could subject him to personal liability. [10] (Dkt. No. 109–5, Artus Exhs. D, H, I; Dkt. No. 115–7, Pl.'s Exh. 32). Defendant Artus did not respond to any of the grievance

appeals directly. (Dkt. No. 109–5, Artus Exhs. A, B, C; Dkt. No. 115–3, Pl.'s Exhs. 7, 9; Dkt. No. 115–4, Pl.'s Exh. 15; Dkt. No. 1155, Pl.'s Exh. 19; Dkt. No. 115–6, Pl.'s Exhs. 26–27; Dkt. No. 112–7, Pl.'s Exhs. 28, 38). Plaintiff argues that Defendant Artus responded to Grievance # CL–56794–08; but that response bears the signature of Defendant Thomas LaValley, who was then Clinton's First Deputy Superintendent. (Dkt. No. 109–5, Artus Exh. A.; Dkt. No. 109–10, LaValley Decl. ¶ 4). Thus, the record fails to show any personal involvement by Defendant Artus.

Accordingly, Defendant Artus should be granted summary judgment on this basis. [11]

## IV. *Eighth Amendment*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102. In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Id.* at 832 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. at 834.

### A. Medical Indifference

#### 1. *Legal Standards*

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle*

*v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.*

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d at 279–80). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the "challenged *delay* or *interruption,* rather than the prisoner's *underlying medical condition* alone." *Id.* at 185 (emphasis in original). The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*9** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. at 847. A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 141 F.Supp.2d

303, 311 (S.D.N.Y.2011) (McMahon, J.). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Even if the medical judgments of prison staff amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Kellam v. Hunt,* No. 9:04–CV–1225 (LEK/ GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept.20, 2007) (Kahn, J.). Moreover, "the fact that a course of treatment is unsuccessful does not ... establish medical malpractice.... *A fortiori,* it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice." *Ramos v. Artuz,* No. 00 Civ. 149, 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (Swain, J.). Finally, penological interests may also inform the decision on the type of care a prisoner receives. *See Estelle v. Gamble,* 429 U.S. at 103.

2. *Analysis*

Plaintiff alleges that he was denied adequate medical treatment for his foot and back pain, and digestive, vision, and dental problems. (*See generally* Am. Compl.; Supplemental Compl.). Even assuming that these conditions were sufficiently serious, a review of the record shows that Defendants did not act with deliberate indifference in responding to these medical needs. Rather, the record shows a number of disagreements between Plaintiff's wishes and the medical care Defendants' provided, which is insufficient to make a constitutional claim of deliberate indifference.

Moreover, in refusing to prescribe stronger back pain medication, Defendant Lashway was entitled to her own medical judgment that Plaintiff showed drug-seeking behavior. *See Wright v. Genovese,* 694 F.Supp.2d at 160 ("concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgment about what drug to prescribe").

Additionally, Clinton's security staff had legitimate penological interests for refusing Plaintiff's request to keep his medical boots in his cell. They determined that doing so "present[ed] an unacceptable security threat to the safety of staff and other inmates." (Racette Decl. ¶ 34). Defendant Racette states that a boot that contains plastic instead of metal may still pose a threat because the "hard plastic" that is used to make the boots' support structures "could easily [be] fashion[ed] [into] a

stabbing instrument," and that a plastic weapon poses a greater threat because metal detectors will not be able to detect it. *Id.* ¶¶ 37, 39–40. The record also shows that Plaintiff had been placed in restraints in March and April 2008 because he had "assaulted [and] seriously injured several [Clinton] staff members using weapons (shanks)" and "on numerous occasions [Plaintiff] made threats to staff." (Dkt. No. 115–7, Pl.'s Exh. 34). Therefore, depriving Plaintiff of his medical boots at all times served the legitimate penological purpose of protecting prison staff and other inmates.

**\*10** Plaintiff has also failed to show that Defendants acted with deliberate indifference to his vision problems. Citing an eye examination record, Plaintiff claims that he was diagnosed by an optometrist of having light sensitivity in May 2008. (Defs.' 7.1 Statement ¶ 69). That record, however, notes that Plaintiff had complained of light sensitivity, not that he was diagnosed with it. (Pl.'s Medical R. I at 76). Moreover, a subsequent eye examination in July 2008 makes no reference to light sensitivity at all. (Pl.'s Medical R. at 78). Plaintiff was told once again in December 2009 that the optometrist did not prescribe tinted glasses because the optometrist concluded that tinted glasses were not indicated despite Plaintiff's complaints. (Pl.'s Medical R. at 70). Notably, although Plaintiff has not received the tinted glasses that he desires, Plaintiff "repeatedly" been "issued eyeglasses to correct his vision." (Pl.'s 7.1 Statement ¶ 71).

Further, Plaintiff's claim that the failure to place him on the Kosher Diet resulted in "[s]evere internal hemorrhoids" in March 2009 is speculative. (Pl.'s Mem. of Law at 14). He offers no support for that proposition. At worst, any link between the denial of the Kosher Diet and the diagnosis of severe hemorrhoids might show medical malpractice, but not deliberate indifference. After reviewing the record, the Court concludes that Defendants were not deliberately indifferent to Plaintiff's gastrointestinal and hemorrhoid problems. Defendants provided a hemorrhoid ointment, fiber supplements, and a high fiber diet. (Pl.'s Medical R. I at 162, 167, 173, 179; Pl.'s Medical R. II at 188; Pl.'s Medical R. III at 2, 49, 52). Plaintiff has admitted that the Metamucil has been "pretty effective" in alleviating his constipation and that the ointment has helped "[c]onsiderably" with his hemorrhoids. (Pl.'s Dep. at 50). While Plaintiff later refused the Controlled A Diet, claiming that it did not work (Pl.'s Medical R. III at 13), the Constitution does

not require that Plaintiff receive the care of his choice. Rather, the Constitution requires only that an inmate receive adequate medical care.

In addition, Plaintiff cannot show the personal involvement of any Defendant in treating (or in failing to treat) his dental problems. Defendants submit—and Plaintiff admits—that "[d]ental professionals [at Clinton] receive professional supervision from the director of their discipline." (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77). When "an inmate complains about dental issues to medical staff, medical staff must refer such complaints to the dental department." (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77). Plaintiff admits—and the record shows—that Clinton's medical staff have referred his concerns to the dental department. (Pl.'s 7.1 Statement ¶ 80; *see also* Pl.'s Medical R. I at 12, 13, 135, 141, 147; Pl.'s Medical R. II at 106–07; Pl.'s Medical R. III at 47). As such, Defendants responded appropriately to Plaintiff's dental conditions, and Plaintiff cannot show the personal involvement of any Defendants in the alleged constitutional deprivations.

 **\*11** Finally, there is no indication that the five-month delay in providing a colonoscopy was the result of Defendants' deliberate indifference to Plaintiff's serious medical needs. A genetic disposition to colon cancer is insufficient to constitute a serious medical condition because it is not a condition of urgency that may result in degeneration of the condition or extreme pain. Moreover, the delay did not expose Plaintiff to a greater risk of colon cancer. In fact, the colonoscopy did not reveal any cancer at all. *Id.*

Accordingly, Defendants should be granted summary judgment as to Plaintiff's medical indifference claims.

### B. Restraints

#### 1. *Legal Standards*
Pursuant to DOCS Directive 4933 § 305.4(a), "[a]ny inmate assigned to an [S.H.U.] who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the deputy superintendent for security or, in his/her absence, the [officer of the day] or higher ranking authority." Prison officials have wide latitude to place restraints on inmates and only violate the Eighth Amendment

if the imposed restraint is "totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain." *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998) (citations omitted).

#### 2. *Analysis*
In this case, the imposition of the restraint orders did not violate Plaintiff's rights under the Due Process Clause. Defendants intercepted a letter, dated December 4, 2008, that Plaintiff wrote to his brother where Plaintiff threatened to "kill one of these bitches in this box down with the police" and that the "only time [Plaintiff] can get at one of these bitches is on the visit because we out of restraints, so if you decide to ever come visit again be ready to get it on, I fight we all fight that's how we go." (Dkt. No. 109–12, Racette Exh. B). Later, in June 2009, the Deputy Superintendent of Elmira Correctional Facility also intercepted a letter where Plaintiff threatened to kill another inmate who was in a rival gang. (Dkt. No. 109–12, Racette Exh. C).

Defendants interpreted these letters as a threat to other inmates in Clinton's S.H.U. (Dkt. No. 109–12, Racette Decl. ¶¶ 7, 16–17). Plaintiff has been assigned to S.H.U. throughout his entire incarceration at Clinton. (Defs.' 7.1 Statement ¶ 8; Pl.'s 7.1 Statement ¶ 8). The initial restraint order on December 10, 2008, was placed on Plaintiff because he had "made threatening statements regarding fighting in the S.H.U. visiting room with other S.H.U. inmates." (Dkt. No. 109–12, Racette Exh. D). Each subsequent restraint order was issued for the same reason." *Id.*

Plaintiff contends he was not a threat to security. (Dkt. No. 115–1, Pl.'s Mem. of Law at 20–25). He argues that the first letter was a ploy that he had learned from a psychology book to create an urgent situation so that his brother would visit. *Id.* at 19–20. Plaintiff also claims that the second letter should not be admitted as evidence because he does not remember writing it, that it is undated, and that a deputy superintendent would not be in the position to intercept letters as a deputy superintendent would not work in the mail room. *Id.* at 24.[12] Even if Plaintiff's claims are true, he has not raised any issue of material fact that would permit a reasonable juror to conclude that Defendants acted "totally without penological justification," that the

restraints were "grossly disproportionate," or that they "involve[d] the unnecessary and wanton infliction of pain." While Plaintiff believes that he does not present a threat to other inmates in S.H.U ., Defendants were authorized to impose the restraint orders under DOCS regulations, and they did so for a legitimate, penological purpose (i.e. ensuring the safety of other persons) after intercepting correspondence that they interpreted as Plaintiff's threats to other inmates. Plaintiff was not required to wear restraints when he was in recreation or in his cell. (Pl.'s Dep. at 66; Dkt. No. 109–12, Racette Exh. D). The restraint orders were lifted in June 2010 after the inmate that Plaintiff had threatened to harm was transferred to another facility. (Racette Decl. ¶ 18; Pl.'s 7.1 Statement ¶ 95). Thus, there is no indication that the restraints were grossly disproportionate to the perceived threat.

**\*12** Accordingly, Defendants should be granted summary judgment on this basis.

### C. Ice in the Recreation Areas

#### 1. *Legal Standards*
In order to state a valid conditions-of-confinement claim under the Eighth Amendment, a plaintiff must allege that: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

To satisfy the objective element, the plaintiff must demonstrate that the conditions under which he or she was confined resulted in "in unquestioned and serious deprivations of basic human needs." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (citing *Rhodes v. Chapman,* 452 U.S. at 347). The Eighth Amendment is implicated for example, "when inmates are denied 'essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased." *Morgan v. Ward,* 699 F.Supp. 1025, 1054 (N.D.N.Y.1988). Conditions of confinement are not cruel and unusual for Eighth Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin,* 757 F.2d at 35. Rather, many unpleasant aspects of prison life "are part of the penalty that criminal

offenders pay for their offenses against society." *Id.* (citation omitted).

Satisfying the subjective element requires that the prisoner show that defendants acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. at 302–03. A prison official acts with deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. at 137.

In this Circuit, proof that an inmate was subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); *see also Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988) (holding that summary judgment for defendants was precluded where prisoner was subjected to bitter cold in cell for three months); *Wright v. McMann,* 37 F.2d 519, 526 (2d Cir.1967) (vacating a dismissal on the pleadings where the complaint alleged that prisoner was deliberately exposed to bitter cold for periods of twenty-one days or more while in solitary confinement).

But where an inmate has not been subjected to "bitter cold" for a "prolonged period," the Second Circuit has held that summary judgment for prison officials is appropriate. *See Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003). In *Trammell,* the inmate was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure. *Id.* at 159. The Second Circuit found that defendants were entitled to summary judgment because the inmate had failed to allege that his cell was open to the elements, lacked adequate heat, or that he had been subjected to "bitter cold." *Id.* at 165.

#### 2. *Analysis*
**\*13** Here, Plaintiff argues that the recreation area was covered in ice, making it difficult for him to exercise because the cold would aggravate the pain in his feet. (Am. Compl. ¶ 33; Pl.'s Dep. at 55–57). Even if Plaintiff's allegations were true, he has failed to satisfy both the objective and subjective prongs of a conditions of

Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 87 of 90

confinement claim. Plaintiff was not exposed to "bitter cold" for a "prolonged period." He refrained from going to the recreation cages and there is nothing in the record to indicate that Defendants forced Plaintiff to be exposed to the cold. (Pl.'s Dep. at 57). Moreover, Plaintiff's admission that Defendants provided galoshes to insulate his feet belie any claim that Defendants acted with deliberate indifference to expose Plaintiff to inhumane conditions. *Id.* at 55–56. Finally, as discussed more fully above, Defendants did not provide Plaintiff with his medical boots when he went to recreation because they were not medically necessary and they posed a potential threat to others. [13]

Accordingly, Defendants should be granted summary judgment on this basis.

## V. *Equal Protection Claims*

### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as race or religion. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, the plaintiff must establish that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

Strict scrutiny is used when "the classification drawn 'impermissibly ... operates to the peculiar disadvantage of a suspect class.' " *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs,* 962 F.2d 136, 141 (2d Cir.1992) (citing *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (footnotes omitted)). Suspect classes are those based on "race, alienage, or national origin, or those which discriminated against a group saddled ... [with] political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* Classifications based on religion are also "inherent[ly] suspect." *Robles v. Dennison,* 745 F.Supp.2d 244, 301 (W.D.N.Y.2010) (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). To survive strict scrutiny, the "State must demonstrate a

compelling governmental interest and show that the law is the least restrictive means of furthering its interest." *City of Boerne v. Flores,* 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

**\*14** Alternatively, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has been irrationally singled out as a "class of one." *Enquist v. Or. Dep't of Agric. .,* 553 U.S. 591, 601, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (internal quotations omitted). The Equal Protection Clause "secure[s] every person .... against intentional and arbitrary discrimination" by state officials. *Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (*per curiam* )). Thus, in a "class of one" claim, the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.* (citing *Willowbrook v. Olech,* 528 U.S. at 564.

### B. Analysis

Plaintiff claims that the denial of adequate medical care for his feet and gastrointestinal problems, "constitute[ ] unequal protection of the law." (Am.Compl.¶ 133). [14] Plaintiff, who is black, is not permitted to wear medical boots while in the S .H.U. at Clinton. (Pl.'s Mem. of Law at 18). He argues that William Blake, a white inmate who also suffers from plantar fasciitis, was permitted to wear medical boots while in the S.H.U. at Great Meadow (Pl.'s Mem. of Law at 18; Dkt. No. 115–2 at 15, Blake Aff. ¶¶ 5–7). Plaintiff also appears to assert a "class of one" claim with regard to his gastrointestinal problems. He argues that a Muslim inmate, Dennis Nelson, received the Kosher Diet while incarcerated at Green Haven Correctional Facility ("Green Haven"). (Pl.'s Mem. of Law at 18; Nelson Aff. ¶ 4). But Plaintiff, who is also Muslim, was denied the Kosher Diet while incarcerated at Clinton. (Pl.'s Mem. of Law at 18).

Without more, Plaintiff has not shown that any *Clinton* officials treated him differently because of his membership in a suspect class or that *Clinton* officials intentionally or arbitrarily discriminated against him. [15] Personnel at Clinton would have no control over or responsibility for the medical care of inmates at other facilities; so a comparison of how isolated inmates at other institutions were treated does not support an equal protection claim against any Clinton official. Moreover, Plaintiff has

Walker v. Fischer, Not Reported in F.Supp.2d (2011)
Case 9:17-cv-00916-GLS-TWD    Document 19    Filed 07/26/18    Page 88 of 90
2011 WL 4369116

neither shown nor alleged the personal involvement of Defendants Fischer and Wright, who are both DOCS officials, in any alleged violation of the Equal Protection Clause.

Accordingly, I recommend granting Defendants' motion for summary judgment as to Plaintiff's equal protection claims.

## VI. *Due Process Violations*

### A. Legal Standards

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

 **\*15** An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Second Circuit has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citations omitted).

### B. Analysis

Here, the restraint orders required Plaintiff to be in restraints whenever he left his cell, except when he would go to recreation. (Pl.'s Dep. at 69–70; Dkt. No. 109–

12, Racette Exh. D). Plaintiff argues that the restraint orders violated his due process rights because he did not receive a misbehavior report prior to being issued the restraint orders. (Am. Compl. ¶ 117; Pl.'s Dep. at 70). The Court concludes that Plaintiff does not have a liberty interest in being free from restraints while out of his cell. Placing a prison inmate in restraints does not impose the "atypical and significant hardship" envisioned in *Sandin. See, e.g., Brown v. Coughlin,* No. 93–CV– 0633E(H), 1995 WL 643349, at \*3(W.D.N.Y. Oct.13, 1995) (Elfvin, J.) (concluding that an S.H.U. inmate "does not have a liberty interest in being unencumbered by mechanical restraints during his exercise period"). As such, Plaintiff's due process claim fails as a matter of law as he had no liberty interest that would trigger due process protections. [16]

Accordingly, I recommend granting Defendants summary judgment on this basis.

## VII. *Conclusion*
WHEREFORE, based on the findings above, it is

**RECOMMENDED,** that Defendants' motion for summary judgment (Dkt. No. 109) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4369116

### Footnotes

1    On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

2    All references to page numbers will be to the page numbers assigned by the court's electronic docketing system.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4369116

3    Neither the Amended Complaint nor the Supplemental Complaint explicitly state an Eighth Amendment conditions of confinement cause of action. Defendants, however, have construed a conditions of confinement claim. (Dkt. No. 109–2, Defs.' Mem. of Law at 20–21). Accordingly, the Court will also analyze whether Defendants are entitled to summary judgment on a conditions of confinement claim. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (holding that were a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and interpret them to raise the strongest arguments that they suggest.").

4    Plaintiff describes this exercise as "having your hands touching your toes." (Pl.'s Supplemental Compl. ¶ 142).

5    Dr. Amatucci is not a party to this action.

6    Plaintiff has admitted to paragraphs 69, 71, 73, and 76, of Defendant Lashway's Declaration. (*See* Pl.'s 7.1 Statement ¶¶ 53, 55, 58, 61).

7    Rabbi Friedman is not a party to this action.

8    Whether the deprivations violated the Constitution is discussed below. *See infra* Point IV(A).

9    Whether the deprivation of the medical boots violated the Constitution is discussed below. *See infra* Point IV(A).

10    Also contained in the record are memoranda from Defendant Artus to Plaintiff modifying Plaintiff's keeplock and S.H.U. confinement times. (Dkt. No. 115–6, Pl.'s Exh. 21). Those matters are not at issue in the pending action.

11    Plaintiff also argues that Defendants Fischer, LaValley, and Artus were personally involved by claiming that they used DOCS Directive 4933 to deny the medical boots. (Dkt. No. 115–1, Pl.'s Mem. of Law at 26). Plaintiff relies on their responses to interrogatories where they admit that the directive does not address every item that is prohibited in S.H.U. (*Id.;* Dkt. No. 115–4, Pl .'s Exh. 12; Dkt. No. 115–7, Pl.'s Exhs. 32, 33). It appears that Plaintiff is attempting to assert that those Defendants created or allowed a policy or custom under which unconstitutional practices occurred. Even after reading Plaintiff's papers liberally, however, there is no indication that the directive contributed to unconstitutional practices, especially when both Defendants Fischer and LaValley stated that exceptions to prohibited items may be allowed for medical reasons. (Dkt. No. 115–4, Pl.'s Exh. 12; Dkt. No. 115–7, Pl.'s Exh. 33).

12    It should be noted that the second letter bears the same salutation and signature as the first letter, which Plaintiff acknowledges writing. (Dkt. No. 109–12, Racette Exhs. B–C).

13    While deprivation of recreation privileges may state a constitutional claim, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), Plaintiff was not deprived of recreation privileges. Rather, by his own admission, he chose to refrain from recreation because he was not provided with medical boots, which he feels would have kept his feet warm. Defendants, however, provided galoshes so that Plaintiff's feet would be insulated from the cold. Still, Plaintiff continued to refrain from recreation. Thus, any deprivation, would have been the result of a choice made by the Plaintiff, which is insufficient for an Eighth Amendment claim based on conditions of confinement. *See Willard v. Ramsey,* No. 07–CV–1156, 2010 WL 786296, at *3 n. 10 (N.D.N.Y. Mar. 2, 2010) (Mordue, C.J.) (holding meritless a prisoner's claim that his Eighth Amendment rights were violated by his conditions of confinement because the prisoner refused, after being offered, participation in recreation).

14    The Amended and Supplemental Complaints make conclusory allegations that the deprivation of adequate medical care for his visual, dental, and back problems, and that the issuance of the restraint order without due process of law, "constitute[ ] unequal protection of the law." (Am. Compl. ¶ 133; Suppl. Compl. ¶ 162). In responding to the summary judgment motion, however, Plaintiff has neither alleged nor offered any allegations or facts to suggest that the treatment for his visual, dental, and back problems violated the Equal Protection Clause. He has neither alleged nor shown that others similarly situated receive different care, or that prison officials acted irrationally when treating those problems. This court concludes that any equal protection claim with respect to these medical care issues is mis-pled and essentially duplicates plaintiff's claim that the defendants were deliberately indifferent to his medical needs. *See, e.g. Hardy v. Diaz,* 9:08–CV–1352 (GLS/ATB), 2010 WL 1633379, at *8 (N.D.N.Y. Mar. 30, 2010) (vague and duplicative equal protection claim based on delays in treatment for Hepatis C virus treated as part of Eighth Amendment deliberate indifference claim) (Report–Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr.21, 2010); *Toney v. Goord,* 04–CV–1174 (TJM/ RFT), 2006 WL 2496859 at *10–11 (N.D.N.Y. Aug. 28, 2006). Finally, the alleged equal protection violation arising from the issuance of the restraint order should be analyzed under the Due Process Clause of the Fourteenth Amendment. *See infra* Point VI.

15    Plaintiff claims that Rabbi Friedman denied the request for the Kosher Diet because Plaintiff is Muslim. (Defs.' Mem. of Law at 16; *see also* Dkt. No. 115–7, Pl.'s Exh. 30). Rabbi Friedman, however, is not a defendant in this action.

16    Plaintiff argues that the restraints also violated DOCS Directive 4933 § 305.4(e). (Pl.'s Mem. of Law at 24). DOCS Directive 4933 § 305.4(e) (viii) states: "If an inmate is under a restraint order directing that he/she be mechanically restrained *whenever* (emphasis in original) he/she leaves the S.H.U. cell for any reason, the inmate will remain mechanically

2011 WL 4369116

restrained during the entire period of time he/she is out of the SHU cell, except .... when in a general population visiting room and not in a noncontact area." Section 3054(e)(vii) was not violated because Plaintiff was placed in restraints while in the S.H.U. visiting room, not the general population visiting room. (*See* Racette Exh. D; *see also* Dkt. No. 115–6, Pl.'s Exh. 20 (letter from Plaintiff and affidavit of Plaintiff's fiancée noting that the visits occurred in the S.H.U. visiting room)).

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.